Nelson L. Atkins (SBN 036752)
nelson_atkins@gshllp.com
Kenneth M. Jones (SBN 140358)
kenneth_jones@gshllp.com
GONZALEZ SAGGIO & HARLAN LLP
3699 Wilshire Boulevard, Suite 890
Los Angeles, California 90010
Telephone: (213) 487-1400
Facsimile: (213) 487-1404

Steven A. Zalesin (admitted *pro hac vice*)
sazalesin@pbwt.com
Derek A. Williams (admitted *pro hac vice*)
dwilliams@pbwt.com
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222

Attorneys for Defendant
THE COCA-COLA COMPANY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POM WONDERFUL LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE COCA-COLA COMPANY, a Delaware corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.   CV-08-06237 SJO (FMOx)<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:   Honorable S. James Otero<br>Date:    January 25, 2010<br>Time:    10:00 a.m.<br>Room:    880 |

1   **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2   **PLEASE TAKE NOTICE THAT** on January 25, 2010, at 10:00 a.m. or as

3   soon thereafter as counsel may be heard, in the courtroom of the Honorable S.

4   James Otero, in the United States District Court, 312 North Spring Street, 16th

5   Floor, Los Angeles, California, 90012, defendant The Coca-Cola Company

6   ("TCCC") will and hereby does move this Court for summary judgment on all

7   claims pled in the First Amended Complaint.

8   TCCC brings this motion pursuant to Federal Rule of Civil Procedure 56 and

9   on the following grounds, which are discussed more fully in the attached

10  Memorandum of Points and Authorities:  (1) Plaintiff's Lanham Act claims relating

11  to the product's naming and labeling are precluded as per this Court's Order of

12  February 10, 2009 ("First Order"); (2) Plaintiff's state law claims relating to the

13  product's naming and labeling are expressly preempted as per this Court's First

14  Order; (3) Plaintiff's Lanham Act and state law claims regarding the incidental use

15  of its product name and label in TCCC's advertising and marketing campaigns must

16  be dismissed because the mere display of a product label which does not itself give

17  rise to a Lanham Act claim cannot subject a manufacturer to a claim of false

18  advertising; (4) Plaintiff's Lanham Act claims regarding TCCC's advertising

19  beyond the name and label must be dismissed because Pom has presented no

20  evidence that TCCC has advertised or marketed the Juice in a misleading manner

21  on its website or in other advertising avenues; and (5) Plaintiff does not have

22  standing to maintain its state law claims because it cannot allege any loss that

23  would entitle it to restitution.

24  This motion is based on this Notice of Motion, the Memorandum of Points

25  and Authorities attached hereto, the declarations and exhibits submitted herewith,

26  any reply papers submitted in support of this motion, oral argument of counsel, the

27  complete files and records in this matter, and such additional matters as the Court

28  may consider.

1     This motion is made following the conference of counsel pursuant to Local

2   Rule 7-3, which took place on December 15, 2009.

3

4   Dated:  December 28, 2009

5                                          PATTERSON BELKNAP WEBB & TYLER LLP

6

7                                          By:    _/s/ Steven A. Zalesin_____

8                                                 Steven A. Zalesin
                                                  Sarah E. Zgliniec
9                                                 Vivian Storm
                                                  YiLing Chen-Josephson
10                                          1133 Avenue of the Americas
11                                          New York, New York 10036

12
                                           Attorneys for Defendant
13                                          THE COCA-COLA COMPANY

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. v

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF FACTS ............................................................... 2

    A.    Factual Background ........................................................ 2

    B.    Legislative and Regulatory Framework.............................4

    C.    Pom's Complaint ...........................................................8

SUMMARY JUDGMENT STANDARD ............................................ 9

ARGUMENT ................................................................................ 9

I.    THE COURT HAS ALREADY DISMISSED POM'S CLAIMS BASED ON THE PRODUCT NAME AND LABEL ................9

    A.    Pom's Lanham Act Claims Concerning the Juice's Name and Label Have Been Dismissed .............................9

    B.    Pom's State Law Claims Based on Standards Not Identical to FDA Regulations Have Been Dismissed.........................11

II.    SUMMARY JUDGMENT IS APPROPRIATE AS TO TCCC'S OTHER ADVERTISING ...........................................13

    A.    Pom Cannot Challenge Incidental Use of the Juice's Name and Label.................................................13

    B.    Pom Has Adduced No Evidence To Show that TCCC's Other Advertising or Marketing Is False or Misleading ..............14

III.    POM'S UCL AND FAL CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING ..............................................17

CONCLUSION ........................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*American Home Prods. Corp. v. Johnson & Johnson,*
672 F. Supp. 135 (S.D.N.Y. 1987) ...................................................11

*Andrus v. AgrEvo USA Co.,*
178 F.3d 395 (5th Cir. 1999)..........................................................14

*Brockington v. J.P. Morgan Chase Bank, N.A.,*
No. C-08-05795, 2009 WL 1916690 (N.D. Cal. July 1, 2009) ........................18

*Cytyc Corp. v. Neuromedical Systems, Inc.,*
12 F. Supp. 2d 296 (S.D.N.Y. 1998) .................................................11

*Lindy Pen Co., Inc. v. Bic Pen Corp.,*
725 F.2d 1240 (9th Cir. 1984) .......................................................16

*Lockwood v. Conagra Foods, Inc.,*
597 F. Supp. 2d 1028 (N.D. Cal. 2009) ............................................12

*Mutual Pharm. Co. v. Ivax Pharm.,*
459 F. Supp. 2d 925 (C.D. Cal. 2006) ..............................................14

*Playboy Enters., Inc. v. Terri Welles, Inc.,*
78 F. Supp. 2d 1066 (S.D. Cal. 1999)...............................................16

*Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.,*
642 F. Supp. 2d 1112 (C.D. Cal. 2009) ........................................10, 12

*Pom Wonderful LLC v. Tropicana Prods., Inc.,*
No. CV 09-566 (DSF) (CTx) (C.D. Cal. Oct. 21, 2009) ......................17, 18, 20

*Pom Wonderful LLC v. Welch Foods, Inc.,*
No. CV 09-567 (AHM)(AGRx) (C.D. Cal June 23, 2009) .............................10

*Pom Wonderful LLC v. Welch Foods, Inc.,*
No. CV 09-567 (AHM)(AGRx) (C.D. Cal. Dec. 21, 2009) ...........17, 18, 19, 20

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.,*

    902 F.2d 222 (3d Cir. 1990) ............................................................................16

*Southland Sod Farms v. Stover Seed Co.,*

    108 F.3d 1134 (9th Cir. 1997) ........................................................................16

*Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates,*

    583 F.3d 716 (9th Cir. 2009) ...........................................................................9

*Walker v. Geico Gen. Ins. Co.,*

    558 F.3d 1025 (9th Cir. 2009) ...........................................................18, 19, 20

## STATE CASES

*Buckland v. Threshold Enters., Ltd.,*

    155 Cal. App. 4th 798, 66 Cal. Rptr. 3d 543 (2007) .................................18, 19

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*

    20 Cal. 4th 163, 83 Cal. Rptr. 2d 548 (1999) ...................................................13

*Citizens of Humanity LLC v. Costco Wholesale Corp.,*

    171 Cal. App. 4th 1, 89 Cal. Rptr. 3d 455 (2009) .....................................18, 20

*In re Tobacco II Cases,*

    46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (2009)....................................................20

*Kelton v. Stravinski,*

    138 Cal. App. 4th 941, 41 Cal. Rptr. 3d 877 (2006) .......................................18

*Korea Supply Co. v. Lockheed Martin Corp.,*

    29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29 (2003)...........................................18, 19

*Overstock.com v. Gradient Analytics, Inc.,*

    151 Cal. App. 4th 688, 61 Cal. Rptr. 3d 29 (2007) .........................................19

## FEDERAL STATUTES, REGULATIONS AND RULES

21 C.F.R. § 100.1(c)(4) .............................................................................................5

21 C.F.R. § 101.15 ..................................................................................................12

1   21 C.F.R. § 102.22(i)(1) .................................................................. 7, 8, 12

2   21 C.F.R. § 102.33 ..................................................................... 6, 8, 10, 10

3   21 U.S.C. § 341 ..................................................................................... 4

4   15 U.S.C. § 1125(a) .............................................................................. 9

5   21 U.S.C. § 343-1(a) ................................................................... 4, 11, 12

6   21 U.S.C. § 343 ....................................................................... 4, 6, 11, 12

7   21 U.S.C. § 371 ..................................................................................... 4

8   56 Fed. Reg. 30452-01 ........................................................................ 6

9   58 Fed. Reg. 2462-01 .......................................................................... 5

10  58 Fed. Reg. 2897 ..................................................... 6, 7, 8, 10, 12, 13

11  136 Cong. Rec. H5836-01 .................................................................. 5

12  136 Cong. Rec. S16607-02 ................................................................. 5

13  Fed. R. Civ. P. 12(b)(6) .................................................................. 1, 16

14  Fed. R. Civ. P. 56(c) ........................................................................... 9

15

16                  **STATE STATUTES, REGULATIONS AND RULES**

17  Cal. Bus. & Prof. Code §§ 17204, 17535 ......................................... 17

18  Cal. Health & Safety Code § 109875 ............................................... 12

19  Cal. Health & Safety Code § 110660 ............................................... 12

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PRELIMINARY STATEMENT

Almost a year ago, in February 2009, this Court granted defendant The Coca-Cola Company's ("TCCC") motion to dismiss Pom Wonderful, LLC's ("Pom") false advertising and unfair competition claims concerning the name and label of TCCC's "Minute Maid Enhanced Pomegranate Blueberry Flavored Blend of 5 Juices" (the "Juice"). The Court rejected Pom's Lanham Act claim "with regard to the Juice's name and labeling" as "impermissibly challenging the FDA's regulations regarding an acceptable 'common or usual name' and appropriate labeling for a multiple-juice beverage." February 10, 2009 Order Granting in Part, Denying in Part Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("First Order") [Dkt. # 25] at 6. Similarly, the Court held that Pom's state law claims regarding the naming and labeling of the Juice were expressly preempted because they sought a result "not identical to" the requirements of the Federal Food, Drug and Cosmetic Act ("FFDCA" or the "Act") and its implementing regulations. First Order at 10-11.

The only portions of Pom's Lanham Act and state law claims that survived dismissal were "the allegations in the Complaint that extend beyond the 'packaging' and 'name' of the Juice to its 'advertising' and 'marketing' . . . ." First Order at 7 ("Because the Court, in contexts beyond the Juice's formal name and labeling areas for which there are relevant FDA regulations, will not be required to interpret FDA regulations, Pom's Lanham Act claim can proceed to the extent it seeks to redress Coca-Cola's marketing and advertising in such areas."). The Court reaffirmed this holding in its September 15, 2009 Order Denying Defendant's Motion to Dismiss First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("Second Order") [Dkt. # 65], in which it "reassert[ed] its previous position" that Pom's challenge to the Juice's name and label were barred, but allowed Pom to attempt to establish that TCCC "has *otherwise* advertised and marketed its product in a misleading manner . . . ." Second Order at 3 (emphasis added); *see also id.* at 2

1   (noting that "FDA juice-naming and labeling regulations do not bar Pom from

2   alleging that Coca-Cola has advertised or marketed the Juice in a misleading

3   manner *on its website* and in *other advertising avenues*" (emphases added)).

4       Undeterred by this Court's express holdings, Pom has pressed ahead with its

5   original allegations, concentrating its attack entirely on the Juice's name and label –

6   the very claims that have already been dismissed.  Pom's depositions of TCCC's

7   witnesses have focused exclusively on the packaging and label of the product,

8   virtually ignoring TCCC's website and other advertisements.  The only evidence

9   put forth by Pom that purports to establish consumer confusion is a survey of the

10   Juice's *bottle*, which concludes that the words "pomegranate" and "blueberry" in

11   the *name of the Juice* are deceptive.

12       With discovery about to close, Pom can point to no evidence that TCCC's

13   marketing or advertising for the Juice – as distinguished from its name and label –

14   is false or misleading.  There is no genuine issue of fact to be tried.  The Court

15   should award summary judgment to TCCC on Pom's claims in their entirety.

16   <center>**STATEMENT OF FACTS**</center>

17       **A.**    **Factual Background**

18       The facts essential to this motion are not in dispute.  The parties both produce

19   fruit juices and fruit juice drinks.  Pom produces, markets and sells a number of

20   beverages that contain pomegranate juice, including Pom Wonderful brand

21   pomegranate juice and pomegranate blueberry juice blend.  SUF ¶ 1.  TCCC, under

22   its Odwalla and Minute Maid brands, also produces beverages that include

23   pomegranate juice, including a 100% pomegranate juice product and a product with

24   pomegranate juice as the primary ingredient.  SUF ¶ 2.  In addition to the parties

25   here, a number of other companies produce beverages that contain pomegranate

26   juice, including pure pomegranate juice and pomegranate juice blends.  SUF ¶ 48.

27       In September 2007, TCCC launched a new product in its "Minute Maid

28   Enhanced Juice" line called "Pomegranate Blueberry Flavored Blend of 5 Juices."

<center>2</center>

SUF ¶ 3.  This product is specially fortified with Omega-3/DHA and other nutrients.  SUF ¶ 5.  A prominent banner or "flag" on the label proclaims that the Juice contains "Omega-3/DHA" to "HELP NOURISH YOUR BRAIN" and "5 Nutrients To Support Brain & Body."  SUF ¶ 9.  Text directly above the flag identifies the product as a "100% fruit juice blend."  SUF ¶ 10.  Below the flag is a fruit collage or "vignette" that depicts each of the five fruit juices in the product. SUF ¶ 11.  These are, in descending order by volume (as shown in the "Ingredients" panel on the back of the bottle), apple, grape, pomegranate, blueberry and raspberry.  SUF ¶ 12.  Below the vignette the label states the formal name of the Juice:  "Pomegranate Blueberry Flavored Blend of 5 Juices."  SUF ¶ 13.

The brain-nourishment claims in TCCC's advertising for the Juice are based upon the unique combination of added nutrients, including not only Omega-3/DHA but also choline, vitamin B-12, vitamin E, and vitamin C, all of which have been shown to contribute to brain development.  SUF ¶¶ 5, 7.  The "help nourish your brain" claim that forms the centerpiece of the product's advertising and marketing is thus fully substantiated, and indeed has been upheld by an independent advertising review board.  SUF ¶¶ 41-42.  Pom does not contest the scientific accuracy of this claim.

TCCC has advertised the Juice through television and print ads, in-store promotions, and on the Minute Maid website.  These advertisements repeat the name of the product but focus on its added nutrients, not its pomegranate or blueberry contents.  SUF ¶¶ 19- 40.  The website states that the product contains "Omega-3/DHA . . . and four other nutrients to help nourish your brain and body." SUF ¶ 37.  Other ads similarly emphasize that the Juice "tastes great and helps nourish your brain and body."  SUF ¶ 25.

In connection with this litigation, Pom commissioned a survey that purports to assess whether consumers are confused by TCCC's "Pomegranate Blueberry Flavored Blend of 5 Juices."  SUF ¶ 43.  The only stimulus shown to the survey

NOTICE OF MOTION AND MEMO OF LAW IN
SUPPORT OF DEF. MSJ
CASE NO. CV 08-06237 SJO (FMOX)

participants was the bottle and label of the Juice.  SUF ¶ 44.  The survey did not attempt to evaluate the messages conveyed by the Juice's website or any of TCCC's other advertising.  SUF ¶¶ 43-45.

**B.      Legislative and Regulatory Framework**

**1.      The FFDCA and NLEA**

The FFDCA gives FDA authority to promulgate regulations that govern the branding of food to "promote honesty and fair dealing in the interest of consumers." 21 U.S.C. § 341 (authorizing FDA to promulgate regulations fixing a "reasonable definition and standard of identity" for food products); *see also* 21 U.S.C. § 371 (authorizing FDA to promulgate regulations for the efficient enforcement of the FFDCA).  The Act defines misbranded foods to include those with "labeling [that] is false or misleading in any particular," 21 U.S.C. § 343(a), those with labeling on which required statements are "not prominently placed . . . with such conspicuousness . . . and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use," 21 U.S.C. § 343(f), and those with labels that fail to disclose "the common or usual name of the food, if any there be."  21 U.S.C. § 343(i).

In 1990, Congress passed the Nutrition Labeling and Education Act ("NLEA"), which expressly preempted all state labeling standards that differ from those of FDA.  Under the NLEA,

> no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce . . . . any requirement for the labeling of food of the type required by . . . [among others, §§ 343(f), (i)] . . . that is not identical to the requirement of such section.

21 U.S.C. § 343-1(a).  A state requirement is "not identical to" federal requirements if it imposes labeling obligations that "[a]re not imposed by or contained in the applicable provision (including any implementing regulation) . . . or [d]iffer from

1  those specifically imposed by or contained in the applicable provision (including

2  any implementing regulation)."  21 C.F.R. § 100.1(c)(4).

3      The NLEA was enacted to help "make sense of the confusing array of

4  nutrition labels that confront all consumers every time they enter the supermarket."

5  136 Cong. Rec. H5836-01 (July 30, 1990) (statement of Rep. Waxman); *see also id.*

6  (statement of Rep. Madigan) ("Consumers today are confronted with a variety of

7  labels that provide them with disjointed and confusing information").  At the same

8  time, Congress was concerned about lack of uniformity in regulation of food labels

9  across all 50 states.  The statute was thus designed to ensure "disclosure of all valid

10 and relevant information to the consumer, while providing the industry with

11 uniformity of law in a number of important areas that will permit them to conduct

12 their business of food distribution in an efficient and cost-effective manner."  *Id.*

13 (statement of Rep. Madigan); *see also* 136 Cong. Rec. S16607-02 (Oct. 24, 1990)

14 (statement of Sen. Hatch) ("[I]t is wrong to permit each of the 50 States to require

15 manufacturers of 20,000 packaged food items to display different health and diet

16 information on identical products sold throughout this country. And, it is wrong to

17 burden the manufacturer with the fear of potentially 50 different lawsuits from 50

18 different State attorneys general, even if similar cases have been dismissed or

19 settled."); 136 Cong. Rec. H5836-01 (1990) (statement of Rep. Bruce) (noting the

20 high cost "to accommodate any one State with unique food labeling

21 requirements."); State Petition Requesting Exemption from Federal Preemption, 58

22 Fed. Reg. 2462-01 at ¶ 4 (Jan. 6, 1993) ("[O]ne of the goals of the 1990

23 amendments is national uniformity in certain aspects of food labeling, so that the

24 food industry can market its products efficiently in all 50 States in a cost-effective

25 manner.").

26 **2.    FDA's Adoption of Implementing Regulations**

27     On July 2, 1991, in response to the NLEA, FDA published for comment

28 proposed rules pertaining to the naming and labeling of multi-juice beverages.

1   Food Labeling, Declaration of Ingredients, Common or Usual Name for

2   Nonstandardized Foods, Diluted Juice Beverages, 56 Fed. Reg. 30452-01 (July 2,

3   1991).  These rules evolved out of more than 25 years of public debate over how to

4   name multi-juice blends and identify their ingredients.  *Id.* at 30452.  In explaining

5   its proposed rules, FDA stated that it sought, among other things, to address the

6   concern that "consumers should be given enough accurate information to easily

7   ascertain the nature of the juices represented to be present in a multiple-juice

8   beverage.  Many multiple-juice beverages, for example, contain only a small

9   amount of a highly flavored, expensive juice."  *Id.* at 30455.

10          A year and a half later, on January 6, 1993, FDA issued its final rules after

11   considering more than 200 comments from industry, consumer groups and other

12   interested parties.  58 Fed. Reg. 2897 at 2897.  These rules implemented 21 U.S.C.

13   § 343(i) and established the "common or usual name" for "beverages that contain

14   fruit or vegetable juice."  21 C.F.R. § 102.33 (2009).  The regulations expressly

15   permit a manufacturer to include a non-primary ingredient in a product name so

16   long as it also "indicate[s] that the named juice is present as a flavor or flavoring."

17   21 C.F.R. § 102.33(d)(1) (2009).  The regulations also provide that the name of a

18   multiple-juice beverage that does not identify all component juices on the label

19   (other than in the ingredient statement) must include a word such as "blend."  21

20   C.F.R. § 102.33(c) (2009).

21          In the preamble to the final rule, FDA explained that it had given careful

22   consideration to the risks of consumer confusion about the contents of juice blends.

23   *See, e.g.,* 58 Fed. Reg. 2897 at 2918-19.  After receiving and evaluating public

24   comments, FDA determined

25          that ***using the term 'flavor'*** with the name of the characterizing juice ***will***

26          ***inform*** the consumer that the juice is present in an amount sufficient to flavor

27          the beverage ***but will not imply*** that the content of that juice is greater than is

28          actually the case. . . .  Accordingly, FDA is providing in § 102.33(d)(1) that a

6

1   multiple juice beverage may use a product name that specifically shows that
2   the named juice is used as a flavor.

3   *Id.* at 2921, ¶ 50 (emphases added).

4   FDA further explained that, if a named juice is not the predominant juice,
5   [t]he label must either state that the beverage is flavored by the named juice
6   (e.g. ***"raspberry flavored juice drink")*** or declare the content of the named
7   juice in a 5 percent range (e.g., "raspberry juice drink 2 to 7 percent
8   raspberry juice"). ***The agency believes that this approach will adequately***
9   ***deal with the kinds of misleading labeling discussed in the comments from***
10  ***consumer groups.***

11  *Id.* at 2900, ¶ 10 (emphases added).

12  In addition to section 102.33(d)(1) concerning juice blends, FDA adopted a
13  regulation concerning the use of the word "flavored" in all foods, including juices.
14  This regulation, published at 21 C.F.R. § 101.22(i)(1)(i), expressly permits a food
15  to be described as "flavored" with natural flavor derived from a "characterizing"
16  ingredient – even if little or none of the ingredient is actually present in the food:

17  If the food is one that is commonly expected to contain a characterizing food
18  ingredient . . . and the food contains natural flavor derived from such
19  ingredient and an amount of characterizing ingredient insufficient to
20  independently characterize the food, or the food contains no such ingredient,
21  the name of the characterizing flavor . . . shall be immediately followed by
22  the word "flavored" . . . .

23  Finally, the Agency considered whether fruit vignettes on juice labels had the
24  potential to mislead the public.  58 Fed. Reg. 2897, at 2921-22.  FDA concluded
25  that "a vignette that pictures only some of the fruit or vegetables in the beverage
26  would not be misleading where the name of the food adequately and appropriately
27  describes the contribution of the pictured juice."  *Id.* at 2921, ¶ 52.  FDA considered
28  as an example "a 100 percent juice product consisting of apple, grape, and

7

1   raspberry juices, in which the raspberry juice provides the characterizing flavor"

2   and the bottle depicts a vignette containing only raspberries. *Id.* FDA concluded

3   that "the vignette [depicting solely raspberries] would not be misleading if the

4   beverage were named 'raspberry flavored fruit juice blend.'" *Id.* FDA thus

5   explicitly rejected a requirement that vignettes on juice labels proportionately

6   reflect the quantity of each fruit ingredient in the juice. *Id.* ¶ 53.

7       TCCC's "Pomegranate Blueberry Flavored Blend of 5 Juices" complies with

8   all applicable FDA regulations. The product's name includes two identified juices,

9   pomegranate and blueberry. Because these named juices are not the predominant

10   juices by volume, the product name includes the word "flavored" as required by 21

11   C.F.R. § 102.33(d), and as expressly permitted by 21 C.F.R. § 101.22(i)(1)(i) based

12   upon the inclusion of "natural flavors" in the Juice. Further, because there are

13   additional juices in the product, the name also includes the word "blend" as

14   required by 21 C.F.R. § 102.33(c). The vignette on the product label depicts each

15   of the juice ingredients and does not depict any ingredients not present in the juice.

16   58 Fed. Reg. 2897, at 2921, ¶ 52.

17      **C.   Pom's Complaint**

18       Pom brought this action in September 2008, alleging that TCCC has misled

19   consumers about the ingredients in the Juice.[1] Pom later filed a First Amended

20   Complaint ("FAC") [Dkt. # 53] on July 27, 2009. Like the original Complaint, the

21   FAC focused single-mindedly on the Juice's name and label. It alleged that a more

22   apt name for the product would be "apple grape juice," that the words

23   "pomegranate" and "blueberry" should not appear on the front of the label, and that

24   the label should not contain a picture of a pomegranate. FAC ¶ 20; *see also id.* ¶ 23

---

[1] Similar lawsuits against other producers of pomegranate juice-containing products
followed. *See, e.g., Pom Wonderful LLC v. Welch Foods, Inc.,* 2:09-cv-00567
(filed Jan. 23, 2009); *Pom Wonderful LLC v. Tropicana Prods., Inc.,* 2:09-cv-00566
(filed Jan. 23, 2009); *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.,* 2:09-
cv-00565 (filed January 23, 2009).

1  ("By name alone, one would expect that the primary ingredients in Coca-Cola's

2  Pomegranate Blueberry Product are pomegranate and blueberry juice.").  The FAC

3  included a one-sentence reference to Minute Maid's website, and mentioned only in

4  passing the fact that TCCC has advertised the Juice on television and in other

5  media.  It did not allege that these other ads were false or misleading to consumers.

6  *Id.* ¶¶ 21-22.

7      The FAC included causes of action for (1) false advertising under the

8  Lanham Act, 15 U.S.C. § 1125(a); (2) false advertising under the California

9  Business and Professions Code § 17500; and (3) statutory unfair competition under

10  California Business and Professions Code § 17200.  FAC ¶¶ 28-50.

11                    **SUMMARY JUDGMENT STANDARD**

12      Summary judgment is appropriate when the pleadings, discovery, disclosure

13  materials on file, and affidavits demonstrate that there is no genuine dispute as to

14  any material fact and that the moving party is entitled to judgment as a matter of

15  law.  *Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 720

16  (9th Cir. 2009) (citing Fed. R. Civ. P. 56(c)).

17                            **ARGUMENT**

18  **I.   The Court Has Already Dismissed Pom's Claims Based on the Product**

19      **Name and Label**

20      **A.   Pom's Lanham Act Claims Concerning the Juice's Name and**

21          **Label Have Been Dismissed**

22      In the First Order, the Court held that "Pom's Lanham Act claim, with regard

23  to the Juice's name and labeling, may be construed as impermissibly challenging

24  the FDA's regulations regarding an acceptable 'common or usual name' and

25  appropriate labeling for a multiple-juice beverage."  First Order at 6; *see also id.* at

26  5 ("Pom's Lanham Act claim may be construed to challenge FDA regulations").

27  The Court thus granted TCCC's motion to dismiss Pom's Lanham Act claim "to the

28  extent it challenges the Juice's formal name and labeling in areas for which the

FDA has promulgated regulations implementing the FFDCA." *Id.* at 7.[2]

This ruling made perfect sense.  As detailed above, FDA rules expressly permit a juice to be named and labeled with non-primary ingredients so long as words such as "flavored" and "blend" are used, *see* 21 C.F.R. §§ 102.33(c) & (d) (2009), and affirmatively reject any requirement of proportional representation of a product's ingredients in a fruit vignette, 58 Fed. Reg. 2897.  Once FDA has spoken about a labeling issue (as is the case here) and the defendant's label complies with FDA directives, the issue is within FDA's sole purview and cannot be revisited under the Lanham Act.  To hold otherwise would impermissibly allow a private litigant to use the Lanham Act to launch an indirect attack on controlling regulations adopted by FDA pursuant to its statutory authority.  *See* First Order at 4 ("[C]ourts have 'tread[ed] carefully when applying the Lanham Act to the advertising of goods . . . that are also subject to regulation by the [F]FDCA lest it be used as a vehicle to accomplish indirectly something that a party could not accomplish directly.'").[3]

Though not cited by this Court in its earlier decisions, other courts

---

[2] The Court allowed Pom to conduct discovery concerning the name and label of the Juice, reasoning that "at this motion to dismiss stage it is unnecessary to demarcate and identify which (if any) of the allegations of the FAC are within the FDA's sole purview, and which allegations are encompassed by the Lanham Act." Second Order at 3-4.

[3] The decisions reached by Judge Matz and Judge Pregerson, discussed in this Court's Second Order, are not to the contrary.  In *Pom v. Welch Foods*, Judge Matz held that not all claims based on Welch's advertising were encompassed by the FFDCA and that, at the motion to dismiss stage, "it is unnecessary and unhelpful to try to demarcate which (if any) allegations in the complaint are within the FDA's sole purview and which are not."  Minute Order at 6, Civ. No. 09-567 (C.D. Cal. June 23, 2009).  In reaching this conclusion, Judge Matz anticipated that Welch would have an "opportunity to demonstrate on a more complete and fully considered record that Pom cannot prove a Lanham Act violation without impeding the ability of the FDA to interpret and enforce its own regulations." *Id.* at 7. Similarly, Judge Pregerson simply held that "[t]o the degree that Plaintiff's claims may cause actual conflict with federal regulations, the Court declines to limit the scope of Plaintiff's allegations at this stage, without a better developed factual record and construing Plaintiff's complaint in the light most favorable to it." *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F. Supp. 2d 1112, 1120 (C.D. Cal. 2009).

NOTICE OF MOTION AND MEMO OF LAW IN
SUPPORT OF DEF. MSJ
CASE NO. CV 08-06237 SJO (FMOX)

1   confronted with Lanham Act claims such as Pom's have refused to permit the

2   statute to be used to second-guess the considered judgment of FDA.  For instance,

3   in *Cytyc Corp. v. Neuromedical Systems, Inc.*, 12 F. Supp. 2d 296 (S.D.N.Y. 1998),

4   defendant brought a Lanham Act counterclaim in which it alleged that a number of

5   promotional statements made by plaintiff for its FDA-approved cervical cancer

6   detection system were false or misleading.  The court dismissed the bulk of the

7   counterclaim, holding that any "representations . . . that comport substantively with

8   statements approved as accurate by the FDA cannot supply the basis for

9   [defendant's] claims" and "are non-actionable." *Id.* at 301 (noting that even those

10   statements that "do not correspond precisely to statements that the FDA has

11   approved . . . are similar enough to the approved statements . . . to conclude, as a

12   matter of law, that they are neither false nor misleading.") (citing *American Home*

13   *Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 143-44 (S.D.N.Y. 1987)

14   (granting summary judgment dismissing Lanham Act claim predicated on aspirin

15   manufacturer's omission from package of safety warning that, as of relevant time,

16   had been considered but not required by FDA)).

17       In sum, Pom's Lanham Act claims directed at the name and label of the Juice

18   are not justiciable, and were correctly dismissed by this Court.

19      **B.**    **Pom's State Law Claims Based on Standards Not Identical to FDA**

20            **Regulations Have Been Dismissed**

21       Similarly, the Court has already dismissed Pom's state law claims that seek

22   to impose new or different rules governing the name and label of the Juice.  As this

23   Court held, "state law that imposes obligations that are 'not identical to' those

24   imposed in Section 343(f) and 343(i) of the FFDCA, as well as the FDA's

25   implementing regulation for these sections, are expressly preempted."  First Order

26   at 10 (quoting 21 U.S.C. § 343-1(a)).  The Court noted that "Pom, through its state

27   law claims, may attempt to impose requirements differing from [the federal]

28   naming and labeling requirements for multiple-juice beverages in the FFDCA and

NOTICE OF MOTION AND MEMO OF LAW IN
SUPPORT OF DEF. MSJ
CASE NO. CV 08-06237 SJO (FMOX)

1  the FDA's implementing regulations." *Id.*  The Court thus ruled that Pom's claims

2  were "preempted to the extent they seek to impose any obligations that are 'not

3  identical to' the sections of the FFDCA, including the FDA's implementing

4  regulations, as referenced in . . . 21 U.S.C. § 343-1, the only relevant sections of

5  which appear to be Section 343(f) and 343(i)." *Id.* at 11.

6      Granting the relief that Pom seeks would have the impermissible effect of

7  "impos[ing] requirements differing" from those enacted by FDA, in contravention

8  of 21 U.S.C. § 343-1(a).[4]  As this Court has already determined, such state law

9  claims are preempted.

10      Pom's attempt to get around this Court's rulings by asserting claims under

11  California's Sherman Act, Cal. Health & Safety Code § 109875, is unavailing.  It is

12  true that the Sherman Act, which states that "[a]ny food is misbranded if its labeling

13  is false and misleading in any particular," Cal. Health & Safety Code § 110660, is

14  identical to 21 U.S.C. § 343(a), a section that does not expressly preempt state law.

15  However, this general language does not change the fact that ***no*** state law can be

16  used to require, directly or indirectly, changes to the labeling rules set forth in 21

17  C.F.R. §§ 102.22(i)(1), 102.33, 101.15 and at 58 Fed. Reg. 2897 – rules that

18  expressly govern the naming and labeling of multi-juice blends.  In implementing

19  these specific regulations, FDA gave meaning to the general requirements of 21

20  U.S.C. § 343(a).  FDA thoughtfully considered the difficulties of creating clear

21  labels for multi-juice blends, and determined that labels consistent with its

22
23
24
25
26
27
28

---

[4]  *Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028 (N.D. Cal. 2009), the sole case that Judge Matz relied upon in ruling on Welch Foods' motion to dismiss Pom's state law claims, is not to the contrary.  The claims in that case did not relate to any of the sections of the FFDCA that preempt state law.  Similarly, in *Pom v. Ocean Spray* Judge Pregerson acknowledged that Pom "is preempted from extending its claims in a manner that would impose requirements that are different from federal standards under the FFDCA and FDA," and held that claims "unrelated to the FDA regulations" were not preempted.  642 F. Supp. 2d at 1121-22.  Accordingly, *Lockwood* and *Pom v. Ocean Spray* have no bearing on the issue presently before the Court: whether Pom should be permitted to proceed to trial on its state law claims that seek to prevent TCCC from labeling its product in a manner that FDA has explicitly considered and approved.

NOTICE OF MOTION AND MEMO OF LAW IN
SUPPORT OF DEF. MSJ
CASE NO. CV 08-06237 SJO (FMOX)

1  regulations would not mislead consumers.  58 Fed. Reg. 2897, at 2918-22.  Pom

2  cannot usurp FDA's exercise of its authority to issue precise rules and regulations

3  that govern fruit-juice blends by relying upon a very general state law provision

4  concerning the labeling of any food.

5  Finally, as the Court has previously determined, to the extent that they seek

6  to attack "'business practices specifically permitted' or 'conduct clearly

7  permit[ted]' by the FFDCA . . . ," Pom's state law claims are barred by California's

8  safe harbor doctrine.  First Order at 14; *see also id*. at 13 ("[I]f the Legislature has

9  permitted certain conduct or considered a situation and concluded no action should

10  lie, courts may not override that determination" (quoting *Cel-Tech Commc'ns, Inc.*

11  *v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182, 83 Cal. Rptr. 2d 548, 562

12  (1999)).

13  Because they are specifically governed and expressly permitted by FDA rules

14  and regulations, the name and label of TCCC's "Pomegranate Blueberry Flavored

15  Blend of 5 Juices" are not subject to challenge under state law.

16  **II.    Summary Judgment Is Appropriate as to TCCC's Other Advertising**

17  **A.    Pom Cannot Challenge Incidental Use of the Name and Label**

18  As detailed above, this Court has already held that Pom cannot contest the

19  Juice's name and label under either the Lanham Act or state law.  It follows that the

20  mere mention of the product name, or depiction of its label, in an advertisement for

21  the Juice cannot support a claim for false advertising or unfair competition.

22  Congress's stated purpose of establishing uniform laws and regulations for juice

23  naming and labeling, as well as FDA's exercise of its regulatory authority, would

24  be thwarted if reference to an FDA-authorized product name could expose the

25  advertiser to liability in a private enforcement action.  No court has ever allowed a

26  false advertising plaintiff to circumvent FDA decision making in this fashion.

27  The same is true of a product label – such as the one at issue here – that is

28  expressly permitted by FDA rules and regulations.  Manufacturers must be free to

13

1    depict their products, including the labels, in advertisements; otherwise, consumers

2    would have no way to find and identify the products in the marketplace.

3    Reproduction in an advertisement of a label that complies with applicable

4    guidelines therefore is not actionable. *See Andrus v. AgrEvo USA Co.*, 178 F.3d

5    395, 400 (5th Cir. 1999) ("when advertising or promotional materials merely repeat

6    information or language contained in the label, claims directed at the advertising

7    necessarily challenge the label itself and are therefore preempted") (internal

8    quotation omitted). Indeed, the preclusion and preemption doctrines discussed

9    above and embraced by this Court would be rendered meaningless if the mere

10   display of a product label could subject the manufacturer to a claim of false

11   advertising. *See* First Order at 4 (noting that courts must tread "'carefully when

12   applying the Lanham Act to the advertising of goods . . . that are also subject to

13   regulation by the [F]FDCA lest it be used as a vehicle to accomplish indirectly

14   something that a party could not accomplish directly.'") (quoting *Mutual Pharm.*

15   *Co. v. Ivax Pharms.*, 459 F. Supp. 2d 925, 934 (C.D. Cal. 2006)).

16          **B.      Pom Has Adduced No Evidence To Show that TCCC's Other**

17                  **Advertising or Marketing Is False or Misleading**

18          In making this motion TCCC fully accepts, and does not contest, this Court's

19   ruling that advertising apart from the Juice's formal name and label is subject to

20   challenge under the Lanham Act. If TCCC were to run TV commercials that stated

21   that its product contains predominantly pomegranate juice, or that showed a person

22   squeezing juice from a pomegranate into an empty bottle and filling it up, TCCC

23   would face liability for false advertising. But ***TCCC has done no such thing***, and

24   Pom does not contend otherwise. Indeed, despite months of excruciating discovery

25   in which it has taken more than a dozen depositions and examined TCCC's internal

26   documents with a fine-toothed comb, Pom has not identified a shred of evidence

27   that any of TCCC's ads are false or misleading in any respect.

28          That is not surprising, for TCCC's advertising and marketing for the Juice

14

1  have nothing to do with the allegations of Pom's complaint. Pom's core theory is

2  that consumers are misled to think that the product contains predominantly

3  pomegranate juice, and thus delivers the health benefits that Pom claims are

4  associated with pomegranates. But TCCC's ads do not address the pomegranate

5  content of the Juice or the specific health benefits supposedly provided by

6  pomegranates. They focus instead on other attributes of the product, such as the

7  distinct benefits of the Omega 3/DHA and other nutrients with which it is fortified,

8  or its delicious flavor. SUF ¶¶ 19-40.

9       For example, the homepage for the Juice, which is part of the Minute Maid

10  website, identifies the product as "Minute Maid Enhanced Pomegranate Blueberry

11  Flavored 100% Juice Blend" and describes it as

12       a great tasting flavored 100% juice blend with 50mg Omega-3/DHA per 8 fl.

13       oz. serving and four other nutrients to help nourish your brain and body. By

14       combining natural fruit juices and targeted fortification, this new Minute

15       Maid enhanced juice delivers enhanced nutrition, and is a perfect addition to

16       a healthy diet.

17  SUF ¶¶ 36-37. The homepage goes on to identify and describe the five nutrients in

18  the Juice that "Help Support Brain and Body": (1) DHA; (2) choline; (3) vitamin

19  B12; (4) vitamin E; and (5) vitamin C. SUF ¶ 38. There is no emphasis on

20  pomegranates or pomegranate juice, let alone on the specific health benefits (*e.g.*,

21  reduced risk of cancer) that Pom claims they provide.[5]

22       The same is true of TCCC's other ads, which similarly have focused on brain

23  nourishment and other product benefits. For example, one television commercial

24  for the Juice used a humorous scenario to emphasize that the product can "Help

25   

---

[5] TCCC disputes the accuracy of many of the pomegranate health-benefit claims
advertised by Pom and relied upon by Pom's expert to compute Pom's supposed
damages in this case. If this action were to proceed to trial, TCCC would
demonstrate that Pom's health claims (a) have already been determined to be false
and misleading and (b) continue to exaggerate and falsely describe the
"healthfulness" of Pom's products.

Nourish Your Brain" with "a five-nutrient boost," and made no mention of pomegranates or pomegranate juice.  SUF ¶¶ 31-32.  A print ad used the headline "Love It Or It's Free" to offer consumers a money-back guarantee, and stated that the Juice "tastes great and helps nourish your brain and body."  SUF ¶ 25.  Other ads proclaim that the Juice "Helps nourish your brain and your sense of taste," playing up the Omega-3/DHA and other additives, and the appealing flavor of the Juice.  SUF ¶ 23.  Pom has not even alleged, much less sought to establish, that any of these ads, or any of these claims about the Juice's Omega-3/DHA content or flavor, are literally or facially false.

Nor are they misleading to consumers.  A Lanham Act plaintiff that seeks to establish that an advertisement is misleading, as opposed to false on its face, bears the burden of establishing that the ad is likely to deceive a substantial portion of its viewing audience.  *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir. 1984); *see also Playboy Enters., Inc. v. Terri Welles, Inc.*, 78 F. Supp. 2d 1066, 1083 (S.D. Cal. 1999), *rev'd in part on other grounds,* 279 F.3d 796 (9th Cir. 2002); *Sandoz Pharm. Corp. v. Richardson-Vicks*, *Inc.*, 902 F.2d 222, 228-29 (3d Cir. 1990) ("plaintiff bears the burden of proving actual deception by a preponderance of the evidence.  Hence, it cannot obtain relief by arguing how consumers *could* react, it must show how consumers *actually do* react.") (emphasis in original).  Such proof usually turns on a survey of consumers.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997).  Pom has no survey and no other evidence to raise a material issue of fact to avoid summary judgment on this issue.

Given the Court's rulings in the First and Second Orders, one would have expected Pom to conduct a survey of the Juice's website or other ads, as opposed to its name or label, in order to attempt to show that TCCC "has **otherwise** advertised and marketed its product in a misleading manner . . . ."  Second Order at 3 (emphasis added).  But Pom did not do so.  Instead it has tendered a survey that was

1  conducted in 2008 – nearly a year before this Court rendered its decisions

2  narrowing Pom's claims – of the Juice's **bottle and label**, supposedly to establish

3  that the words "pomegranate" and "blueberry" in the Juice's name are deceptive.

4  SUF ¶ 43.  TCCC hotly disputes the methodology and conclusions of this biased

5  and leading survey.  But even accepting it at face value, Pom's outdated survey is

6  directed entirely at Pom's since-dismissed claims concerning the Juice's name and

7  label, and provides no evidence that TCCC's other advertising misleads consumers.

8       Because it has marshaled no evidence that TCCC "has advertised or

9  marketed the Juice in a misleading manner on its website and in other advertising

10  avenues," Second Order at 2, Pom cannot withstand summary judgment as to these

11  ads.  Pom made its bed, and now must lie in it.  Its entire case should be dismissed.

12  **III.    Pom's UCL and FAL Claims Should Be Dismissed for Lack of Standing**

13       Though the Court need not reach this issue, Pom's state law claims – both as

14  to the Juice's label *and* as to TCCC's other advertising – fail as a matter of law for

15  an additional reason:  Pom has no standing to pursue them.  In its September 15,

16  2009 Order, the Court declined to dismiss Pom's California's Unfair Competition

17  Law ("UCL") and False Advertising Law ("FAL") claims on standing grounds at

18  that early stage of the litigation.  After this Court issued its Order, however, Judge

19  Fischer and Judge Matz, addressing *this exact issue* other cases brought by Pom,

20  "respectfully disagreed" with this Court's ruling and dismissed Pom's UCL and

21  FAL claims for lack of standing.  *Pom Wonderful, LLC v. Tropicana Prods., Inc.*,

22  No. CV 09-566 DSF (CTx), (C.D. Cal. Oct. 21, 2009), [Dkt. # 55] ("*Tropicana*") at

23  2-3; *Pom Wonderful, LLC v. Welch Foods, Inc.*, No. CV 09-567 (AHM) (AGRx),

24  (C.D. Cal. Dec. 21, 2009), [Dkt. # 72] ("*Welch*") at 6 n.2.  The logic of these

25  decisions is compelling, and should be followed here.

26       To have standing to raise claims under the UCL and FAL, a plaintiff must

27  have "suffered an injury-in-fact" and have "lost money or property as a result of . . .

28  unfair competition."  Cal. Bus. & Prof. Code §§ 17204, 17535.  *See also*

NOTICE OF MOTION AND MEMO OF LAW IN
SUPPORT OF DEF. MSJ
CASE NO. CV 08-06237 SJO (FMOX)

1   *Brockington v. J.P. Morgan Chase Bank, N.A.*, No. C-08-05795, 2009 WL

2   1916690, at *4 (N.D. Cal. July 1, 2009).  California courts have interpreted the

3   "lost money or property" requirement to mean that a plaintiff must be entitled to

4   ***restitution*** from the defendant in order to have standing to pursue a cause of action.

5   *See Citizens of Humanity, LLC v. Costco Wholesale Corp.*, 171 Cal. App. 4th 1, 22,

6   89 Cal. Rptr. 3d 455, 472 (2009); *Buckland v. Threshold Enterprises, Ltd.*, 155 Cal.

7   App. 4th 798, 817-19, 66 Cal. Rptr. 3d 543, 557-58 (2007); *see also Walker v.*

8   *Geico Gen. Ins. Co.,* 558 F.3d 1025, 1027 (9th Cir. 2009).

9        In *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149, 131

10   Cal. Rptr. 2d 29, 42 (2003), the Supreme Court of California explained that, for

11   purposes of UCL remedies, restitution is not "limited only to the return of money or

12   property that was once in the possession of that person."  The UCL also allows a

13   plaintiff to recover money in which he or she has a "vested interest," *i.e.*, property

14   that could be the subject of a constructive trust.  *Id.* at 1149-50, 131 Cal. Rptr. 2d at

15   42.  Thus, while earned but unpaid wages would qualify as a vested interest, a lost

16   business opportunity would not.  *Id*. at 1150-51, 131 Cal. Rptr. 29 at 42-43.

17   ("Compensation for a lost business opportunity is a measure of damages and not

18   restitution."); *see also Kelton v. Stravinski*, 138 Cal. App. 4th 941, 949, 41 Cal.

19   Rptr. 3d 877, 883 (2006) (lost profits are damages and not restitution).

20        Pom has asserted that it is entitled to restitution for TCCC's "wrongful

21   taking" of Pom's "vested interest in its rightful share of the pomegranate juice

22   market."  Opp'n to TCCC's motion to dismiss Pom's First Amended Complaint at

23   20.  Pom, however, has adduced no evidence that it has a "vested" share of the

24   pomegranate juice market.  Moreover, Pom can point to no authority in support of

25   its claim that market share can constitute a vested interest.  Addressing this precise

26   claim by Pom in its suit against Tropicana, Judge Fischer ruled that "there is no

27   reasonable definition of vested interest that would include market share."

28   *Tropicana* at 2.  Judge Matz similarly rejected this argument in Pom's case against

18

NOTICE OF MOTION AND MEMO OF LAW IN
SUPPORT OF DEF. MSJ
CASE NO. CV 08-06237 SJO (FMOX)

1   Welch, holding that "like the plaintiff in *Korea Supply*, Pom seeks to recover

2   'nonrestitutionary disgorgement of profits' that are nothing more than a 'contingent

3   expectancy of a payment from a third party' – in this case, consumers." *Welch* at 5

4   (citing *Korea Supply*, 29 Cal. 4th at 1150, 131 Cal. Rptr. 2d at 42).

5       *Overstock.com v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 61 Cal.

6   Rptr. 3d 29 (2007), the sole case on which Pom has relied to support its assertion

7   that the loss of "rightful" market share is a vested interest that entitles it to

8   restitution, is not on point.  In *Overstock.com*, the plaintiff alleged that defendants,

9   with the specific intent of artificially depressing plaintiff's stock price, published

10  negative reports defaming plaintiff.  The court found that the resulting "diminution

11  in value of [plaintiff's] assets" and the "decline in its market capitalization" were

12  vested interests sufficient to meet the UCL's "injury in fact" requirement.  *Id.* at

13  716, 61 Cal. Rptr. 3d at 52.  The *Overstock.com* court spoke only to the "injury in

14  fact" prong of the standing requirement, not to the "lost money or property" prong.

15  More importantly, the court based its "vested interest" analysis on market

16  *capitalization* – the value of plaintiff's stock – not on the market *share* on which

17  Pom relies here.  In fact, *Overstock.com* explicitly distinguished cases in which the

18  harm to a plaintiff stemmed from the effect of the defendant's actions *on the*

19  *consumer market*, as opposed to the plaintiff itself.  *Id.*

20      Pom's interest in its market share is, like the plaintiff's in *Korea Supply*, a

21  mere "expectancy."  *Korea Supply*, 29 Cal. 4th at 1149, 31 Cal. Rptr. 2d at 42.  As

22  such, it is not a vested interest that warrants restitution under the UCL.[6]

23      Judges Fischer and Matz were similarly unpersuaded by Pom's argument

24  that, even if it cannot establish entitlement to restitution, it nonetheless has standing

25  to seek *injunctive relief* under the UCL and FAL.  Both the Ninth Circuit and

26

---

27  [6] This same analysis applies to Pom's FAL claim.  *See Buckland*, 66 Cal. Rptr. 3d
    at 557-58, 66 Cal. Rptr. 3d at 557-58 (the FAL "impose[s] the [same] standing
28  requirements and limits placed upon UCL actions.").

NOTICE OF MOTION AND MEMO OF LAW IN
SUPPORT OF DEF. MSJ
CASE NO. CV 08-06237 SJO (FMOX)

1  California state courts have held that a restitutionary interest is required for

2  standing, even if the plaintiff does not seek restitution as a remedy.  *See Walker*,

3  558 F.3d at 1027 [7]; *Citizens of Humanity LLC*, 171 Cal. App. 4th at 22, 89 Cal.

4  Rptr. 3d at 473.  Pom's UCL and FAL claims thus fail in their entirety, and should

5  be dismissed for this reason as well.

6  <div align="center">**CONCLUSION**</div>

7         Pom has purposefully ignored this Court's instruction to focus its attention

8  on TCCC's other advertising and marketing, and instead has directed its entire case

9  at the Juice's name and label.  The Court has already dismissed Pom's allegations

10  concerning these FDA-regulated materials, and with good reason.  There is no

11  material issue of fact that requires a trial; Pom's claims are deficient as a matter of

12  law.  TCCC therefore respectfully requests that the Court grant its motion for

13  summary judgment and dismiss Pom's claims in their entirety.

14

15  Dated:  December 28, 2009

16                         PATTERSON BELKNAP WEBB & TYLER LLP

17

18                         By:    */s/ Steven A. Zalesin*

19                                Steven A. Zalesin
                                  Sarah E. Zgliniec

20                                Vivian Storm
                                  YiLing Chen-Josephson

21                         1133 Avenue of the Americas

22                         New York, New York 10036

23                         Attorneys for Defendant

24                         THE COCA-COLA COMPANY

25  ───────────────

26  [7] Pom contends that *Walker*'s reasoning has been "abrogated" by *In re Tobacco II Cases*, 93 Cal. 4th 298, 93 Cal. Rptr. 3d 559(2009).  As Judges Fischer and Matz noted, however, *Tobacco II*, which discussed the differences in standing

27  requirements imposed on class representatives and those imposed on absent class members, does not address the UCL's definition of "lost money or property" nor

28  does it disapprove of *Walker*.  *See Welch* at 7 n.3 (citing *Tropicana*).