Nelson L. Atkins (SBN 036752)
nelson_atkins@gshllp.com
Kenneth M. Jones (SBN 140358)
kenneth_jones@gshllp.com
GONZALEZ SAGGIO & HARLAN LLP
3699 Wilshire Boulevard, Suite 890
Los Angeles, California 90010
Telephone: (213) 487-1400
Facsimile: (213) 487-1402

Steven A. Zalesin (admitted *pro hac vice*)
sazalesin@pbwt.com
Derek A. Williams (admitted *pro hac vice*)
dwilliams@pbwt.com
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222

Attorneys for Defendant
THE COCA-COLA COMPANY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POM WONDERFUL LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE COCA-COLA COMPANY, a Delaware corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.   CV-08-06237 SJO (FMOx)<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 3**<br><br>Judge:   Honorable S. James Otero<br>Date:   March 9, 2010<br>Time:   10:00 a.m.<br>Place:   Courtroom 1, Second Floor |

Pom seeks to prevent Dr. Kivetz from offering an opinion based on one of the most telling pieces of evidence in this case:  market data showing that in its first two years after launch Minute Maid Enhanced Pomegranate Blueberry Flavored Blend of 5 Juices ("the Juice") sourced *only 0.1%* of its overall volume from Pom. This "source of volume" data, collected by the world-leading marketing and research company Nielsen, gives the lie to Pom's claim that it has lost more than *$278 million* in profits due to sales of the Juice.  The Nielsen data is well-respected and widely-used.  Pom nevertheless focuses the brunt of its attack on Dr. Kivetz's reasonable reliance on the data to form opinions on whether and to what extent Pom products and the Juice compete, whether the Juice drew meaningful sales away from Pom, and whether the methodology used by Pom's damages expert Joseph Anastasi is reliable.

In its bid to preclude Dr. Kivetz's highly probative testimony, Pom mischaracterizes the Nielsen data and Dr. Kivetz's reliance on it.  Pom thus argues that (1) the data comes from an undisclosed expert – even though the data is not an expert opinion at all and was disclosed during discovery, (2) Dr. Kivetz's reliance on the data is impermissible under *Turner v. Burlington Northern Santa Fe Railroad Co.*, 338 F.3d 1058 (9th Cir. 2003) – even though the principles of that case support admission of Dr. Kivetz's testimony, and (3) the data is not reliable or trustworthy – even though the Nielsen data is of the type relied on by experts such as Dr. Kivetz and has been accepted as reliable by industry, government, and the courts.  Neither the facts nor law support Pom's arguments.

Pom's additional arguments to preclude Dr. Kivetz's testimony concerning "re-coding" and his allegedly "cumulative" testimony are also without merit.

**BACKGROUND**

Dr. Kivetz is a Professor of Marketing at Columbia Business School.  He is an expert on consumer behavior, marketing management, survey methods,

consumer and sales incentives, and marketing techniques. 2/2/10 Beck Decl., Exh. B at p. 64 (Kivetz Rep. ¶¶ 1, 3). Pom has not challenged Dr. Kivetz's expertise in any of these areas.

Nielsen data is respected and widely used in varied industries and countries. In particular, Nielsen data is commonly relied upon in industry, government, and academia to study source of volume and brand shifting. *Id.* at pp. 93-94 (Kivetz Rep. ¶ 64); 2/9/10 Zalesin Decl., Exh. 6 at pp. 90-91 (Kivetz Dep. Tr. at 77:14-78:15). In 2008, the United States Department of Agriculture ("USDA") released a study of Nielsen data concluding that "the overall accuracy of self-reported data collected by [Nielsen] Homescan panelists seems to be in line with other commonly used (government-collected) economic data sets."[1] *See* 2/9/10 Zalesin Decl., Exh. 7 at 97 (USDA, *On the Accuracy of Nielsen Homescan Data* at iii). Dr. Kivetz's own research and teaching often rely on research using data of this type. 2/2/10 Beck Decl., Exh. B at p. 94 (Kivetz Rep. ¶ 64).

Courts regularly recognize and credit Nielsen data as reliable evidence, including as evidence of source of volume. *See, e.g.*, *State of N.Y. v. Kraft General Foods, Inc.*, 926 F.Supp. 321, 353 (S.D.N.Y. 1995) ("Nielsen studies show that only a small proportion of Grape-Nuts volume 'shifted' between 1992 and 1993 to or from Nabisco Shredded Wheat."); *Matrix Essentials v. Quality King Distributors, Inc.*, 522 F. Supp. 2d 470, 474 (E.D.N.Y. 2007) (accepting use of Nielsen data to show diversion of volume from brand-name cosmetic to generic); *Nestle Prepared Foods Co. v. Pocket Foods Corp.*, 2006 WL 2990208, *4 (D. Colo. Oct. 19, 2006) (court listed A.C. Nielsen Household Panel Data as "undisputed fact"); *U.S. v. Eastman Kodak Co.*, 853 F. Supp. 1454 (W.D.N.Y. 1994) (accepting use of Nielsen checkout scan data to show price elasticity of

---

[1] The USDA reached its conclusion that Nielsen data is as reliable as other commonly used government-collected data *despite* identifying certain shortcomings in Nielsen data.

1  demand); *Ansell, Inc. v. Schmid Laboratories, Inc.*, 757 F. Supp. 467, 477 (D.N.J.

2  1991) (considering market share data from Nielsen).

3        Minute Maid itself routinely relies on Nielsen source-of-volume data in the

4  normal course of its business.  Minute Maid uses an on-site team of Nielsen

5  employees specifically to track the source of volume for new Minute Maid products

6  six months after launch.  *See* 2/9/10 Zalesin Decl., Exh. 8 at pp. 129-33 (Rasmussen

7  Dep. Tr. at 175:1-176:2, 224:11-224:25, 245:4-246:5).  Minute Maid employee

8  Denise Rasmussen informed Pom's counsel of this fact at her deposition, and even

9  directed Pom's counsel to a specific individual who could answer detailed

10  questions about Nielsen's source analyses.  *Id* at p. 134 (Rasmussen Dep. Tr. at

11  256:4-256:12).  Pom chose not to question that individual or further pursue the

12  matter.

13        In his expert report, Dr. Kivetz relies upon a Nielsen "report" presenting

14  Nielsen source-of-volume data for a two-year period following launch of the Juice.

15  2/2/10 Beck Decl., Exh. B at pp. 128-38 (Kivetz Rep., Exh. D).  This data forms

16  one of the bases for Dr. Kivetz's opinions that Pom products do not compete with

17  the Juice, that sales of the Juice did not draw meaningful sales away from Pom, and

18  that the methodology used by Pom's damages expert is unreliable.  *Id.* at pp. 93-95

19  (Kivetz Rep. ¶¶ 63-67).  Another Minute Maid expert, forensic accountant Avram

20  Tucker, relies on the Nielsen data to compute the maximum amount of profits Pom

21  could have lost due to sales of the Juice – an amount of $200,000.  2/2/10 Beck

22  Decl., Exh. A at pp. 40-41 (Tucker Rep. at 37-38).

23                                    **ARGUMENT**

24  **I.    DR. KIVETZ PROPERLY RELIES UPON THE NIELSEN DATA**

25        **A.    The Nielsen "Report" Is Not an Undisclosed Expert Report**

26        Pom first attempts to portray the data relied upon by Dr. Kivetz as the

27  product of an improper expert report.  This argument distorts both the law and facts.

28  While Dr. Kivetz does draw his data from a "report" prepared by Nielsen, black

letter law permits experts to rely on reports and studies conducted and prepared by others, so long as these reports and studies are of a type reasonably relied on by experts in the field. *See, e.g.*, *United States v. W.R. Grace*, 246 F.3d 745, 760-61 (9th Cir. 2007) (failure to consider whether data from studies by the Environmental Protection Agency was of the type reasonably relied upon by experts in the field was abuse of discretion). Pom presents no evidence disputing Dr. Kivetz's testimony that experts commonly rely upon Nielsen data to study source of volume and brand shifting. Nor does Pom cite a single case supporting its argument that Dr. Kivetz cannot rely on the data simply because he asked for it during this litigation. *See* Plaintiff Pom Wonderful LLC's Notice of Motion and Motion *In Limine* No. 3 [Dkt. # 191] at 2-4.

Indeed, Pom's expert witness Dr. E. Deborah Jay, whose consumer survey Pom offers to prove liability, relies upon a similar third-party source. Dr. Jay commissioned research to determine the characteristics of her target audience. 2/9/10 Zalesin Decl., Exh. 9 at p. 137 (Jay Survey at 10). She did not directly oversee this third-party research and had no personal knowledge as to whether it was properly conducted. She simply believed the third party would conduct it appropriately based on previous experience. 2/9/10 Zalesin Decl., Exh. 21 at pp. 273-74 (Jay Dep. Tr. at 84:7-85:21). Dr. Kivetz has just as much of a right to rely upon the data provided by Nielsen's "report" as Dr. Jay has to rely upon data from the third-party research. To the extent that either Minute Maid or Pom takes issue with the third-party sources or methods underlying Dr. Jay's and Dr. Kivetz's opinions, those issues can be addressed on cross-examination.

**B.**    **Dr. Kivetz's Reliance on the Nielsen Data Is Appropriate Under *Turner v. Burlington Northern***

Pom relies on *Turner* – and *Turner* alone – to argue that Dr. Kivetz improperly uses the Nielsen data as "substantive evidence of his ultimate

1  conclusions." Yet due consideration of the Ninth Circuit's analysis in *Turner*

2  demonstrates that Dr. Kivetz's reliance on the Nielsen data is wholly appropriate.

3     In *Turner*, the defendant contacted an expert to investigate the cause of a fire.

4  The expert took samples of debris piles and sent them to a laboratory for analysis.

5  The laboratory's report showed that one of the samples contained a compound

6  consistent with the presence of gasoline. Based on this report, the expert intended

7  to testify that the fire was caused by arson. The district court excluded those

8  portions of the expert's testimony relying on the laboratory report, and the

9  defendant appealed. *Turner*, 338 F.3d at 1060-61.

10    The Ninth Circuit began its analysis by noting that Fed R. Evid. 703 requires

11  courts to ask two questions when evaluating whether to admit expert testimony

12  relying on "otherwise inadmissible evidence": "whether the facts are of a type

13  reasonably relied on by experts in the particular field" and "whether the probative

14  value of the underlying data substantially outweighs its prejudicial effect." *Id.* at

15  1061. The court then determined that "the lab report was the ***only*** evidence of

16  gasoline in the soil" and the expert "used the report ***not as data upon which an***

17  ***expert in his field would reasonably rely*** in forming an opinion, but rather intended

18  to use it as substantive evidence of his ultimate conclusions that the fire was

19  intentionally created by pouring gasoline into the soil." *Id.* at 1062 (emphasis

20  added). The court next evaluated the probative value and prejudice of the

21  "otherwise inadmissible hearsay." It concluded that, because the prejudice of

22  admission was "substantial" while the probative value was "minimal," the district

23  court did not abuse its discretion in excluding the expert testimony relying on the

24  lab report. *Id.*

25    As an initial matter, *Turner* applies only to inadmissible evidence. *Id.* at

26  1060. Unlike the lab report in *Turner*, the Nielsen data and report are admissible as

27  business records. *See* F.R.E. 803(6). As Denise Rasmussen has testified, Nielsen

28  regularly compiles and presents data on source of volume for new products in the

regular course of Minute Maid's business. *See* 2/9/10 Zalesin Decl., Exh. 8 at pp. 129-33 (Rasmussen Dep. Tr. 175:1-176:2, 224:11-224:25, 245:4-246:5). That the "report" containing the data relied on by Dr. Kivetz encompasses a longer time period than the typical six-month source-of-volume data prepared by Nielsen, and thus was titled an "ad hoc" report, is a distinction without a difference. Pom makes no argument that the longer time period examined in the report provided to Dr. Kivetz affects its reliability. Regardless of the time period at issue, Nielsen regularly produces such records for Minute Maid, and the business record exception applies.

But even if the Nielsen data relied on by Dr. Kivetz were "otherwise inadmissible hearsay," the Court should admit Dr. Kivetz's testimony, pursuant to Rule 703 and the Ninth Circuit's reasoning in *Turner*. In *Turner*, the Court's concern was that the lab report was the only evidence that the fire had been started by gasoline. *Turner*, 338 F.3d at 1062. In other words, the lab report was not a piece of data the expert used to form his own conclusion about the cause of the fire – it was the only evidence of his conclusion. This case is different. Here, Dr. Kivetz applies his own expertise in evaluating the data contained in the Nielsen "report." He opines that the Nielsen data provides the basis for a more reasonable approach to determining Pom's lost sales than the methodology applied by Mr. Anastasi, and he relies on the Nielsen data in forming his opinions that Minute Maid's Juice does not compete with Pom products and has not siphoned significant sales from Pom. 2/2/10 Beck Decl., Exh. B at pp. 93-95 (Kivetz Rep. ¶¶ 63-67).

Moreover, the Nielsen data is not the only basis for Dr. Kivetz's opinions. For example, he relies on general marketing principles and a wide variety of research on consumer decision-making, among other things, in arriving at his opinions. *Id.* at pp. 88-93 (Kivetz Rep. ¶¶ 52-62). The Nielsen data is but one factor that informs Dr. Kivetz's opinions; it is not, as in *Turner*, the sole evidence of the expert's conclusion.

1     Meanwhile, the Nielsen data is of the type that Minute Maid, other

2     businesses, government agencies, and academics rely upon in the ordinary course;

3     the USDA has recognized that such data is as accurate as commonly used

4     government-collected economic data sets; and numerous courts have recognized

5     and credited this data.  Indeed, Dr. Kivetz confirms in his report that he regularly

6     relies on research using similar data.  2/2/10 Beck Decl., Exh. B at p. 94 (Kivetz

7     Rep. ¶ 64).  It was no less reasonable for him to rely on that "type of data" here.

8     Thus, unlike the report in *Turner*, the Nielsen data is plainly "data upon which an

9     expert in his field would reasonably rely in forming his opinion."  *Turner*, 338 F.3d

10    at 1062.

11        Finally, Dr. Kivetz's testimony based on the Nielsen data is admissible

12    because its highly probative value substantially outweighs any potential prejudice.

13    Pom's damages claim is premised on terribly misguided assumptions by Pom's

14    damages expert Mr. Anastasi about the extent to which Minute Maid's sales of the

15    Juice come at the expense of sales of Pom's products.  The Nielsen source-of-

16    volume data and Dr. Kivetz's testimony about it puncture those inflated

17    assumptions.  The jury should not be prevented from hearing this probative

18    evidence.

19        **C.    Dr. Kivetz's Use of the Nielsen Data Is Not Unreliable**

20        Pom's argument regarding reliability boils down to the contention that the

21    Nielsen "report" from which Dr. Kivetz obtains the data on which he relies does not

22    sufficiently explain the terms it uses (*e.g.*, "interaction index" and "normalized

23    market share").  Such inquiry may be appropriate for cross-examination of Dr.

24    Kivetz.  But it ignores the relevant inquiry for admissibility, which is whether the

25    expert relied on facts or data "of a type reasonably relied upon by experts in the

26    particular field in forming opinions or inferences upon the subject."[2]  Rule 703.  For

27    [2] Pom's argument is also hypocritical in light of the fact, described above, that Pom
       expert Dr. Jay relies on third-party research whose actual methodology she has no
28    knowledge of.

the reasons described above, Pom does not and cannot seriously question that the Nielsen data at issue here is "of a type reasonably relied upon by experts in the particular field."

### D. The Nielsen Data Is Not a "Survey"

In its last stab to assail Dr. Kivetz's reliance on the Nielsen data, Pom mischaracterizes the data as a "survey" requiring all the indicia of survey "trustworthiness" – proper universe, representative sample, etc. *See* Plaintiff's Motion in Limine No. 3 [Dkt. # 191] at 8. It is public knowledge, however, that Nielsen data does not come from surveys, but instead from "a panel of households who record their grocery purchases." *See* 2/9/10 Zalesin Decl., Exh. 7 at p. 101 (USDA, *On the Accuracy of Nielsen Homescan Data* at 3). Pom's "untrustworthiness" argument is therefore inapplicable.

## II. DR. KIVETZ'S "RE-CODING" TESTIMONY IS ADMISSIBLE

Dr. Kivetz offers rebuttal to the Jay Survey and concludes that the survey's leading questions and improper methodology biased the results in Pom's favor. Pom moves to preclude Dr. Kivetz from making an important observation. Dr. Kivetz and his research assistant reviewed the survey respondents' verbatim answers and found that, when consumers were asked unbiased questions regarding the messages conveyed by the Juice's packaging, almost no one reported that they took away any of the specific health messages (such as "antixiodants") often associated with pomegranate juice. 2/2/10 Beck Decl., Exh. B at pp. 101-02 (Kivetz Rep. ¶ 80).

Pom's complaint that Dr. Kivetz failed to produce his "re-coding" data is misplaced and moot. All that was involved in Dr. Kivetz's "re-coding" was an examination and re-*counting* of the verbatim answers that Pom produced. There was no underlying "data" for Dr. Kivetz to produce. Dr. Kivetz did record notations concerning his observation, and Minute Maid produced them in advance

of Dr. Kivetz's deposition. Pom therefore has incurred no prejudice that would preclude Dr. Kivetz from offering opinion based on "re-coding."

## III. DR. KIVETZ'S TESTIMONY IS NOT CUMULATIVE

Pom "anticipates" Dr. Kivetz will offer trial testimony that will be "needlessly cumulative" of testimony by Minute Maid expert Avram Tucker, and that such testimony must be excluded under Rule 403 as causing "undue delay." *See* Plaintiff's Motion in Limine No. 3 [Dkt. # 191] at 9-10. Pom's "anticipation" is incorrect.

The report of Pom's damages expert Mr. Anastasi contains opinions on everything from the future yield of pomegranate orchards, to viral marketing awareness of Pom's products, to the efficacious amount of pomegranate juice, to the consistency of fruit juice labeling, to Minute Maid's enterprise value. It is perfectly reasonable, and necessary, both for Minute Maid to use multiple experts to rebut Mr. Anastasi's grab-bag of testimony, and for those experts to address, from their different disciplinary perspectives, some of the same flaws in Mr. Anastasi's report. *Ortho-Mcneil Pharm. Inc. v. Barr Labs.*, Inc., No. 03-CV-4678, 2006 WL 1805897, at *12 (D.N.J. June 29, 2006) ("The Court, after examining the experts' backgrounds, finds that while both experts may advance identical theories, they reach them through a meaningfully different skill set and background, and thus, cannot be considered cumulative."). The testimony of these rebuttal experts will necessarily overlap and rely upon each other to some degree. *See, e.g., Holmes v. Sood,* No. 02 Civ. 7266, 2006 WL 1988716, at *4 (N.D. Ill. July 11, 2006) (denying motion in limine to bar cumulative expert testimony, because overlapping expert testimony is not sufficient under Rule 403 to bar the testimony of either witness). Indeed, Pom's expert Mr. Anastasi relies for his damages opinion on the testimony of Pom's survey expert Dr. Jay. There is nothing remarkable or improper about this approach.

Pom's concern for "undue delay" is a classic red herring. The parties have agreed that their trial time will be timed and evenly divided. The parties should be permitted to use their allocated time as they see fit. To the extent that a Minute Maid expert attempts to offer testimony that is truly and needlessly cumulative at trial, Pom can object then. But the court should make no blanket, pre-emptive rulings based on Pom's mere "anticipation."

<u>CONCLUSION</u>

For the foregoing reasons, Pom's Motion in Limine No. 3 to exclude testimony of Dr. Ran Kivetz should be denied.

Dated: February 9, 2010

PATTERSON BELKNAP WEBB & TYLER LLP

By:    */s/ Steven A. Zalesin*
     Steven A. Zalesin
1133 Avenue of the Americas
New York, New York 10036

Attorneys for Defendant
THE COCA-COLA COMPANY