**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| POM WONDERFUL LLC,<br><br>              Plaintiff,<br><br>v.<br><br>THE COCA COLA COMPANY,<br><br>              Defendant. | NO. CV 08-06237 SJO (FMOx)<br><br>**ORDER GRANTING IN PART, DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION RE: DEFENDANT'S AFFIRMATIVE DEFENSES OF SAFE HARBOR AND COMPLIANCE WITH LAWS**<br>[Docket Nos. 149, 150] |

This matter is before the Court on Defendant The Coca Cola Company's ("Coca Cola" or "Defendant") Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56, filed December 28, 2009, and Plaintiff Pom Wonderful LLC's ("Pom" or "Plaintiff") Motion for Partial Summary Adjudication Re: Defendant's Affirmative Defenses of Safe Harbor and Compliance with Laws, also filed December 28, 2009. The parties filed Oppositions and Replies to the respective Motions. The Court found this matter suitable for disposition without oral argument and vacated the hearings set for January 25, 2010. *See* Fed. R. Civ. P. 78(b). For the following reasons, Coca Cola's Motion is **GRANTED IN PART** and **DENIED IN PART**, and Pom's Motion is **DENIED**.

I.   BACKGROUND

Pom produces, markets, and sells POM WONDERFUL® brand bottled pomegranate juice and various pomegranate juice blends, including a pomegranate blueberry juice blend.  (First Am. Compl. ("FAC") ¶ 11; Pl.'s Statement of Genuine Issues of Fact and Proposed Conclusions of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s SOF Opp'n") ¶ 1.)  Coca Cola, under the brand Minute Maid, is one of Pom's primary competitors in the bottled pomegranate juice market.  (FAC ¶ 17; Pl.'s SOF Opp'n ¶ 2.)  In September 2007, Coca Cola announced a new product in its "Minute Maid Enhanced Juices" line, entitled "Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend."  (FAC ¶ 18; Pl.'s SOF Opp'n ¶ 3.)  The formal name of "Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend" is "Pomegranate Blueberry Flavored Blend Of 5 Juices" ("the Juice").  (Def.'s Mot. for Summ. J. Pursuant to Fed. R. Civ. P. 56 ("Def.'s Mot.") 3; Pl.'s SOF Opp'n ¶ 3; Decl. of Charles Torrey in Supp. of Def.'s Mot. for Summ. J. ("Torrey Decl.") ¶ 3.)  Specifically, in ranking the ingredients of the Juice by volume, apple ranks first, grape ranks second, pomegranate ranks third, blueberry ranks fourth, and raspberry ranks fifth.  (FAC ¶ 22.)

A.   The Juice's Bottle

"The Juice has used the same bottle and label since it was first introduced."  (Pl.'s SOF Opp'n ¶ 8.)  A "prominent banner or 'flag' (the "Banner") on the Juice label states 'Omega-3/DHA HELP NOURISH YOUR BRAIN 5 Nutrients To Support Brain & Body.'"  (Pl.'s SOF Opp'n ¶ 9.)  Pom acknowledges that the Banner is prominent, but contends that "the text 'Omega-3/DHA' and '5 Nutrients To Support Brain & Body' is not prominently displayed."  (Torrey Decl. Ex. 1, p. 9.) Above the Banner reads "100% Fruit Juice Blend," and below the Banner appears a fruit vignette (the "Fruit Vignette") that "depicts each of the five fruit ingredients in the Juice."  (Torrey Decl. Ex. 1, p. 9; Pl.'s SOF Opp'n ¶¶ 10, 11.)  Specifically, the Fruit Vignette includes images of a half-cut pomegranate, a half-cut apple, and several blueberries, grapes, and raspberries.  (Torrey Decl. Ex. 1, p. 9.)  Below the Fruit Vignette reads "Pomegranate Blueberry," and below that, "Flavored Blend Of 5 Juices."  (Torrey Decl. Ex. 1, p. 9.)  "The back of the Juice bottle reads 'Minute Maid Enhanced Pomegranate Blueberry Is Made With A Blend Of Apple, Grape, Pomegranate,

Blueberry, And Raspberry Juices From Concentrate And Other Ingredients." (Torrey Decl. Ex. 1, p. 9.)  It is undisputed that "[t]he back of the bottle does not include other references to pomegranates or blueberries."  (Pl.'s SOF Opp'n ¶ 16.)

B.   The Juice's Advertisements

Coca Cola advertises the Juice "through television and print ad[vertisements], coupons, in-store promotions, and on the Minute Maid website."  (Pl.'s SOF Opp'n ¶ 17.)  Coca Cola maintains that its "brain-nourishment" claims, which form the centerpiece of the Juice's advertising and marketing campaign, "are based upon the unique combination of added nutrients, including not only Omega-3/DHA, but also choline, vitamin B-12, vitamin E, and vitamin C, all of which have been shown to contribute to brain development."[1]  (Def.'s Mot. 3.)  Coca Cola, therefore, contends that its "help nourish your brain" claim is fully substantiated, and that in fact, the National Advertising Division of the Council of Better Business Bureaus ("NAD") concluded that "[Coca Cola] ha[s] a reasonable basis for its claim that [the Juice] can 'help nourish your brain.'" (Def.'s Mot. 3; Decl. of Steven A. Zalesin in Supp. of Def.'s Mot. for Summ. J. ("Zalesin Decl.") Ex. 2.)  "Pom does not contest the scientific accuracy of this claim."  (Def.'s Mot. 3.)  As such, Coca Cola argues that its advertising and marketing, separate and apart from the naming and labeling of the Juice, focus on the Juice's added nutrients and "brain nourishment," not on the Juice's pomegranate or blueberry content. (Def.'s Mot. 3.)  Coca Cola further notes that its "[o]ther ads similarly emphasize that the Juice tastes great."  (Def.'s Mot. 3.)

---

[1]   The Court notes the Food and Drug Administration's ("FDA") February 23, 2010 Warning Letter to Pom.  *See* Letter from Roberta C. Wagner, to Matt Tauper (Feb. 23, 2010) (on file with the Court) ("Your POM Wonderful 100% Pomegranate Juice and POMx products are offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners . . . Thus, your products are misbranded under Section 502(f)(1) of the Act, in that the labeling for these drugs fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)] . . . Your [product] is also a misbranded food within the meaning of Section 403(r)(1)(A) of the Act [21 U.S.C. § 343(r)(1)(A)] because the product bears a nutrient content claim that does not meet the requirements to make the claim.").

### 1.  Coupons

Coca Cola contends that its "coupons have included pictures of the Juice bottle, but have focused on savings, rather than the fruit ingredients in the product," and that "in-store promotional materials describe the Juice as a 'Pomegranate Blueberry Flavored 100% Juice Blend' or 'Pomegranate Blueberry Flavored Blend Of 5 Juices,' and [have] pictured the bottle sometimes next to its fruit ingredients – but have made no other references to pomegranates or blueberries." (Pl.'s SOF Opp'n ¶¶ 18, 20; Torrey Decl. Exs. 2, 3.)    Pom, on the other hand, alleges that Coca Cola's "coupons prominently feature, in large text, the name 'POMEGRANATE BLUEBERRY,'" and that "[t]he promotional materials further display images of pomegranates only – and no other fruit – which are heaped about the bottle." (Pl.'s SOF Opp'n ¶¶ 18, 20; Pl.'s Statement of Additional Material Facts ("Pl.'s Addt'l SOF") ¶¶ 39-40; Torrey Decl. Exs. 2, 3.)

### 2.  Print Advertisements

Coca Cola's print advertising has included campaigns entitled 'Love it or it's free!,' 'Helps nourish your brain and your sense of taste,' 'help nourish your brain,' 'OOPS Someone forgot to boost,' and 'You².' (Torrey Decl. Ex. 4; Pl.'s SOF Opp'n ¶¶ 22-23.)  Coca Cola argues that these "print advertisements all featur[ed] pictures of the [Juice] bottle with few other references to pomegranates." (Pl.'s SOF Opp'n ¶ 22.) Coca Cola states that "[the Juice's] print ads [have] focused on the nutritional benefits of the Omega-3D/DHA fortification and the product's great taste rather than the Juice's pomegranate juice content." (Pl.'s SOF Opp'n ¶ 24.)

Pom disputes whether the focus of Coca Cola's print advertisements is solely on the nutritional benefits of the Omega-3/DHA fortification, and the Juice's good taste, and not on the Juice's pomegranate juice content. (Pl.'s SOF Opp'n ¶¶ 22, 24; Torrey Decl. Ex. 4.)  Pom argues that Coca Cola's print advertisements prominently display the words "Blueberry Pomegranate." (Pl.'s SOF Opp'n ¶¶ 24, 25, 26.)  Pom cites Coca Cola's print advertisements, which include "Minute Maid Pomegranate Blueberry flavored juice blend packs goodness for your brain and body in every sip" as illustrative of Coca Cola's emphasis on the Juice's pomegranate blueberry content. (Pl.'s SOF Opp'n ¶ 24.)  Furthermore, Pom cites one print advertisement that

1  depicts only the top half of the Juice's bottle, thereby excluding "Pomegranate Blueberry Flavored

2  Blend Of 5 Juices."  (Torrey Decl. Ex. 4, p. 36.)

3          3.    Television Advertisements

4          Coca Cola maintains that the television advertisements used to promote the Juice have

5  "flashed images of the five fruit ingredients, but have made no other references to pomegranates

6  or blueberries."  (Pl.'s SOF Opp'n ¶ 29.)  "For example, [Coca Cola cites] the 'We Meet Again'

7  commercial, [that] focused on a man who mistook his daughter's art teacher for an ex-girlfriend

8  before drinking the Juice, but correctly identified her afterwards."  (Pl.'s SOF Opp'n ¶ 30.)

9  Coca Cola argues:

10                 The commercial showed the man drinking from the bottle, displayed

11                 the bottle and its 'Help Nourish Your Brain' flag on its own, and flashed

12                 the Juice's five fruit ingredients . . . An announcer described the Juice

13                 as 'Minute Maid Enhanced with a five-nutrient boost,' but made no

14                 mention of pomegranates or blueberries.

15  (Pl.'s SOF Opp'n ¶ 31.)

16          Pom, on the other hand, contends that Coca Cola's television advertising identifies the

17  Juice as a "pomegranate and blueberry juice blend," first, and makes no explicit reference to the

18  Juice's flavor.  (Pl.'s SOF Opp'n ¶ 29; Pl.'s Addt'l SOF ¶¶ 41, 42.)  Pom further alleges that the

19  paper copy that Coca Cola submitted as evidence of the "Help Nourish Your Brain" commercial

20  "does not depict the Juice's five fruit ingredients."  (Pl.'s SOF Opp'n ¶ 31.)

21          4.    The Minute Maid Website

22          Finally, Coca Cola maintains that its "Minute Maid website [the "Enhanced Juices Website"]

23  contains information about the Juice."[2]  (Torrey Decl. Ex. 6; Pl.'s SOF Opp'n ¶ 33.)  Coca Cola

24  _____

25          [2]  The Court notes that the parties refer to www.minutemaid.com in their pleadings, but
    when the Court attempted to access said website, it was directed to

26  www.minutemaid.com/index.jsp.  (Pl.'s SOF Opp'n ¶ 33.)  Furthermore, because the parties
    identify said website as including references to the Juice, as well as depicting the full

27  Minute Maid® Enhanced Juice and Juice Drink line, it is assumed that the parties intend to refer
    to www.minutemaid.com/EnhancedJuices.jsp, which includes those features.  Accordingly, the

28  Court will refer to www.minutemaid.com/EnhancedJuices.jsp as the Enhanced Juices Website

states that "[r]eferences to the Juice are on [the Enhanced Juices Website], and [also] in a section of the website dedicated to the Juice [the Juice Webpage]" (collectively, the "Minute Maid Webpages"). (Pl.'s SOF Opp'n ¶ 34.) Pom disputes whether the Enhanced Juices Website includes "sections," as Coca Cola contends, but otherwise agrees that the Minute Maid Webpages focus on the Juice's "product and nutrition information, storage tips, the benefits of the Juice's added ingredients, and games related to the Juice."[3]  (Pl.'s SOF Opp'n ¶ 35.) Regardless of whether the relevant webpages form the same website, there are two distinct pages, one that relates to the Minute Maid® Enhanced Juices & Juice Drinks, generally, and which will be referred to as the Enhanced Juices Website, and one that relates to the Juice, specifically, and which will be referred to as the Juice Webpage. (Torrey Decl. 6.)

Coca Cola contends that "[h]eadings on [Minute Maid Webpages] refer to the Juice as 'Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend,'" but which Pom contests.[4]  (Pl.'s SOF Opp'n ¶ 36.) Instead, Pom argues that the "Flavored 100% Juice Blend" is in "a different text and font color, . . . [and] far smaller than the header [Minute Maid® Enhanced Pomegranate Blueberry]." (Pl.'s SOF Opp'n ¶ 36; Torrey Decl. Ex. 6, p. 47.) Because "Flavored 100% Juice Blend" is also located on a lower line, Pom argues that the header consists of only "Minute Maid® Enhanced Pomegranate Blueberry." (Pl.'s SOF Opp'n ¶ 36; Torrey Decl. Ex. 6, p. 47.)

The parties disagree over other features of the Juice Webpage, too. Coca Cola asserts that the Juice Webpage sufficiently emphasizes "'Minute Maid® Enhanced Pomegranate

---

because it most closely parallels that which the parties refer to in their pleadings. To that end, the Enhanced Juices Website provides access to the "Minute Maid® Enhanced Pomegranate Blueberry" page, www.minutemaid.com/PomegranateBlueberry.jsp, which includes even more information about the Juice, and will be referred to as the "Juice Webpage."

[3]  The Enhanced Juices Website includes a row of different words, each of which provides information relating to a different topic. The row includes the following "topics:" (1) Products; (2) Healthy Living; (3) Recipes; (4) About Us; (5) Promotions; (6) News; and (7) Downloads.

[4]  Here, it is clear that Coca Cola intends to cite to what the Court refers to as the Juice Webpage, since the Enhanced Juices Website does not include any heading that reads "Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend."

1    Blueberry Flavored 100% Juice Blend,' and places "no emphasis on pomegranates or
2    pomegranate juice, let alone on the specific health benefits (*e.g.*, reduced risk of cancer) that Pom
3    claims [Coca Cola] provide[s]."   (Pl.'s SOF Opp'n ¶ 40; Torrey Decl. Ex. 6, p. 47.)   The
4    Juice Webpage contains the following language:

5            Minute Maid® Enhanced Pomegranate Blueberry is a great tasting
6            flavored 100% juice blend with 50mg of Omega-3/DHA per 8 fl. oz.
7            serving and four other nutrients to help nourish your brain and body.
8            Find it in the chilled juice section of your local store.

9    (Torrey Decl. Ex. 6, p. 47.) Below this language is an icon entitled "get product information," that
10   links to another page (the "Get Information Page") that includes additional information about the
11   Juice:

12           Minute Maid Enhanced Pomegranate Blueberry is a great tasting
13           flavored 100% juice blend with 50mg of Omega-3/DHA per 8 fl. oz.
14           serving and four other nutrients to help nourish your brain and body.
15           By combining natural fruit juices and targeted fortification, this new
16           Minute Maid Enhanced Juice delivers enhanced nutrition, and is a
17           perfect addition to a healthy diet.

18   (Torrey Decl. Ex. 6, p. 48.)   Still more, an icon entitled "Nutrition Information" on the Get
19   Information Page, links to another page that contains the Juice's nutritional information (the
20   "Nutritional Information Page").  (Torrey Decl. Ex. 6, p. 50.)  The Nutritional Information Page
21   states that the Juice contains apple, grape, and pomegranate juices from concentrate, blueberry
22   juice from concentrate, natural flavors, and raspberry juice from concentrate. (Torrey Decl. Ex. 6,
23   p. 50.)

24          Consequently, Pom contends that the Minute Maid Webpages emphasize the Juice's
25   pomegranate and blueberry juice content.   (Pl.'s SOF Opp'n ¶¶ 36-40.)   Pom notes that

26

27

28

1  Minute Maid's Brand Director, Ashley Ann Schmidt, confirmed that the Minute Maid Webpages are
2  intended to advertise and market the Juice.[5]  (Pl.'s Addt'l SOF ¶ 5.)

3         C.    Pom's Allegations Against Coca Cola

4         "[T]he main ingredients in [the Juice] are neither pomegranate, nor blueberry juice, but
5  rather, apple and grape juice."  (FAC ¶ 19; *supra* Part I.)  Specifically, the Juice "contains only
6  0.3% pomegranate juice and 0.2% blueberry juice."  (Pl.'s Addt'l SOF ¶ 1; Silverman Decl. Ex. F.)
7  By contrast, "[a]pple and grape juices make up more than 99.4% of the Juice's contents, with the
8  fifth type of juice, raspberry juice, making up just 0.1%."  (Pl.'s Addt'l SOF ¶ 1; Silverman Decl. Ex.
9  F.) Therefore, Pom contends that Coca Cola labels the Juice as a "Pomegranate Blueberry" juice,
10 and advertises and markets it, through its packaging, commercials, Minute Maid Webpages,[6] and
11 other forms of advertising, "based on the representation that the Juice's primary ingredients . . .
12 are pomegranate and blueberry juice, when, in fact, the primary ingredients are actually apple and
13 grape juice."  (FAC ¶¶ 8, 20.)  Accordingly, Pom alleges that consumers of the Juice "are likely
14 to be misled and deceived by [its] . . . labeling, marketing and advertising," which damages not
15 only the consuming public, but also Pom, as Coca Cola's competitor.  (FAC ¶¶ 23–26.)

16        1.   Consumer Complaints

17        Pom contends that Coca Cola has received a record number of complaints regarding the
18 Juice.  (Pl.'s Addt'l SOF ¶¶ 16-23; *see generally* Nancy Tyndal Dep. 11-15, 43-49, 252,
19 Dec. 10, 2009.)  Nancy Tyndal ("Tyndal"), a fourteen-year employee of Coca Cola, and who has
20 "field[ed] consumer complaints about many products, . . . asserts that there have been no
21 Minute Maid products about which consumers have complained more."  (Nancy Tyndal Dep.
22 252:6-18, Dec. 10, 2009.)  Indeed, Pom provides a list of consumer complaints provided to it by

23 _____

24     [5] The Court notes that Ms. Schmidt used the language "the Website," which is terminology
25 that the Court has since abandoned because it is an overly broad definition of the Minute Maid
   Webpages.  It is, however, irrelevant whether Ms. Schmidt intended to refer to the Enhanced
26 Juices Website or the Juice Webpage.  What is important is whether Minute Maid intends to use
   the Minute Maid Webpages as a form of communicating to consumers.
27
28     [6] The Court again notes that the parties' references to "the Minute Maid website"
   encompasses both the Enhanced Juices Website and the Juice Webpage.

Coca Cola, and which Pom contends suggests that consumers have been misled into believing
that the Juice was something for which it is not.  (Pl.'s Addt'l SOF ¶¶ 19-23.)  For example, one
consumer complaint reads:

> Today I made the mistake of buying [the] Minute Maid product that
> you call 'Pomegranate Blueberry[.]'  What a crock.  It's nothing but
> fancy apple grape juice.  You people are scumbags for mislabeling
> your products.  I'll never buy this product again.  I'll never buy
> Minute Maid products again.  And I'll tell all of my friends about this
> fraud.  Thanks for wasting my time and money . . . .[7]

(Pl.'s Addt'l SOF ¶ 19; Pl.'s Opp'n 3-4.)  The Court notes that Pom has referenced several other
similar complaints, but concludes that it unnecessary to reference them all.  (Pl.'s Opp'n 4.)

### 2.   The Field Survey

"Pom commissioned Dr. E. Deborah Jay ("Dr. Jay") to conduct a survey (the "Field Survey")
that assesse[d] consumer confusion in connection with [Coca Cola's] advertising of the Juice."[8]

---

[7]   The Court notes Coca Cola's opposition to Pom's inclusion of "selected consumer complaints."  (*See generally* Def.'s Objections to Evidence Presented in Conjunction with Pl.'s Opp'n to Summ. J. ("Def.'s Objections to Evidence"))  Pom, however, alleges that the complaints it cites and relies upon, were produced by Coca Cola.  (Silverman Decl. ¶¶ 15-19.)  In any event, even if the Court declines to address the consumer complaints to which Coca Cola objects, Nancy Tyndal, a Coca Cola employee, states that in her experience, the Juice has received more complaints than any other Minute Maid product.  (Silverman Decl. Ex. L.)

[8]   Dr. Jay is the President and CEO of Field Research Corporation, which is, according to Pom, one of the oldest and most respected marketing and public opinion research firms in the United States.  (Pl.'s Addt'l SOF ¶ 24.)  The Field Survey was conducted with 538 face-to-face double-blind interviews of adults age 18 and older who believed they would purchase a pomegranate juice blend and a blueberry juice blend in the next three months.  (Pl.'s Addt'l SOF ¶ 25.)  "The Field Survey interviewed a 'test' group of respondents who were shown the Juice's actual bottle label, along with a 'control' group of respondents who were shown a slightly modified bottle with the words 'Pomegranate Blueberry' removed from the front and back label."  (Pl.'s Addt'l SOF ¶ 26.)  According to Pom, "36% of the test group in the Field Survey indicated that they believed the Juice mainly contains pomegranate and blueberry juice, and not other types of fruit juice."  (Pl.'s Addt'l SOF ¶ 27.)  "32% of the test group in the Field Survey indicated that they believed the Juice mainly contains pomegranate and blueberry juice, and not other types of fruit juice, *because of the words* 'pomegranate blueberry' on the label."  (Pl.'s Addt'l SOF ¶ 28) (emphasis added.)  Finally, Pom contends that "1% of the control group in the Field Survey

(Pl.'s SOF Opp'n ¶ 43; Pl.'s Addt'l SOF ¶¶ 24-33.)  Dr. Jay concluded that "a substantial proportion of potential purchasers of pomegranate and blueberry juice blends are likely to mistakenly believe that [the Juice] mainly contains pomegranate and blueberry juice (and not other types of fruit juice) due to the packaging (the words 'pomegranate blueberry' on the front of the bottle and in the product name on the back of the bottle)."  (Pl.'s SOF Opp'n ¶ 47.)  Pom notes that "Dr. Jay did not purport to conclude that this was the only consumer confusion which exists regarding the Juice, or that such confusion is limited to the bottle, as opposed to other means of false advertising."  (Pl.'s SOF Opp'n ¶ 47.)  Pom further contends that "[t]he 35% differential which the Field Survey found between the test and control groups' respective belief that the Juice only contains pomegranate and blueberry juice far exceeds the percentage that district courts typically find acceptable for a consumer survey in support of a Lanham Act claim."  (Pl.'s Opp'n 5.)  Therefore, Pom argues that the Field Survey demonstrates the misleading effect that the Minute Maid Webpages have on consumers, so that consumers are likely "to believe that the Juice *mainly* contains pomegranate and blueberry juice (and not other types of fruit juice)."  (Pl.'s Addt'l SOF ¶¶ 32-33.)  Accordingly, Pom claims that "[t]he Field Survey evidences the misleading effect of [Coca Cola's] decision to identify the Juice by the name 'Pomegranate Blueberry.'"  (Pl.'s Addt'l SOF ¶ 31.)

Principally, Coca Cola contests the efficacy of the Field Survey.  (Pl.'s SOF Opp'n ¶¶ 43-47.)  First, Coca Cola argues that "[t]he only stimulus shown to the survey participants was the bottle and the label of the Juice," and so, the Field Survey did "not attempt to evaluate the messages conveyed by Minute Maid's website or any of [Coca Cola's] other advertising."  (Pl.'s SOF Opp'n ¶ 45; Def.'s Mot. 3-4.)  Coca Cola notes that "[t]he [Field] [S]urvey found that the main message the [Juice's] bottle communicated to most consumers was that 'the product is healthy, nutritious, nourishes the brain, is good for you, has Omega-3/DHA or has other vitamins and nutrients.'"  (Pl.'s SOF Opp'n ¶ 46.)  Finally, Coca Cola alleges that "Dr. Jay concluded that any

---

indicated that they believed the Juice mainly contains pomegranate and blueberry juice, and *not other types of fruit juice*."  (Pl.'s Addt'l SOF ¶ 29) (emphasis added.)

consumer confusion about the [Juice] was due to packaging (the words 'pomegranate blueberry' on the front of the bottle and in the product name on the back of the bottle)," and not due to the Juice's advertising or marketing.  (Pl.'s SOF Opp'n ¶ 47.)

### 3.   Coca Cola's Alleged Knowledge That the Juice Is Misleading

Finally, Pom argues that Coca Cola knew that the Juice was misleading, but willingly assumed the advertising risk that any misconception necessarily created.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Opp'n") 3.)  Pom cites a correspondence between Coca Cola employees sent prior to the Juice's launch, and which allegedly illustrates Coca Cola's intent to launch a misleading product:[9]

> As discussed here is a copy of the front label for the new MM
> Enhanced Juice Pomegrante [sic] Blueberry product.  The product has
> a blend of apple, grape, pomegranate, blueberry & raspberry juices
> from conc.  We are in compliance with the FDA regs related to the
> naming of juice containing products.  There is a risk from a misleading
> standpoint as the product has less than 0.5% of pomegranate and
> blueberry juices.  Mike St. John is aware of this issue & is willing to
> assume the risk.

(Silverman Decl. Ex. H; Pl.'s Opp'n 3; Pl.'s Addt'l SOF ¶¶ 6-7.)  According to Pom, "[t]his e-mail constitutes damning evidence of [Coca Cola's] willful consumer deception."  (Pl.'s Opp'n 3.)

### D.   Procedural History

Based on the above-mentioned facts, Pom brought suit against Coca Cola on September 22, 2008, alleging causes of action for: (1) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); (2) false advertising under California Business and Professions Code § 17500; and (3) statutory unfair competition under California Business and Professions Code § 17200.

---

[9]   The correspondence at issue here was sent by A. Lucy Reid ("Reid"), Coca Cola's Director of Scientific and Regulatory Affairs, to Reid's boss, Mike St. John ("St. John"), President and General Manager of Minute Maid.  (Pl.'s Opp'n 3; Pl.'s Addt'l SOF ¶¶ 6-7; Silverman Decl. Exs. G, H.)

1    (*See* FAC ¶¶ 28–50.)  On February 10, 2009, the Court denied in part, and granted in part, Coca

2    Cola's Motion to Dismiss (the "First Motion to Dismiss").  (*See* Order of Feb. 10, 2009.)

3    Specifically, the Court granted in part Coca Cola's First Motion to Dismiss Pom's Lanham Act

4    claim "only to the extent it challenges the Juice's formal name and labeling in areas for which the

5    FDA has promulgated regulations implementing the [Federal Food, Drug, and Cosmetic Act]."[10]

6    (*See* Order of Feb. 10, 2009.)   Regarding Pom's state law claims, the Court granted in part

7    Coca Cola's First Motion to Dismiss "to the extent [the state law claims] seek to impose any

8    obligations that are 'not identical to' the sections of the FFDCA . . . ."  (*See* Order of

9    Feb. 10, 2009.)  The Court concluded:

10                    [t]o the extent the safe harbor doctrine applied in this case, it would

11                    only bar Pom's claim for statutory unfair competition under California

12                    Business and Professions Code § 17200 with respect to "business

13                    practices specifically permitted" or conduct "clearly permit[ted" by the

14                    FFDCA . . . . [However,] [b]ecause Coca Cola merely contends that

15                    the safe harbor doctrine applies to the 'FDA's Juice naming

16                    regulations' and the Court has already held that Pom's state law

17                    claims are expressly preempted to the extent they seek to impose

18                    obligations differing from those contained in the FFDCA and its

19                    accompanying FDA regulations regarding the Juice's "common or

20                    usual name," the safe harbor would not extend beyond the portion of

21

22

23            [10]   The Federal Food, Drug, and Cosmetic Act ("FFDCA"), also referred to as the Federal
       Drug and Cosmetic Act ("FDCA"), gives the FDA authority to promulgate regulations that
24     govern the branding of food, in order to "promote honesty and fair dealing in the interest of consumers."
       21 U.S.C. §§ 301, 341.  "Under 21 U.S.C. § 337(a), the FDCA provides that 'all such proceedings
25     for the enforcement, or to restrain violations of [the Act] shall be by and in the name of the
       United States.'  Courts have generally interpreted this to mean that no private right of action exists
26     to redress alleged violations of the FDCA."   *Summit Technology, Inc. v. High-Line Medical
       Instruments Co., Inc.*, 922 F. Supp. 299, 305 (C.D. Cal. 1996) (internal citations omitted); *Ginochio
27     v. Surgikos, Inc.*, 864 F. Supp. 948, 956 (N.D. Cal. 1994) (citing various courts that have held that
       "there is no private cause of action for violations of the [FDCA]").
28

1    the claims that the Court has already found to be expressly preempted

2    by the FFDCA.

3    (*See* Order of Feb. 10, 2009.)

4    Following the filing of Pom's FAC on July 27, 2009, Coca Cola filed a Motion to Dismiss

5    First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (the "Second Motion to Dismiss").

6    (*See generally* FAC.) The Court "reasserted its previous position" and denied Coca Cola's Second

7    Motion to Dismiss. (*See* Order of Sept. 15, 2009.) The Court concluded that "FDA juice-naming

8    and labeling regulations do not bar Pom from alleging that Coca Cola has advertised or marketed

9    the Juice in a misleading manner on its website and in other advertising avenues. . . at this motion

10   to dismiss stage it is unnecessary to demarcate and identify which (if any) of the allegations in the

11   FAC are within the FDA's sole purview, and which allegations are encompassed by the Lanham

12   Act." (*See* Order of Sept. 15, 2009.) Moreover, regarding Pom's state law claims, the Court

13   permitted Pom to establish that Coca Cola's profits can be 'traced to ill-gotten funds,' which would

14   [therefore,] be a 'vested' interest, and entitle Pom to restitution." (*See* Order of Sept. 15, 2009.)

15   However, without more facts before it, the Court declined to preclude Pom from pursuing its state

16   law claims at the motion to dismiss stage.

17   Coca Cola now moves for summary judgment, arguing that "Pom can point to no evidence

18   that [Coca Cola's] marketing or advertising for the Juice – as distinguished from [the Juice's] name

19   and label – is false or misleading." (Def.'s Mot. 2) Pom, too, moves for partial summary

20   adjudication, on the grounds that applicable law does not provide Coca Cola with the "safe harbor"

21   or "compliance with laws" affirmative defenses to Pom's claims, and which are asserted pursuant

22   to the Lanham Act § 43(a) ("the Lanham Act") and Cal. Bus. & Prof. Code §§ 17200 and 17500.

23   (*See* Pl.'s Notice of Mot. and Mot. for Partial Summ. J. Re: Def.'s Affirmative Defenses of Safe

24   Harbor and Compliance with Laws; Mem. of P. & A. ("Pl.'s Mot.") 2.)

25   II.   DISCUSSION

26        A.   Standard for Summary Judgment

27   Summary judgment is proper only if "the pleadings, the discovery and disclosure materials

28   on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ.

13

P. 56(c).  A "material" fact is one that could affect the outcome of the case under the governing substantive law, and an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008) (internal citation omitted).

In determining whether a genuine issue of material fact exists, the court must not make credibility determinations or weigh conflicting evidence.  *Anderson*, 477 U.S. at 255.  Rather, the court must view the evidence in the light most favorable to the non-moving party, drawing all "justifiable inferences" in its favor.  *Id.* (internal citation omitted); *see Atlanta Attachment Co.*, 516 F.3d at 1365 (internal citation omitted); *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045 (Fed. Cir. 2001) (internal citations omitted).

B.      The Lanham Act

"Under the Lanham Act, any person that uses a 'false description or representation' that is 'in connection with any goods' is liable to another private individual 'who believes he is or is likely to be damaged by the use of any such false description or representation.'"  *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.* ("*Ocean Spray*"), 642 F. Supp. 2d 1112, 1117 (C.D. Cal. 2009)[11]; *see Jack Russell Terrier Network of Northern California v. American Kennel Club. Inc.*, 407 F.3d

---

[11]   "After filing the present action, Pom filed three other actions in the Central District of California, alleging that Tropicana Products ("Tropicana"), Ocean Spray Cranberries, Inc. ("Ocean Spray"), and Welch Foods, Inc. ("Welch's") misrepresent the amount of pomegranate juice . . . contained in their blended juice products." (Pl.'s Opp'n 6.)  The Court notes that although the three sister cases are similar to the present case, they are also factually distinguishable.  For example, although Pom cites *Ocean Spray*, the Ocean Spray label arguably includes a greater number of references to pomegranate juice, including "If you're a cranberry or pomegranate lover this juice should make you 100% happy!" and "We've combined two anti-oxidant powerhouses, the cranberry and pomegranate, along with other tasty juices."  As such, in *Ocean Spray*, Judge Dean D. Pregerson concluded that he did not find that "the essential claim advanced by [the] [p]laintiff – that [the] [d]efendant's label misrepresents the primary ingredients of the Beverage – relies on a determination by the FDA or an interpretation of its regulations." *Ocean Spray*, 642 F. Supp. 2d at 1119.

1027, 1036 (9th Cir. 2005); 15 U.S.C. § 1125(a).[12]  Indeed, the Lanham Act is designed to protect

commercial interests from a competitor's false advertising and to protect the business community

from having its reputation and good will diverted.  *See Phoenix v. McDonald's Corp.*, 489 F.3d

1156, 1168 (11th Cir. 2007); *see also Schering-Plough Healthcare Products, Inc. v. Schwarz

Pharm., Inc.*, 586 F.3d 500, 512 (7th Cir. 2009) ("The purpose of the false-advertising provisions

of the Lanham Act is to protect sellers from having their customers lured away from them by

deceptive ads or labels, or other promotional materials.").  To establish a false advertising claim

under the Lanham Act, a plaintiff must demonstrate that the challenged description or

representation is false.  *Gonzalez v. Allstate Ins. Co.*, 2005 WL 5891935, *5

(C.D. Cal. Aug. 2, 2005).  "Falsity may be established by proving that (1) the advertising is literally

false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or

confuse consumers."[13]  *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995); *see Southland Sod*

---

[12]   Section 43(a) of the Lanham Act as amended, states: (1) Any person who, on or in
connection with any goods or services, or any container for goods, used in commerce any word,
term, name, symbol, or device, or any combination thereof, or any false designation of origin, false
or misleading description of fact, or false or misleading representation of fact, which – (A) is likely
to cause confusion, or to cause mistake or to deceive as to the affiliation, connection, or
association of such person with another person, or as to the origin, sponsorship, or approval of
his goods, services, or commercial activities by another person, or (B) in commercial advertising
or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her
or another person's goods, services, or commercial activities, shall be liable in a civil action by any
person who believes that he or she is or is likely to be damaged by such act.  15 U.S.C. § 1125(a).

[13]   Some courts frame the requirements for establishing a false advertising claim under
§ 43(a) of the Lanham Act differently, requiring that plaintiffs show: (1) a false statement or fact
by the defendant in a commercial advertisement about its own or another's product; (2) the
statement actually deceived or has the tendency to deceive a substantial segment of its audience;
(3) the deception is material, in that it is likely to influence the purchasing decision; (4) the
defendant caused its false statement to enter interstate commerce; (5) the plaintiff has been or
is likely to be injured as a result of the false statement, either by direct diversion of sales from itself
to defendant or by a lessening of the good will associated with its products.  *Del Webb Cmty., Inc.,
v. Partington*, 2009 WL 3053709 (D. Nev. Sept. 18, 2009) (citing *Southland Sod Farms
v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)); *see CKE Rest. v. Jack In The Box, Inc.*,
494 F. Supp. 2d 1139, 1143-1148 (C.D. Cal. 2007).  Either way, Pom must show that Coca Cola
made false or misleading advertisements, and that Coca Cola's advertisements deceived a
substantial segment of its audience.  Thus, regardless of how the Court frames the test, the
principal two requirements for establishing liability under § 43(a) of the Lanham Act remain the
same.

1   *Farms*, 108 F.3d 1134, 1139 (9th Cir. 1997) ("[t]o demonstrate falsity within the meaning of the

2   Lanham Act, a plaintiff must show that an advertisement is literally false, . . . or that the statement

3   was literally true but likely to mislead or confuse consumers.");[14] *see Mutual Pharm. Co. v. Watson*

4   *Pharm., Inc.* ("*Mut. Pharm. Co. II*"), 2009 WL 3401117 (C.D. Cal. Oct. 19, 2009).  "[T]he Lanham

5   Act encompasses more than blatant falsehoods.  It embraces 'innuendo, indirect intimations, and

6   ambiguous suggestions' evidenced by the consuming public's misapprehension of the hard facts

7   underlying an advertisement."  *The Proctor & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d

8   114, 119 (2d Cir. 1984) (internal citations omitted); *see Cytosport, Inc., v. Nature's Best, Inc.*

9   ("*Cytosport*"), 2007 WL 1345379, *1 (E.D. Cal. May 8, 2007); *see Cottrell, Ltd. v. Biotrol Int'l, Inc.*

10  ("*Cottrell*"), 191 F.3d 1248, 1252 (10th Cir. 1999); *see also Pfizer, Inc. v. Miles, Inc.*, 868 F. Supp.

11  437, 442 (D. Conn. 1994) (holding that [the Lanham Act] embraces false impressions, innuendo,

12  and ambiguous suggestions).  Moreover, the Lanham Act covers only "commercial advertising or

13  promotion."  *Schwarz Pharm., Inc. v. Breckenridge Pharm., Inc.*, 388 F. Supp. 2d 967, 981 (E.D.

14  Wisconsin 2005) (citing *Sanderson v. Culligan Intern, Co.*, 415 F.3d 620, 624 (7th Cir. 2005) and

15  *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir 2001)).

16       Finally, because "[t]he Lanham Act and the FFDCA have overlapping jurisdiction in areas

17  such as marketing and product labeling, though the purposes of the two statutes are different,"

18  the Court now turns to an analysis of the FFDCA and FDA.  *Ocean Spray*, 642 F. Supp. 2d at

19  1118.

20             1.      The FFDCA and FDA[15]

21

22  _____

23       [14]   "To constitute commercial advertising or promotion, a statement of fact must be:

24  (1) commercial speech; (2) by the defendant who is in commercial competition with the plaintiff;
    (3) for the purpose of influencing consumers to buy defendant's goods or services.  While the

25  representations need not be made in a 'classic advertising campaign,' but may consist instead of
    more informal types of 'promotions,' the representations (4) must be disseminated sufficiently to

26  the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."

27  *Mut. Pharm. Co. II*, 2009 WL 3401117 at *3 (citing *Coastal Abstract Services, Inc. v. First*
    *American Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).

28       [15]   *See supra* note 10.

Compared to the Lanham Act, which is "primarily intended to protect commercial interests from unfair competition," the FFDCA, which was passed by Congress in response to "unsafe drugs and fraudulent marketing," is intended to "protect the public from unsafe or mislabeled products" by setting forth federal labeling requirements. *Wyeth v. Sun Pharm. Industries, Ltd.*, 2010 WL 746394 (E.D. Mich. Mar. 2, 2010) (citing *Wyeth v. Levine,* S. Ct. 1187, 1195 (2009))[16]; *see* 21 C.F.R. §§ 101 *et seq.*; *see Schwarz Pharm., Inc.,* 388 F. Supp. 2d at 973 ("The Lanham Act provides a remedy to a plaintiff harmed by 'commercial advertising or promotion' that 'misrepresents the nature, characteristic, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . In contrast, the FDCA 'is not focused on the truth or falsity of the advertising claims' but on protecting the public interest in safety and efficacy of food, drugs, and cosmetics.") (internal citations omitted).  Moreover, the FFDCA can only be enforced by the FDA or the Department of Justice. *Id.*; *Ocean Spray*, 642 F. Supp. 2d at 1118 (internal citations omitted).

Indeed, the FFDCA is explicit: "all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337 (a). "When and if a claim strays too close to the exclusive enforcement domain of the FDA, it cannot stand." *Schwarz Pharm., Inc.*, 388 F. Supp. 2d at 973 (citing *Summit Tech., Inc.*, 922 F. Supp. at 306); *see Schering-Plough*, 586 F.3d at 508-09 (holding that the FDA should be given the chance to opine on the proper labeling before a Lanham Act suit is filed because it has more experience with consumers' understanding of drug labels than judges do); *see also United States v. An Article of Food . . . Manischewitz*, 377 F. Supp. 746, 749 (D.C.N.Y. 1974) ("The function of the court in [sic] merely to determine whether the existing label is misleading, not to tell the [FDA] what amendments may be appropriate in order to rectify the situation.)".[17]

---

[16]  The Court cites to the Supreme Court Reporter because this case has not yet been published by the U.S. Reporter.

[17]  "The FDCA renders unlawful, inter alia, the misbranding of food and the distribution of misbranded food, [21 U.S.C. § 343; 21 C.F.R. § 331 (a)-(b)], and it authorizes the FDA to enforce those prohibitions via enforcement actions in the United States District Courts for injunctions or criminal penalties.  *Id.* at §§ 332, 333.  The FDCA also delegates to the FDA certain additional

In 1990, Congress passed the Nutrition Labeling and Education Act ("NLEA"), which promulgated rules for labeling and branding foods.  *See* The Nutrition Labeling and Education Act of 1990, (Public Law 101-535).[18]  Specifically, the NLEA addressed the issue of when consumers may be led to believe that a named juice is present in a beverage more than is actually the case.[19]  *Id.*  On July 2, 1991, in response to the passage of the NLEA, the FDA published for comment, proposed rules (the "1991 proposals") pertaining to the naming and labeling of multi-juice beverages.  *See* Food Labeling; Declarations of Ingredients; Common or Usual Name for Nonstandardized Foods; Diluted Juice Beverages, 56 Fed. Reg. 30452-01 (proposed July 2, 1991) (to be codified at 21 C.F.R. §§ 101, 102).[20]  The FDA expressly noted:

> [C]onsumers should be given enough accurate information to easily ascertain the nature of the juices represented to be present in a multiple-juice beverage.  Many multiple-juice beverages, for example, contain only a small amount of a highly flavored, expensive juice . . . Consequently, the agency is proposing to revise the current § 102.33 (a) to state that if a product contains less than 100 percent juice, and uses the word "juice" in the common or usual name, then the word

tools to prevent misbranding. The FDA may, and indeed must, officially express its concerns with a warning or label before reporting a violation to a United States Attorney for criminal proceedings, to afford the regulated entity notice and an opportunity to present its views. *Id.* at § 335. In the case of 'minor violations,' the agency may issue 'a suitable written notice or warning.' *Id.* at § 336. The FDA is also delegated the authority affirmatively to regulate food labels and warnings." *See Fellner v. Tri-Union Seafoods, L.L.C.,* 539 F.3d 237, 254-55 (3d Cir. 2008).

[18]  The NLEA amended the FFDCA and sought to "address concerns that the FDA had brought 'virtually no enforcement actions' against the types of claims it had previously prohibited by clarifying and strengthening 'the [FDA's] legal authority . . . to establish the circumstances under which claims may be made about the nutrients in foods . . ." *Whitaker v. Thompson*, 239 F. Supp. 2d 43, 45 (D.C. Cir. 2003); *see* 21 C.F.R. §§ 343 *et seq.*

[19]  21 U.S.C. § 343 (a) provides that a food shall be deemed misbranded if "its labeling is false or misleading in any particular way."  21 U.S.C. § 343 (a).

[20]  Regulations under 21 C.F.R. Part 101 provide general provisions for food labeling and provide detailed regulations relating to 21 U.S.C. § 343 (f).  *See* 21 C.F.R. § 101.30 (regulating "any food that purports to be a beverage that contains any fruit or vegetable juices.")

1        "juice" must be qualified by a term that indicates dilution (e.g., drink,

2        beverage, cocktail).

3 *Id.* at 30455, 30461.  The FDA further suggested:

4        [I]f a product is a multiple-juice beverage or blend of single-strength

5        juices, and declares, names, implies, or represents on the label, other

6        than in the ingredient statement, one or more of the individual juices

7        (represented juices), then the names of the juices so listed shall be

8        included in the common name or usual name in descending order of

9        predominance by volume, unless the common or usual name

10       specifically shows that the represented flavor is used as a flavor (e.g.,

11       raspberry-flavored apple and pear juice drink) . . . Thus, FDA

12       [proposes in 21 C.F.R. § 102.33 (c)] that if a diluted multiple-juice

13       beverage or blend of a single-strength juice contains a represented

14       juice and one or more that is not represented i.e., not named or

15       implied through words or vignettes, other than in the ingredient

16       statement, then the common or usual name for the product shall

17       indicate that the nonrepresented juices are present (e.g.,

18       "Raspcranberry: raspberry and cranberry juice in a blend of two other

19       fruit juices.")

20 *Id.* at 30462.  Thus, the 1991 proposals reflected the FDA's position that a multiple-juice beverage

21 named for a represented flavor would not necessarily be misleading.  *Id.*

22      Thereafter, on January 6, 1993, the FDA issued final rules in response to the NLEA (the

23 "1993 Final Rules").  *See* Food Labeling; Declarations of Ingredients; Common or Usual Name

24 for Nonstandardized Foods; Diluted Juice Beverages, 58 Fed. Reg. 2897-01 (Jan. 6, 1993) (to be

25 codified at 21 C.F.R. §§ 101, 102).  Here, the FDA explained that if a named juice is not the

26 predominant juice:

27       The label must either state that the beverage is flavored by the named

28       juice (e.g., "raspberry *flavored* juice drink") or declare that the content

1        of the named juice in a 5 percent range (e.g. "raspberry juice drink 2

2        to 7 percent raspberry juice").  The agency believes that this approach

3        will adequately deal with the kinds of misleading labeling discussed in

4        the comments from consumer groups.

5  *Id.* at 2900 (emphasis added); *see* 21 C.F.R. § 102.33 (b) (2009) ("If the product is a diluted

6  multiple-juice beverage or a blend of single-strength juices and names, other than in the ingredient

7  statement, more than one juice, then the names of those juices must be in descending order or

8  predominance by volume *unless the name specifically shows that the juice with the represented*

9  *flavor is used as a flavor* (e.g., raspberry-flavored apple and pear juice.") (emphasis added).

10        Again, the 1993 Final Rules reflected the FDA's position that multiple-juice beverages

11  named for a represented or characteristic flavor or juice are not necessarily misleading.  58 Fed.

12  Reg. 2897 at 2918-19 ("The basic nature of a product can be described in various ways, e.g., as

13  a blend of five juices," and a product containing apple, grape, raspberry, and cranberry juice may

14  include the name "Raspberry and cranberry flavored juice beverage in a blend of two other juices

15  . . . There are several ways in which a multiple-juice beverage can be appropriately labeled.").

16        Consequently, in accordance with the 1993 Final Rules, 21 C.F.R. § 102.33 (c) states:

17        If a diluted multiple-juice beverage . . . contains a juice that is named

18        or implied on the label or labeling other than the ingredient statement

19        (represented juice) and also contains a juice other than the named or

20        implied juice (nonrepresented juice), then the common or usual name

21        for the product shall indicate that the represented juice is not the only

22        juice present (e.g., "Apple blend; apple juice in a blend of two other

23        fruit juices").

24  *See* 21 C.F.R. § 102.33 (c) (2009).  Similarly, 21 C.F.R. § 102.33 (d) provides:

25        In a diluted multiple-juice beverage or blend of single- strength juices

26        where one or more, but not all, of the juices are named on the label

27        other than in the ingredient statement, and where the named juice is

28        not the predominant juice, the common or usual name for the product

1       shall: (1) *Indicate that the named juice is present as a flavor or*
2       *flavoring* (e.g., "Raspcranberry"; raspberry and cranberry flavored
3       juice drink); or (2) Include the amount of the named juice, declared in
4       a 5-percent range (e.g. Raspcranberry; raspberry and cranberry juice
5       beverage, 10- to 15- percent cranberry juice and 3- to 8- percent
6       raspberry juice.)  The 5- percent range, when used, shall be declared
7       in the manner set forth in § 102.5 (b)(2).

8   *See* 21 C.F.R. § 102.33 (d) (emphasis added).  In addition to that which is explained in 21 C.F.R.

9   §§ 102 *et seq.*, the FDA adopted regulations concerning the use of the word "flavored" for all foods

10  generally, and provides that a food may be described as "flavored" with natural flavor derived from

11  a "characterizing" ingredient, even if little of the "characterizing" ingredient is actually present in

12  the food.  21 C.R.F. § 101.22 (i)(1)(i) explains:

13      If the food is one that is commonly expected to contain a
14      characterizing food ingredient . . . and the food contains natural flavor
15      derived from such ingredient and an amount of characterizing
16      ingredient insufficient to independently characterize the food, or the
17      food contains no such ingredient, the name of the characterizing flavor
18      . . . shall be immediately followed by the word '*flavored*' . . . .

19  *See* 21 C.R.F. § 101.22 (i)(1)(i) (emphasis added).

20      Finally, in the 1993 Final Rules, the FDA considered whether fruit vignettes on juice labels

21  have the potential to mislead the public, and whether such vignettes shall be FDA-regulated.  *See*

22  58 Fed. Reg. 2897, at 2919-22.  The FDA concluded:

23      The agency did not [referring to previous proposals] propose a
24      specific requirement regarding the relative amounts of the various
25      fruits depicted in a label vignette but solicited comments on whether
26      it should require that the vignette accurately reflect the quantity of the
27      fruit present or the taste of the product, or whether some other
28      requirement is appropriate . . . The agency agrees that it is not always

1    necessary that the label of a multiple-juice beverage depict each juice
2    in a vignette.  The agency believes that a vignette that pictures only
3    some of the fruit or vegetables in the beverage *would not be*
4    *misleading where the name of the food adequately and appropriately*
5    *describes the contribution of the pictured juice*.  For example, a 100
6    percent juice product consisting of apple, grape, and raspberry juices,
7    in which the raspberry juice provides the characterizing flavor, a
8    vignette depicting raspberries would not necessarily be misleading if
9    the statement of identity were "raspberry juice in a blend" or
10   "raspberry juice in a blend of two other juices, 3 to 8 percent raspberry
11   juice."  Moreover, if these three juices were in a beverage containing
12   50 percent total juice, a vignette picturing raspberries would not be
13   misleading in the presence of a name like "raspberry flavored juice
14   beverage."  Accordingly, *FDA is not requiring that vignettes depict the*
15   *fruit or vegetables for all juices present*.  However FDA believes that
16   a vignette that pictures the fruit or vegetable sources of all juices
17   present in a product would provide useful information and thus
18   *encourages* manufacturers to use such vignettes.

19   *See* 58 Fed. Reg. 2897 at 2918-21 (emphasis added).  Thus, in the 1993 Final Rules, the FDA

20   concluded that in the context of multi-juice beverages, manufacturers are not required to depict

21   all the fruits or vegetables in vignettes.  *Id*. at 1921-22.  Instead, the FDA merely encouraged

22   manufacturers to depict all fruits and vegetables present in the juice, as that would be instructive

23   to consumers.  Thus, in the context of vignettes on multi-juice beverages, the 1993 Final Rules

24   reflect the FDA's position that it is an agency specifically tasked with regulating names and labels

25   in order to prevent the misbranding of products.  *Id*.

26          2.      Interplay Between the Lanham Act and the FFDCA

27          In light of the distinction between the Lanham Act and the FFDCA, and their remedial

28   mechanisms, a line of cases has arisen finding that Lanham Act claims are barred where private

22

1  litigants ask the court to determine preemptively how the FDA will interpret and enforce its own

2  regulations.  *See Mutual Pharm. Co. v. Ivax Pharm., Inc.* ("*Mutual I*")*,* 459 F. Supp. 2d 925, 933

3  (C.D. Cal. 2006).  This interplay between the Lanham Act and the FFDCA, therefore, requires

4  "courts [to] . . . tread carefully when applying the Lanham Act to advertising of goods . . . that are

5  also subject to regulation by the FDCA, lest it be used as a vehicle to accomplish indirectly

6  something a party could not accomplish directly."  *Id.*

7          On one hand, "[c]ourts have refused to allow a Lanham Act claim to proceed where, in

8  order to determine the falsity or misleading nature of the representation at issue, the court would

9  be required to interpret and then apply FFDCA statutory or regulatory provisions."  *Mutual I*, 459

10  F. Supp. 2d at 934 (citing *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d

11  Cir. 1990); *see Cottrell,* 191 F.3d at 1255; *see also All One God Faith, Inc. v. The Hain Celestial*

12  *Group, Inc.*, 2009 WL 4907433 (N.D. Cal. Dec. 14, 2009).  "Simply put, the Lanham Act does not

13  allow a federal court to determine preemptively how a federal agency will interpret and enforce its

14  own regulations."  *Summit Tech.*, 922 F. Supp. at 306 (citing *Sandoz Pharm. Corp.*, 902 F.2d at

15  231); *see Summit Tech., Inc. v. High-Line Med. Instruments, Co.* ("*Summit II*"), 933 F. Supp. 918,

16  933 (C.D. Cal. 1996) (refusing to allow a Lanham Act claim to proceed where the claim would

17  force the court to rule directly on the legality of the defendant's conduct before the FDA had a

18  chance to do so).  This is especially true "in light of Congress' intention to repose in [the FDA] the

19  task of enforcing the FFDCA."  *Braintree Lab., Inc. v. Nephro-Tech., Inc.* ("*Braintree*")*,* 1997 WL

20  94237, *6 (D. Kan. Feb. 26, 1997).  "It is in this context that many courts have refused to allow a

21  Lanham Act claim to proceed, as the alleged 'falsity' is not something that is verifiable without . . .

22  interpretation and application of FDA regulations."  *Id.* at 936; *see also Sandoz Pharm. Corp.*, 902

23  F.2d at 231 (refusing to adjudge falsity of a cough syrup label when "the FDA ha[d] not found

24  conclusively that [the product was mislabeled]" because doing so would require original

25  interpretation of the FFDCA or its regulations).  As the court in *Mutual I* concluded:

26              If the allegedly false or misleading nature of the statement can be

27              easily verified, then the fact that the determination of the truth of that

28              statement was made by the FDA is immaterial so long as the party

1    can also show the other requirements for establishing a Lanham Act

2    claim, that is, that the false or misleading statement is likely to deceive

3    consumers.

4  *Mutual I,* 459 F. Supp. at 935.  In *American Home Products Corp. v. Johnson & Johnson*, the court

5  similarly concluded that FDA approval was a defense to a competitor's Lanham Act claim.

6  *American Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 145 (S.D.N.Y. 1987).  The

7  court held that "[i]f FDA approval of the precise label used by a drug manufacturer is a defense

8  to a consumer's product liability action, it should be *a fortiori*, a defense to a competitor's action

9  under the Lanham Act."  *Id.*

10      "On the other hand, the simple fact that a matter touches upon an area dealt with by the

11  FDA is not a bar to proceeding with a claim under the Lanham Act."  *Ocean Spray*, 642 F.

12  Supp. 2d at 1118 (citing *Mutual I*, 459 F. Supp. 2d at 935).  For example, a Lanham Act claim may

13  proceed where a plaintiff alleges that the defendant has affirmatively misrepresented compliance

14  with FDA regulations, or where a court would only need to "verify whether defendant's specific

15  label or conduct conforms to what the FDA has already determined is required."  *Id.; see also*

16  *Braintree,* 1997 WL 94237, *6 (holding that "[m]ost obviously, a false statement of FDA approval

17  is sanctionable")*; see also Cytosport*, 2007 WL 1345379 at *2 (holding that "courts have refused

18  to dismiss Lanham Act claims when plaintiffs can establish that the statements at issue are false

19  or misleading without relying on the FDCA or FDA regulations").  To this end, preclusion of a

20  Lanham Act claim will likely rest on "whether the false advertising involves a fact that can be easily

21  verifiable, without requiring the truth of the fact to be determined by the FDA."  *Ocean Spray*, 642

22  F. Supp. 2d at 1118 (internal citation omitted).

23      Moreover, some courts have concluded that "false statements are actionable under the

24  Lanham Act, even if their truth may be generally within the purview of the FDA."  *Cytosport*, 2007

25  WL 1345379, at * 2 (citing *Summit II*, 933 F. Supp. at 933); *see Cottrell,* 191 F.3d at 1256;  As the

26  court in *Summit Tech.* explained, "a plaintiff may bring a Lanham Act cause of action for

27  affirmatively misrepresenting facts, even if the facts may be governed by FDA regulations."

28

1   *Summit Tech.*, 922 F. Supp. at 307; *see also Pfizer, Inc.*, 868 F. Supp. at 449 (holding that literally

2   false statements concerning areas of the FDA's purview can be actionable under the Lanham Act).

3   In *Grove Fresh Distributors, Inc. v. The Flavor Fresh Foods, Inc.*, the defendants sold

4   orange juice labeled as "100% Orange Juice from Concentrate." *Grove Fresh*, 720 F. Supp. 714,

5   715 (N.D. Ill. 1989). The plaintiff sued under the Lanham Act, "asserting that because defendants'

6   product was not 100% orange juice, its labeling was false and misleading." *Summit Tech.*, 922

7   F. Supp. at 307. The court found that plaintiff's claim was not an FFDCA cause of action

8   "because, even without the FDA's orange juice definition, plaintiff could still establish a violation

9   of [the Lanham Act]– indeed, the commercial definition of pure orange juice could be determined

10  without *any* reference to FDA regulations." *Id.* The plaintiff could "rely on the FDA regulation

11  merely to establish the standard or duty which [the] defendants allegedly failed to meet. Nothing

12  prohibit[ed] [the plaintiff] from using the FDCA or its accompanying regulations in this fashion."

13  *Id.* Likewise, in *Summit II,* the plaintiff argued that the defendant's imported products were

14  improperly labeled because they were labeled as "identical" to domestically manufactured

15  products that were FDA-approved. *Summit II*, 933 F. Supp. at 933. The court declined to dismiss

16  the action because "the question of whether the domestic and international [products] are

17  'identical' is a factual one that can be resolved without the interpretation or application of FDA

18  regulations." *Id.*

19  Similarly, in *Cytosport*, the court concluded that it would "not need to rely on the FFDCA

20  or any FDA regulation to show that the statement 'Carb Conscious' is misleading." *Cytosport*,

21  2007 WL 1345379 at *3. Specifically, the court would not need to interpret or otherwise apply

22  FFDCA or FDA regulations. *Id.* "To make its case, [the plaintiff] [could] present evidence, such

23  as consumer surveys, that indicate consumers would consider such statement misleading when

24  [the product] contains 15 grams of carbohydrate." *Id.* The court in *Mutual I,* therefore, concluded

25  that it could distinguish between instances where courts "find either as a matter of common sense

26  or normal English, that which the FDA, with all of its scientific expertise, has yet to determine . . .

27  [and instances where] the [FDA] should be given the first chance to exercise that discretion or to

28  apply that discretion." *Mutual I,* 459 F. Supp. 2d at 938.

25

3.    <u>Establishing Advertising under the Lanham Act Is Misleading</u>

Assuming a Lanham Act claim is not precluded by the FFDCA or FDA regulations, "in order to recover damages, . . . the plaintiff must demonstrate that it has been damaged by actual consumer reliance on the misleading statements."  *Emerging Material Tech., Inc. v. Rubicon Tech., Inc.*, 2009 WL 5064349, *4 (N.D. Ill. Dec. 14, 2009).  Here, the statements-at-issue, namely Coca Cola's naming, labeling, advertising, and marketing, are not alleged to be literally false, but rather, misleading in context.   Thus, "[w]here a statement is not literally false and is only misleading in context, . . . proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical." *Mut. Pharm. Co. II*, 2009 WL 3401117 at *3 (citing *The William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995)); *see Del Webb,* 2009 WL 3053709 at * 13*; see Sandoz Pharm. Corp.*, 902 F.2d at 228-29 (context is important in evaluating the message conveyed); *see also Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992) (requiring plaintiff to demonstrate that a "statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement").  Indeed, "[e]ven if an advertisement is not literally false, relief is available under [the] Lanham Act § 43(a) if it can be shown that the advertisement has misled, confused, or deceived the consuming public." *Southland Sod. Farms*, 108 F.3d 1134 at 1140.

"Reactions of the public are typically tested through the use of consumer surveys." *Southland Sod. Farms*, 108 F.3d 1134 at 1140; *see also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:55 (4th ed. 1996) ("If the ad is not clear, plaintiff must produce evidence, usually in the form of market research or consumer surveys, showing exactly what message ordinary consumers received from the ad . . . . [T]he moving party must provide expert testimony or other evidence.") (internal citations omitted).  "To assess the truth of [the] more amorphous, [or] misleading statements, the courts favor testing by consumer reaction surveys, but have also found falsity based on their own independent reaction and the reaction of witnesses testifying before the court, including testimony based on test results, consumer surveys, complaints received, allegations of more than a few instances of misrepresentation and

otherwise." *Cottrell*, 191 F.3d at 1252.  In *Cottrell*, the Tenth Circuit concluded that "if [the plaintiff] can establish by consumer surveys or other means that [the defendant's] advertising is likely to confuse or actually confuses consumers, then the effect of the false 'implication' of EPA approval that [the plaintiff] now assumes could be as damaging for Lanham Act purposes as an express false claim of EPA approval." *Id.* at 1256; *see also Mut. Pharm. Co. II*, 2009 WL 3401117 at *3 (holding that the plaintiff did not need to rely on the FDCA or any FDA regulations in order to determine whether a statement was misleading, and instead, could "present evidence, such as consumer surveys, to indicate [that] consumers would consider [said] statement misleading"). However, "[t]o prove that use of [a] particular marketing channel conveys such a false impression . . . [the plaintiff] cannot . . . obtain relief by arguing how consumers could react; *it must be shown how consumers actually do react*." *Mutual I*, 459 F. Supp. 2d at 940 (internal citations omitted) (emphasis added).  Similarly, in *Sandoz*, the Third Circuit concluded:

> A Lanham Act plaintiff . . . is not entitled to the luxury of deference to its judgment.  Consequently, where advertisements are not literally false, plaintiff bears the burden of proving the actual deception by a preponderance of the evidence.  Hence, [a plaintiff] cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react . . . The effect of the advertisement on the consumer is the critical determination, and it must be demonstrated by a Lanham Act plaintiff regardless of whether the claim is facially ambiguous.

*Sandoz*, 902 F.2d at 228-29.  However, "[s]ubjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act." (*Cytec Corp.* v. *Neuromedical Sys., Inc.*, 12 F. Supp. 2d 296, 300 (S.D.N.Y. 1998) (citing *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)), and "[a]s a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case." *Southland Sod Farms*, 108 F.3d at 1144.

1    In any event, the "failure to establish that a significant number of consumers [are] actually

2    deceived is not necessarily fatal to [a plaintiff's] case.  If [the defendant has] intentionally misled

3    consumers, [the court will presume that] consumers were in fact deceived and [the defendant]

4    would have the burden of demonstrating otherwise."  *The William H. Morris Co. v. Group W, Inc.*,

5    66 F.3d 255, 258 (9th Cir. 1995); *see Del Webb,* 2009 WL 3053709 at *13; *see also Novartis*

6    *Consumer Health, Inc. v. Johnson & Johnson*, 290 F.3d 578, 594 (3d Cir. 2002).  Indeed, where

7    a defendant "intentionally misl[eads]" consumers, by "deliberate conduct of egregious nature,"

8    courts may presume that consumers have been deceived.  *William H. Morris Co.*, 66 F. 3d at 258;

9    *see also Gonzalez v. Allstate Ins. Co.*, 2005 WL 5891935, *10 (C.D. Cal. Aug. 2, 2005).

10   Accordingly, even if Pom cannot establish by a preponderance of evidence that consumers were

11   actually deceived by Coca Cola's allegedly misleading statements, if Pom can establish willful

12   misconduct by Coca Cola, then the Court may presume that consumers have been deceived.

13          C.   The State Law Claims

14   Since this Court's September 15, 2009 Order, several other courts in the Central District

15   have addressed the issue of whether Pom has standing to assert similarly pled state law claims,

16   and which the Court finds compelling.  *See Pom Wonderful LLC v. Tropicana Products, Inc., et*

17   *al.* ("*Tropicana*"), CV 09-00566 DSF (CTx), (C.D. Cal. Oct. 21, 2009); *Pom Wonderful LLC*

18   *v. Welch Foods, Inc.* ("*Welch*"), CV 09-00567 AHM (AGRx), (C.D. Cal. Dec. 21, 2009).

19   Specifically, to have standing under California Business & Professions Code § 17200, referred to

20   as California's Unfair Competition Law ("UCL"), and California Business & Professions Code

21   § 17500, referred to as California's False Advertising Law ("FAL"), Pom must show that it has

22   suffered an injury in fact, namely that it has "lost money or property as a result of . . . unfair

23   competition."  Cal. Bus. & Prof. Code §§ 17204, 17535.  "[L]ost money or property" have been

24   interpreted as requiring that a plaintiff show he is entitled to restitution from a defendant.  *See*

25   *Citizens of Humanity, LLC v. Costco Wholesale Corp.*, 89 Cal. Rptr. 3d  455, 472 (Cal. Ct.

26   App. 2009) (holding that the alleged harm to a plaintiff's goodwill is not a loss of "money or

27   property as a result of the unfair competition," and is insufficient to confer standing on the plaintiff);

28   *see also Buckland v. Threshold Enterprises, Ltd.*, 66 Cal. Rptr. 3d 543, 557-58 (Cal. Ct. App.

28

2007) (holding that a plaintiff's purchase of goods which was made expressly in order to establish standing for an action in the public interest was "not reasonably viewed as lost money or property under the standing requirement").

In *Korea Supply Corp. v. Lockheed Martin Corp.*, the California Supreme Court held that for purposes of California's UCL, restitution is not "limited only to the return of money or property that was once in the possession of that person." *Korea Supply Corp. v. Lockheed Martin Corp.*, 131 Cal. Rptr. 2d 29, 42 (Cal. 2003). Specifically, the California Supreme Court held that "restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *Id.* Thus, although earned "wages [can] be recovered as restitution under the UCL," a lost business opportunity, which is only an "attenuated expectancy interest," and not subject to a constructive trust, is not a vested interest, and cannot be recovered under the UCL as restitution. *Id.* The court further noted: "As the United States Supreme Court recently said, a constructive trust requires 'money or property identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession.'" *Id.* (citing *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213 (2002)).

Here, it has been shown that Pom is not entitled to restitutionary relief. Specifically, it is clear that Pom has no vested share of the pomegranate juice market, or a vested interest in Coca Cola's profits from the Juice. As Judge Dale S. Fischer succinctly explained in *Tropicana*, "there is no reasonable definition of vested interest that would include market share." *Tropicana,* CV 09-00566, at 2. Similarly, Judge Howard A. Matz concluded that "like the plaintiff in *Korea Supply*, Pom seeks to recover nonrestitutionary disgorgement of profits that are nothing more than a 'contingent expectancy of a payment from a third party' – in this case, consumers." *Welch*, CV 09-00567, at 5 (citing *Korea Supply Corp.*, 131 Cal. Rptr. 2d at 42). Moreover, Pom is not entitled to seek injunctive relief under the UCL and FAL, either. Indeed, as both Judge Dale S. Fischer and Judge Howard A. Matz noted, a restitutionary interest is required for standing, even if the plaintiff does not seek restitution as a remedy. *See Welch*, CV 09-00567, at 5; *see Tropicana,* CV 09-00566, at 2*; see Walker*, 558 F.3d at 1027. Because Pom's state law claims

1   are strikingly similar to those it has pled in the above-mentioned cases, and because the Court

2   finds Judge Howard A. Matz and Judge Dale S. Fischer's reasoning to be compelling, Coca Cola's

3   summary adjudication as to this issue is GRANTED.

4          Accordingly, Coca Cola's Motion is **GRANTED IN PART** to the extent that Pom's state law

5   claims are **DISMISSED**.  Pom's Motion is **DENIED** as moot to the extent that it seeks to preclude

6   Coca Cola's affirmative defenses against its state law claims.

7          D.    The Lanham Act Claim

8                1.    Naming and Labeling

9          Principally, Pom contends that Judge A. Howard Matz, Judge Dean D. Pregerson, and

10  Judge Dale S. Fischer, as well as this Court, "all got it right at the motion to dismiss stage that

11  federal law does not preclude or preempt Pom's claims against juice product naming and labeling."

12  (Pl.'s Opp'n 2.)   To that end, Pom seeks to have this Court indirectly require that Coca Cola

13  change the Juice's naming and labeling to reflect what Pom believes is a more appropriate naming

14  and/or labeling of the Juice's bottle.  (FAC ¶ 20.)  Pom states:

15                Instead of calling its product "Apple Grape" juice, which are the two

16                primary juices in its product, Coca Cola made a marketing decision to

17                give this product the brand name "Pomegranate Blueberry" juice on

18                the front label, and to juxtapose this brand name with a picture of a

19                pomegranate and other fruits, among other misleading elements.

20  (FAC ¶ 20; Pl.'s Mot. 5.)  Specifically, Pom alleges that Coca Cola's naming and labeling on the

21  Juice's bottle is voluntary, and thus, Pom's claims are not directed at the features of the Juice's

22  "formal" naming and labeling.  (Pl.'s Opp'n 10; Pl.'s Mot. 5.)  Pom argues therefore, that the

23  Lanham Act claim is directed towards the Juice's naming and labeling, for "which [Coca Cola]

24  chose in order to maximize the label's deceptive impact on consumers."  (Pl.'s Opp'n 10.)

25          Coca Cola contends that the Juice's name, "Pomegranate Blueberry Flavored Blend Of 5

26  Juices," "complies with all applicable FDA regulations," and so, is precluded from being challenged

27  by the Lanham Act.  Def.'s Mot. 8; *see* 58 Fed. Reg. 2897 at 2920; *see also* 21 C.F.R. § 102.33

28  (stating that "this revision of new § 102.33 along with the others discussed below are adequate

1    to prevent misleading labels on multiple-juice beverages").  In support of its contention that the

2    Juice's naming and labeling comport with the relevant FFDCA and FDA regulations, Coca Cola

3    states that the Juice's "name includes two identified juices, pomegranate and blueberry.  Because

4    these named juices are not the predominant juices by volume, the product name includes the word

5    'flavored,' as required by 21 C.F.R. § 102.33 (d), and as expressly permitted by 21

6    C.F.R. § 101.22 (i)(1)(i), based upon the inclusion of 'natural flavors' in the Juice."  (Def.'s Mot. 8.)

7    Coca Cola further maintains that "because there are additional juices in the product, the [Juice's]

8    name also includes the word 'blend,' as required by 21 C.F.R. § 102.33 (c)."  (Def.'s Mot. 8.)

9         This Court's previous Order held that Pom's Lanham Act claim against the Juice's formal

10   name and label, "Pomegranate Blueberry Flavored Blend Of 5 Juices," "impermissibly challeng[es]

11   the FDA's labeling for a multiple-juice beverage."  (Order of Feb. 19, 2009).  The FDA has directly

12   spoken on the issues that form the basis of Pom's Lanham Act claim against the naming and

13   labeling of the Juice, and has therefore, reached a conclusion as to what is permissible.  *See* 21

14   C.F.R. §§ 102.33 (c), (d).  Indeed, the FDA has spoken on several occasions, and each time, it

15   has concluded that manufacturers of multiple-juice beverages may identify their beverages with

16   a non-primary, characteristic juice, as Coca Cola does here.  *See* 56 Fed. Reg. 30452; *see* 58

17   Fed. Reg. 2897; *see Holk v. Snapple Beverage Corp.*, 574 F. Supp. 2d 447, 454 (D.

18   New Jersey 2008), *cited with disapproval in Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d

19   1028, 1034 (N.D. Cal. 2009) ("the FDA under the broad authority granted to it by the FFDCA, has

20   promulgated comprehensive regulations pertaining to, *inter alia*, . . . the common or usual name

21   for diluted multiple-juice beverages or a product containing a blend of single-strength juices . . . .").

22   The rules promulgated by the FDA are intended to protect the public from unsafe or mislabeled

23   products by setting forth federal labeling requirements, and with which the Juice's naming and

24   labeling comply.  *Wyeth v. Sun Pharm. Indus., Ltd.*, 2010 WL 746394 (E.D. Mich. Mar. 2, 2010)

25   (citing *Wyeth v. Levine,* 129 S. Ct. 1187, 1195 (2009)).  Thus, the name "Pomegranate Blueberry

26   Flavored Blend Of 5 Juices" sufficiently comports with the requirements of 21 C.F.R. §§ 102.33

27   (c),(d).

28

1   Moreover, although the Juice's name appears in different fonts and on different lines, Pom

2   has not provided the Court with evidence that the Juice's naming and labeling is not prominently

3   displayed, and so not in compliance with 21 U.S.C. § 343 (f).[21]  *See Wyeth v. Levine*, 129 S. Ct.

4   at 1197 ("The FDCA does not provide that a drug is misbranded simply because the manufacturer

5   has altered an FDA-approved label; instead, the misbranding provision focuses on the substance

6   of the label and, among other things, proscribes labels that fail to include 'adequate warnings.'");

7   *see Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 823-24 (1986) ("a drug is 'misbranded'

8   under the FDCA if 'the labeling or advertising *fails to reveal facts material . . .* with respect to

9   consequences which may result from the use of the article to which the labeling or advertising

10  relates.") (emphasis added) (internal citations omitted); *see Mensing v. Wyeth, Inc.*, 588 F.3d 603,

11  611 (8th Cir. 2009) (holding that the misbranding provisions of the FDCA, 21 U.S.C. § 355 (e),

12  "focus on the accuracy of a product's label"); *see also* 21 U.S.C. § 352 (f).  Pom has not shown

13  that the Juice's name must appear on one single line, must be in one font, or must be centrally

14  located on the Juice's bottle, in order to avoid being branded mislabeled, or that as a consequence

15  of these aesthetic features, the Juice's naming and labeling is not prominently displayed.  *See* 21

16  U.S.C. § 343 (f)*; see generally* Pl.'s Opp'n; *see* 58 Fed. Reg. 2897, at 2902-03; *see also Braintree,*

17  1997 WL 94237, *6.  Instead, all that 21 U.S.C. § 343 (f) requires is that Coca Cola prominently

18  place the label on the Juice's bottle, and which Coca Cola does sufficiently.  *See* 21 U.S.C. § 343

19  (f).

20      In any event, any such determination that naming and labeling must be displayed in a

21  particular way or fashion, as Pom suggests, would necessarily be for the FDA to determine, and

22  so, is not for this Court to construe or interpret.  *See Braintree,* 1997 WL 94237 at *6.  Thus,

23  because "Pomegranate Blueberry Flavored Blend Of 5 Juices" complies with the relevant FDA

24

25      [21] 21 U.S.C. § 343 (f), entitled "Prominence of information on label," provides: "If any word,
26  statement, or other information required by or under authority of this chapter to appear on the label
    or labeling is not *prominently placed* thereon with such conspicuousness (as compared with other
27  words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to
    be read and understood by the ordinary individual under customary conditions of purchase and
28  use." 21 U.S.C. § 343 (f) (emphasis added).

1   regulations and is prominently displayed on the Juice's front panel, pursuant to 21 U.S.C. § 343 (f),

2   even if not to the liking of Pom, this Court cannot conclude that the Juice's naming and labeling

3   is misleading, inaccurate, or outside the purview of the FDA.

4         Of course, "Pom is free to lobby Congress or petition FDA to change its rules . . . ." Def.'s

5   Opp'n 2; *see also American Home Prods. Corp.*, 672 F. Supp. at 145 ("If the intercession of a

6   private attorney general is needed to press the FDA to perform that duty with respect to a

7   particular product label, the quickest and most effective relief could be obtained through a direct

8   petition to the agency and not through an unfair competition action against the manufacturer

9   . . . There is no apparent reason why [the plaintiff] cannot ask the FDA to reconsider that approval

10  in light of the survey evidence it has presented here to show the message users take from . . . [the

11  defendant's] package.")  As a private litigant, Pom cannot seek to have this Court indirectly attack

12  FDA regulations as courts may not be used to second-guess the considered judgments of the

13  FDA.[22]  *Cytyc*, 12 F. Supp. 2d at 301 (concluding that FDA approval of statements is a defense

14  to a competitor's Lanham Act claim).  Coca Cola may name the Juice a blend or a flavor since

15  such language is expressly permitted (required here) by the FDA, even if pomegranate and/or

16  blueberry are merely characteristic, rather than primary juices in the Juice.  *See* 21

17  C.F.R. §§ 102.33 (c), (d).  Pom's challenge to the Juice's name and label, "Pomegranate

18  Blueberry Flavored Blend Of 5 Juices," on the Juice's bottle, is therefore, barred.  *Id.*

19        Accordingly, because Coca Cola's naming and labeling of the Juice comports with the

20  relevant FFDCA and FDA regulations, Coca Cola's Motion is **GRANTED IN PART** to the extent

21  that Pom is precluded from pursuing its Lanham Act claim against the naming and labeling on the

22  Juice's bottle.  Similarly, Pom's Motion is **DENIED** as moot to the extent that Pom seeks to bar

23

24  _____

25     [22]  Pom argues that *Cytyc* is distinguishable from the facts of this case because the FDA
has not expressly approved of the Juice's naming or labeling.  (Pl.'s Opp'n 12.)  However, the

26  Court finds *Cytyc* compelling because the court in *Cytyc* similarly dealt with "statements that [did]
not correspond precisely to statements that the FDA ha[d] approved."  *Cytyc*, 12 F. Supp. 2d at

27  301.  In any event, the court concluded that "the challenged statements discussed above [were]
similar enough to the approved statements for the court to conclude, as a matter of law, that they

28  are neither false not misleading."  *Id.*

1  Coca Cola from presenting evidence that the Juice's naming and labeling comply with FDA
2  regulations.

3                    2.        The Fruit Vignette

4         Pom contends that the imagery on the Juice's bottle's front panel, which includes the
5  Fruit Vignette, intentionally misleads consumers.  (Pl.'s Opp'n 11; Def's Statement in Opp'n ¶ 2.)
6  Specifically, because the centrally-placed Fruit Vignette includes a large half-open pomegranate,
7  Pom argues that consumers will incorrectly believe that the Juice consists primarily of
8  pomegranate juice.  (Pl.'s Opp'n 11; Torrey Decl. Ex. 1; Def's Statement in Opp'n ¶ 2.)   In
9  response, Coca Cola contends that because the Fruit Vignette complies with FDA regulations,
10  Pom is necessarily precluded from alleging that the Fruit Vignette violates the Lanham Act. (Def.'s
11  Mot. 8.)

12         In the FDA's 1993 Final Rules, whereby the FDA discussed the depiction of fruits on a label
13  vignette, the FDA expressed the belief that vignettes depicting pictures of the fruit or vegetable
14  sources of all juices present in a product would be useful to consumers, and so encouraged
15  manufacturers to use vignettes.  See 58 Fed. Reg. 2897 at 2918-21; see Ocean Spray, 642 F.
16  Supp. 2d at 1119-20.  The fact that the FDA discussed vignettes within the context of juice labels
17  suggests that vignettes are related to and/or part of a juice's label.  Specifically, the FDA stated
18  that "a vignette that pictures only some of the fruit or vegetables in the beverage would not be
19  misleading where the name of the food adequately and appropriately describes the contribution
20  of the pictured juice."  See 58 Fed. Reg. 2897 at 2918-21.  Indeed, it is generally a juice's name,
21  as well as the vignette, that instructs consumers as to what a juice contains.  Thus, it would be
22  inconsistent, if not nonsensical, for the FDA to say that a determination of whether a juice's
23  naming and labeling is misleading depends on the interplay between a juice's naming and labeling,
24  and any accompanying vignette, but that it, nonetheless, declines to regulate such vignettes.
25  Rather, because vignettes are intricately related to a determination of whether a juice label and/or
26  name is misleading, vignettes, like the Fruit Vignette, are within the FDA's purview.

27         To that end, the example used by the FDA in its 1993 Final Rules indicates that the
28  Fruit Vignette clearly complies with FDA requirements relating to the depiction of vignettes.  See

                                                  34

58 Fed. Reg. 2897 at 2918-21.  Specifically, the FDA indicated that for a "100 percent juice product consisting of apple, grape, and raspberries, in which the raspberry juice provides the characterizing flavor," it would not be misleading if the vignette depicts only raspberries, as long as "the statement of identity [is] 'raspberry juice in a blend,' or 'raspberry juice in a blend of two other juices, 3 to 8 percent raspberry juice.'"  *See* 58 Fed. Reg. 2897 at 2918-21.  Here, the Juice is identified as a "Blend," such that Coca Cola's statement of identity adequately and appropriately identifies pomegranate and blueberry as merely characterizing flavors.  Thus, because the Fruit Vignette in fact depicts all of the juices in the Juice, as opposed to only "some" of the juices (i.e., blueberries and/or pomegranates), Coca Cola has seemingly provided more information and identification for consumers than is even required by the FDA.  Pursuant to the FDA's 1993 Final Rules, the Fruit Vignette is, therefore, clearly not misleading.

Subsequent to the FDA's 1993 Final Rules, a handful of courts have looked at whether the FDA is tasked with regulating fruit vignettes on products, and in each instance, the court has concluded that the regulation of vignettes comes within the FDA's purview.  *See R. McKinnis v. Kellogg, USA*, 2007 WL 476060, *4 (C.D. Cal. Sept. 19, 2007); *see Holk v. Snapple Beverage Corp.*, 574 F. Supp. 2d at 454.[23]  Although *R. McKinnis* pertains to state law claims, and so is distinguishable from the facts before this Court, *R. McKinnis* concluded that fruit vignettes are FDA-regulated:

> For one, the depiction of fruit on a product label is not a specific
> affirmation that a product contains any fruit at all.  *FDA regulations*
> *permit illustrations of fruit on product label[s]* to indicate that product's

---

[23]  Although the court in *Holk* concluded that the "FDA, under the broad authority granted to it by the FFDCA, has promulgated comprehensive regulations pertaining to . . . (4) label depictions by 'vignette or other pictorial representation' on products," *Lockwood* expressly stated that it was "not persuaded by [*Holk*]."  *See Lockwood*, 597 F. Supp. 2d at 1034; *see Holk*, 574 F. Supp. 2d at 454.  In any event, the Court cites *Holk* because it is one of only a few courts that has directly dealt with the issue of whether vignettes come within the purview of the FDA, and because *Lockwood* did not expressly or directly conclude that fruit vignettes are outside the purview of the FDA. *See Lockwood*, 597 F. Supp. 2d at 1034.  Rather, *Lockwood* merely indicated that the FDA's reach is not as extensive or as exhaustive as *Holk* concluded.  *Id.*

'characterizing flavor,' even where the product contains no ingredients derived from the depicted fruit . . . . Froot Loops contains 'ALL NATURAL FLAVORS' of lime, orange, lemon, cherry, raspberry, and blueberry, as disclosed in the ingredients panel, rendering any depiction of fruit 'vignettes' on the box entirely accurate and permissible under FDA regulations.

*R. McKinnis,* 2007 WL 476060 at *4 (emphasis added).

Accordingly, because the depiction of vignettes on multi-juice beverages is an area of regulation within the FDA's purview, as the FDA's 1993 Final Rules and subsequent caselaw reflect, and because the Fruit Vignette is clearly not misleading pursuant to the FDA's 1993 Final Rules, Coca Cola's Motion is **GRANTED IN PART** to the extent that Pom is precluded from pursuing its Lanham Act claim against the Fruit Vignette.  Similarly, Pom's Motion is **DENIED** as moot to the extent that Pom seeks to bar Coca Cola from presenting evidence that the Fruit Vignette complies with FDA regulations.

### 3.   Advertising and Marketing

#### a.   Consumer Confusion

This Court previously concluded that Pom is not prevented from alleging that Coca Cola "has otherwise advertised and marketed [the Juice] in a misleading manner . . ." (Order of Sept. 15, 2009.)  Coca Cola "fully accepts, and does not contest . . . that advertising apart from the Juice's formal name and label is subject to challenge under [the] Lanham Act." (Def.'s Mot. 14.)  As such, it is critical that Pom show "proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients." *The William H. Morris Co.*, 66 F.3d at 258.  As in *Gonzalez*, whether Coca Cola's advertising and marketing has a tendency to deceive a substantial segment of the relevant audience is a disputed question of fact. *Gonzalez*, 2005 WL 5891935, *9.

"The party offering a survey as proof of consumer confusion bears the burden of proving its reliability." *Pfizer, Inc.*, 868 F. Supp. at 447.  To that end, Pom alleges that "[t]he 35% differential which the Field Survey found between the test and control groups' respective belief that

the Juice only contains pomegranate and blueberry juice far exceeds the percentage that district courts typically find acceptably for a consumer survey in support of a Lanham Act claim."  Decl of Steven A. Zalesin ("Zalesin Decl.") Ex. 1; Pl.'s Opp'n 5; *see Novartis Consumer Health, Inc.*, 290 F.3d at 594 (finding that 15.5% would be sufficient to support a finding of substantial consumer confusion).  The Field Survey provides some evidence of consumer deception.  (Zalesin Decl. Ex. 1.)  Pom contends that the Field Survey directly demonstrates the generally misleading effect that the Juice has on consumers, such that consumers are likely "to believe that the Juice *mainly* contains pomegranate and blueberry juice (and not other types of fruit juice)."  (Zalesin Decl. Ex. 1; Pl.'s Addt'l SOF ¶¶ 32-33.)

Coca Cola "hotly disputes the methodology and conclusions of [the Field Survey]."  (Def.'s Mot. 17; Decl. of Dr. Ran Kivetz in Supp. of Def.'s Mot. for Summ. J. ("Kivetz Decl.") ¶ 2.)  Coca Cola argues that "Pom has not identified a shred of evidence that any of [Coca Cola's] ads are false or misleading in any respect," and so "Pom has offered no evidence that [Coca Cola's] website or ads have misled consumers."  (Def.'s Mot. 14; Def.'s Reply 5.)  As such, Coca Cola contends that because the Field Survey fails to address Coca Cola's advertising or marketing, and instead, only addresses the Juice's name and label, it is "unreliable."  (Def.'s Reply 3; Kivetz Decl. ¶ 3, Ex. A.)  Specifically, Coca Cola states that "[t]he only stimulus shown to the survey participants was the bottle and label of the Juice," and so the Field Survey "did not attempt to evaluate the messages conveyed by the Juice's website of any of [Coca Cola's] other advertising."  (Def.'s Mot. 3-4; *see generally* Kivetz Decl. Ex. A.)

The Ninth Circuit holds that "surveys in trademark cases are to be admitted as long as they are conducted according to accepted principles . . . [Moreover,] [t]echnical reliability goes to the weight accorded a survey, not its admissibility."  *CKE Rest.*, 494 F. Supp. 2d at 1144 (citing *E. J. Gallo Winery v. Gallo Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992)); *see also Pfizer, Inc.*, 868 F. Supp. at 447 ("The probative value of a survey depends entirely upon its fundamental fairness and objectivity, which in turn depends on many factors, such as whether it is properly 'filtered' to screen out those who got no message from the advertisement, whether the questions are directed to the real questions, and whether the questions are leading or suggestive.").  Furthermore:

1          The weight and evidentiary value of a survey's results rest upon the

2          underlying objectivity of the survey itself.  This objectivity, in turn,

3          depends upon many factors, such as whether [the survey] is properly

4          filtered to screen out those who got no message from the

5          advertisement whether the questions are directed to the real issues,

6          and whether the questions are leading or suggestive.

7  *CKE Rest.*, 494 F. Supp. 2d at 1144 (citing *Johnson & Johnson Merck Consumers v. Smithkline*

8  *Beecham Corp.*, 960 F.2d 294, 300 (2d Cir. 1992)).  Any deficiencies cited by Coca Cola regarding

9  the Field Survey, therefore, "weaken the relevance and credibility of the survey evidence."  *CKE*

10  *Rest.*, 494 F. Supp. 2d at 1144.  Accordingly, the Field Survey is seemingly unreliable for the

11  reasons articulated by Defendant.  In particular, the Field Survey does not appear to relate to

12  Coca Cola's advertising and marketing, and only implicates the naming and labeling of the Juice

13  bottle.  (Jay Decl. Ex. A.)  However, whether the Field Survey actually meets the *Daubert*

14  standards is best considered at trial.

15                        b.     Willful Deception

16      In any event, even if the Field Survey is defective as to the advertising and marketing claim,

17  if Pom has other evidence of consumer deception, or if Pom can show that Coca Cola intentionally

18  misled consumers, the burden may shift to Coca Cola to demonstrate otherwise.  *See The William*

19  *H. Morris Co.*, 66 F.3d at 258.

20      Coca Cola, however, contends that Pom cannot "circumvent the consumer survey

21  requirement by arguing that [Coca Cola's] false advertising is 'willful' and 'thus inherently

22  establishes that consumers are substantially deceived.'"  (Def.'s Reply 4; Pl.'s Opp'n 18.)

23  Coca Cola argues that Pom's evidence of alleged "willful deception" does not relate to its website

24  or advertisements for the Juice.  (Def.'s Reply 4-5.)  First, Coca Cola states that the Reid

25  correspondence, referred to by Pom as a "smoking gun," relates solely to the Juice's name, not

26  its advertising, marketing, or website.  (Def.'s Reply 5.)  Coca Cola further notes that the Reid

27  correspondence illustrates Coca Cola's desire to comply with FDA regulations, and so, does not

28  evidence an egregious or willful intent to deceive.  (Def.'s Reply 5.)  Finally, Coca Cola argues that

the consumer complaints cited by Pom are based on consumers who bought the Juice in stores, not consumers who viewed the website or Coca Cola's other advertising media. (Def.'s Reply 5.)

Coca Cola's claims are seemingly meritorious.  However, the Court concludes that Pom should have the opportunity to demonstrate otherwise.  Accordingly, drawing all inferences in favor of Pom as this Court must, the Court concludes that triable issues of material fact remain as to Pom's advertising and marketing claims.

III.   <u>RULING</u>

For the foregoing reasons, Coca Cola's Motion is **GRANTED IN PART** and **DENIED IN PART**, and Pom's Motion is **DENIED**.

IT IS SO ORDERED.

Dated:  May 5, 2010

_S. James Otero_

_____
                    S. JAMES OTERO
          UNITED STATES DISTRICT JUDGE