JEFFREY A. ROSENFELD (SBN 136896)
jeffrey.rosenfeld@dlapiper.com
DLA PIPER LLP
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067
Tel:    310-595-3000
Fax:   310-595-3300

STEVEN A. ZALESIN (admitted *pro hac vice*)
sazalesin@pbwt.com
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:    212-336-2000
Fax:   212-336-2222

Attorneys for Defendant
THE COCA COLA COMPANY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POM WONDERFUL LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> THE COCA-COLA COMPANY, a Delaware corporation; and DOES 1-10, inclusive, <br><br> Defendants. | Case No.   2:08-cv-06237-SJO-MRW <br><br> **DEFENDANT'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT** <br><br> **L.R. 16-4** <br><br> **(REDACTED)** <br><br> Judge:    Honorable S. James Otero <br> Trial:     March 15, 2016 |

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ...................................................... 1

II.     INTRODUCTION .......................................................................... 2

    A.   The Minute Maid Enhanced Pomegranate Blueberry Flavored Blend of 5 Juices ................................................................. 2

    B.   Pom's Marketing of Its "Super-Premium" Juices ................... 3

    C.   Pom's Litigation Campaign and Its Unclean Hands .............. 4

    D.   Pom Attempts to Abandon Its Health-Based Allegations ...... 7

III.    POM'S LANHAM ACT CLAIM ................................................... 8

    A.   Summary of Pom's Claim [L.R. 16-4.1(a)] ........................... 8

    B.   Elements of Pom's Claim [L.R. 16-4.1(b)] ........................... 8

    C.   Key Evidence in Opposition to Pom's Claim  [L.R. 16-4.1(c)] ........... 9

IV.     MINUTE MAID'S AFFIRMATIVE DEFENSE OF UNCLEAN HANDS ........... 22

    A.   Summary of Minute Maid's Unclean Hands Affirmative Defense [L.R. 16-4.1(d)] ................................................. 22

    B.   Elements of Minute Maid's Unclean Hands Affirmative Defense [L.R. 16-4.1(e)] ................................................. 23

    C.   Key Evidence Supporting Minute Maid's Unclean Hands Defense [L.R. 16-4.1(f)] ................................................. 23

V.      EVIDENTIARY ISSUES [L.R. 16-4.1(h)] .................................... 28

VI.     KEY LEGAL ISSUES GERMANE TO THE CASE [L.R. 16-4.1(i)] .......... 29

VII.    BIFURCATION OF ISSUES [L.R. 16-4.3] .................................... 30

VIII.   ISSUES TO BE RESOLVED BY THE JURY AND THE COURT [L.R. 16-4.4] ........... 30

    A.   Issues Triable to the Jury ................................................... 30

B.      Issues Triable to the Court ....................................................... 30

IX.    ATTORNEYS' FEES [L.R. 16-4.5] ..................................................... 34

X.     ABANDONMENT OF ISSUES [L.R. 16-4.6] .......................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Fed. Republic of Nigeria,*
 219 F.3d 869 (9th Cir. 2000) ................................................................ 22, 23, 26

*Am. Footwear Corp. v. General Footwear Co.,*
 609 F.2d 655 (2d Cir. 1979) ............................................................................. 16

*BMMG, Inc. v. Am.-Telecast Corp.,*
 1993 U.S. Dist. LEXIS 21072 (C.D. Cal. May 6, 1993), *aff'd*, 1994
 U.S. App. LEXIS 34142 (9th Cir. Dec. 1,1994) ............................................... 18

*Cairns v. Franklin Mint Co.,*
 24 F. Supp. 2d 1013 (C.D. Cal. 1998) ................................................................ 9

*Camel Hair & Cashmere Mfg. Inst. v. Saks Fifth Ave.,*
 284 F.3d 302 (1st Cir. 2002) ............................................................................. 15

*Castrol, Inc. v. Pennzoil Quaker State Co.,*
 169 F. Supp. 2d 332 (D.N.J. 2001) ................................................................... 32

*In re Century 21-Remax Real Estate Adver. Claims Litig.,*
 882 F. Supp. 915 (C.D. Cal. 1994) ..................................................................... 9

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.,*
 526 U.S. 687 (1999) .......................................................................................... 32

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.,*
 911 F.2d 242 (9th Cir. 1990) .............................................................................. 9

*Diodato v. Turecamo Coastal & Harbor Towing, Inc.,*
 100 F.R.D. 756,758 (S.D.N.Y. 1984) ................................................................ 33

*Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.,*
 890 F.2d 165 (9th Cir. 1989) ............................................................................. 23

*Ellenburg v. Brockway, Inc.,*
 763 F.2d 1091 (9th Cir. 1985) ........................................................................... 23

*Emco, Inc. v. Obst,*
 2004 U.S. Dist. LEXIS 12118 (C.D. Cal. May 7, 2004) .................................... 26

iii

*Fifty-Six Hope Rd. Music v. A.V.E.L.A., Inc.*,
   778 F.3d 1059 (9th Cir. 2015) ............................................................. 31

*FLIR Sys., Inc. v. Sierra Media, Inc.*,
   965 F. Supp. 2d 1184 (D. Or. 2013) .................................................. 26

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
   826 F.2d 837 (9th Cir. 1987) ......................................................... 23, 25

*Gracie v. Gracie*,
   217 F.3d 1060 (9th Cir. 2000) ............................................................. 30

*Harper House, Inc. v. Thomas Nelson, Inc.*,
   889 F.2d 197 (9th Cir. 1989) .......................................................... 17, 21

*Henrickson v. eBay, Inc.*,
   165 F. Supp. 2d 1082 (C.D. Cal. 2001) .............................................. 22

*Int'l Olympic Comm. v. San Francisco Arts & Athletics*,
   781 F.2d 733 (9th Cir. 1986) ............................................................... 30

*Japan Telecom, Inc. v. Japan Telecom Am., Inc.*,
   287 F.3d 866 (9th Cir. 2002) ............................................................... 26

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
   304 F.3d 829 (9th Cir. 2002) ............................................................... 26

*Johnson & Johnson Vision Care, Inc. v. 1-800 CONTACTS, Inc.*,
   299 F.3d 1242 (11th Cir. 2002) ........................................................... 15

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc
   Rorer Pharm., Inc.*,
   19 F.3d 125 (3d Cir. 1994) ................................................................. 12

*Keystone Driller Co. v. Gen. Excavator Co.*,
   290 U.S. 240 (1933) ........................................................................... 26

*Kournikova v. Gen. Media Commc'ns, Inc.*,
   278 F. Supp. 2d 1111 (C.D. Cal. 2003) .............................................. 16

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993) ....................................................... 17, 21

iv

*Manhattan Med. Co. v. Wood*,
 108 U.S. 218 (1883) ........................................................................ 27

*McClaran v. Plastic Indus., Inc.*,
 97 F.3d 347 (9th Cir. 1996) ....................................................... 19, 30

*Memphis Keeley Inst. v. Leslie E. Keeley Co.*,
 155 F. 964 (6th Cir. 1907) .............................................................. 27

*Metro Motors v. Nissan Motor Corp.*,
 339 F.3d 746 (8th Cir. 2003) ......................................................... 26

*Mut. Pharm. Co. v. Ivax Pharm. Inc.*,
 459 F. Supp. 2d 925 (C.D. Cal. 2006) .............................................. 9

*Nat'l Basketball Assoc. v. Motorola, Inc.*,
 105 F.3d 841 (2d Cir. 1997) ........................................................... 15

*Oyster Software, Inc. v. Forms Processing, Inc.*,
 2001 U.S. Dist. LEXIS 22520 (N.D. Cal. Dec. 6, 2001) ................... 31

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
 227 F.3d 489 (5th Cir. 2000) ......................................................... 15

*Playboy Enters., Inc. v. Baccarat Clothing Co.*,
 692 F.2d 1272 (9th Cir. 1982) ....................................................... 31

*In re POM Wonderful LLC*,
 No. 9344 (U.S. Fed. Trade Comm'n May 17, 2012) ....................... 6, 7

*Pom Wonderful LLC v. Coca-Cola Co.*,
 134 S. Ct. 2228 (2014) ..................................................................... 5

*Pom Wonderful LLC v. Coca-Cola Co.*,
 679 F.3d 1170 (9th Cir. 2012) ..................................................... 5, 14

*Pom Wonderful LLC v. Coca-Cola Co.*,
 727 F. Supp. 2d 849 (C.D. Cal. 2010) ......................................... 5, 9, 10, 14

*POM Wonderful, LLC v. FTC*,
 777 F.3d 478 (D.C. Cir. 2015) .......................................................... 7

*Pom Wonderful LLC v. Tropicana Prods., Inc.*,
 No. 09-cv-00566 DSF (C.D. Cal. Nov. 1, 2010) ....................... 7, 28, 33

*Pom Wonderful LLC v. Welch Foods, Inc.*,
 737 F. Supp. 2d 1105 (C.D. Cal. 2010).................................................28

*Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*,
 324 U.S. 806 (1945) ........................................................................23, 26

*Reebok Intern., Ltd. v. Marnatech Enters., Inc.*,
 970 F.2d 552 (9th Cir. 1992).................................................................31

*Reese v. Odwalla, Inc.*,
 30 F. Supp. 3d 935 (N.D. Cal. 2014)....................................................14

*Republic Molding Corp. v. B.W. Photo Utils.*,
 319 F.2d 347 (9th Cir. 1983)............................................................23, 33

*Rice v. Fox Broad. Co.*,
 330 F.3d 1170 (9th Cir. 2003)...........................................................9, 15

*Sears, Roebuck & Co. v. Menard, Inc.*,
 2003 U.S. Dist. LEXIS 951 (N.D. Ill. Jan. 22, 2003) ..........................16

*Southland Sod Farms v. Stover Seed Co.*,
 108 F.3d 1134 (9th Cir. 1997)..................................................................9

*TrafficSchool.com, Inc. v. Edriver Inc.*,
 653 F.3d 820 (9th Cir. 2011)....................................................20, 21, 23

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
 793 F.2d 1034 (9th Cir. 1986).................................................................30

*Wang Labs., Inc. v. Mitsubishi Elec. Am., Inc.*,
 103 F.3d 1571 (9th Cir. 1997).................................................................33

*The William H. Morris Co. v. Grp. W, Inc.*,
 66 F.3d 255 (9th Cir. 1995).....................................................................12

*ZAZU Designs v. L'Oreal S.A.*,
 979 F.2d 499 (7th Cir. 1992)...................................................................19

**Statutes and Regulations**

15 U.S.C. § 1117(a) ........................................................................*passim*

21 C.F.R. § 102.33...................................................................................10

58 Fed. Reg. 2897 (1996) ...................................................................... 11, 14

**Other Authorities**

47 Am. Jur. 2d Jury § 94 (2010) .............................................................. 33

Fed. R. Civ. P. 38(a) ................................................................................ 30

Fed. R. Civ. P. 39(c) ................................................................................ 33

ALJ's Initial Decision, *In re POM Wonderful LLC*,
    No. 9344 (U.S. Fed. Trade Comm'n May 17, 2012) ........................... 6

Opinion of the Commission, *In re POM Wonderful LLC*, No. 9344
    (U.S. Fed. Trade Comm'n Jan. 10, 2013) ........................................... 6

Final Order, *In re POM Wonderful LLC*, No. 9344 (U.S. Fed. Trade
    Comm'n Jan. 10, 2013) ....................................................................... 7

U.S. CONST. amend. VII .......................................................................... 30

## I.     **PRELIMINARY STATEMENT**

The gravamen of the complaint by Pom Wonderful LLC ("Pom") is that the name and label of Minute Maid's product, "Minute Maid Enhanced Pomegranate Blueberry Flavored Blend of 5 Juices," misled consumers to think that pomegranate juice and blueberry juice were the Juice's predominant ingredients on a *volume* basis.  But as the name and label plainly stated, the product was a ***blend of five juices*** that was ***flavored*** with pomegranate juice and blueberry juice.  The label depicted all five of the fruits whose juices comprised the blend, and all five were explicitly disclosed, in order of predominance, in the ingredient list on the Juice's label.  "Blend" and "flavored" are words that appear on countless beverage labels, and consumers understand that a "flavored" food or beverage contains only enough of the named ingredient (cherry, vanilla, pomegranate, etc.) to give the product its characteristic flavor.  As a matter of plain English and common sense, "flavored" means "tastes like."  It does not mean "contains primarily," as Pom would have the jury believe.

Even if Pom could show the Juice's name and label were misleading, however, Pom has not shown that it sustained any injury, much less proven that it is entitled to the tens of millions of dollars in damages it asks the jury to award.  Pom suffered no harm because Minute Maid's product appealed to entirely different consumers and was discontinued in 2014 after several years of declining sales.  Moreover, the damages theories Pom has advanced—which rest on supply assumptions Pom did not have the resources to meet, fanciful speculation about Pom's future growth, and a defective survey commissioned for litigation—are unsupportable.

Pom's claims in any event are barred by its own unclean hands.  Pom built its business, and created the market for pomegranate beverages, by advertising its products as a veritable fountain of youth, capable of curing everything from heart disease to erectile dysfunction.  But these claims were a total sham:  as the Federal

Trade Commission ("FTC") and other regulatory bodies have determined, there was never any credible scientific evidence to back up Pom's false health claims. Additionally, despite lambasting Minute Maid and others for including "filler juices" in their products, Pom was quietly doing *the exact same thing*.  At trial, the truth about Pom's lies and hypocrisy will be brought to light, and Minute Maid will prove that Pom cannot and should not be rewarded for its own misdeeds.

## II.   <u>INTRODUCTION</u>

### A.   The Minute Maid Enhanced Pomegranate Blueberry Flavored Blend of 5 Juices

Coca-Cola owns several well-known juice brands including Odwalla®, Simply®, and Minute Maid®.  Across its multiple brands, Coca-Cola manufactures and sells juices, juice blends and juice drinks of almost every type and flavor. Minute Maid is Coca-Cola's most longstanding and popular juice brand, specializing in "all family" juices and juice drinks sold primarily in the chilled juice aisle of grocery stores.

In 2007, Minute Maid introduced the juice product at issue in this action— Minute Maid Enhanced Pomegranate Blueberry Flavored Blend of 5 Juices (the "Juice")—to an existing line of "enhanced" juices and juice drinks.  The Juice was a "flavored multi-juice blend" consisting of mostly apple and grape juice flavored with small amounts of pomegranate, blueberry, and raspberry juices and other natural flavors, and fortified with several nutrients that provide nutritional support for body and brain (namely, DHA, Choline, and Vitamins B12, C, and E).  Minute Maid hoped such blends would be popular with consumers because they offer premium or exotic fruit "flavors" at low cost by combining small amounts of expensive, flavorful juice (such as mango, passion fruit, pineapple or pomegranate) with affordable juices like apple or grape juice.

Consistent with regulations promulgated by the U.S. Food and Drug Administration ("FDA"), the five juices blended in the Juice were all listed on the

Juice's back label, in descending order by volume.  Text at the top of the Juice's label identified the product as a "100% fruit juice blend."  An image (or "vignette") depicted each of the five fruits whose juices were in the product.  Below the vignette was the Juice's name:  "Pomegranate Blueberry Flavored Blend of 5 Juices."  Minute Maid advertised the Juice through television commercials, print ads, and in-store promotions, which focused primarily on the Juice's nutritional benefits in supporting brain and body.

### B.    Pom's Marketing of Its "Super-Premium" Juices

Pom's juice business began in 2002.  Pom created a line of super-premium pomegranate juices sold in the produce aisle and targeted to affluent, highly educated, health-conscious consumers.  In nearly all of its advertisements, Pom touted the millions of dollars it had spent to "prove" that its brand of pomegranate juice is nature's remedy for a broad range of ailments.  These claimed health benefits purportedly justified the juice's high price and bitter taste.

Pom's health claims propelled immense sales of Pom's products in its first years in business.  But other super-premium juice brands such as Bolthouse Farms®, Naked®, and Coca-Cola's own Odwalla® were quick to introduce pomegranate juices of their own.  "Pomegranate" soon replaced "kiwi" and "green tea" as the latest flavor fad.  By 2005, the market was overrun with hundreds of pomegranate-inspired products:  pomegranate-flavored cereal, pomegranate-flavored vodka, pomegranate-flavored granola bars, pomegranate-flavored soda, and pomegranate-flavored ice cream, to name just a few.  Mainstream juice brands such as Welch's, Ocean Spray, Tropicana, and Minute Maid were among the last companies to jump on the "pomegranate" bandwagon with low-cost, pomegranate-flavored multi-juice blends.

Despite its early meteoric rise, beginning in 2005, Pom encountered problems largely of its own making.  In 2005 and 2006, the National Advertising Division of the U.S. Council of Better Business Bureaus ("NAD") found that several of Pom's

health advertisements were unsupported.  In April 2009, the Advertising Standards Authority ("ASA")—the British counterpart to NAD—similarly found that Pom could not substantiate its claims that its juice prolongs life.  In February 23, 2010, the FDA issued a warning letter citing Pom for "serious violations" of the Food, Drug and Cosmetics Act, and detailing how, by hawking the ability of its products to treat or prevent various diseases, Pom had been marketing them as unapproved new drugs.  And in September 2010, the FTC's longstanding inquiry into Pom's health claims culminated with the FTC initiating an administrative proceeding, in which it alleged that Pom had misrepresented the benefits of pomegranate juice for heart disease, prostate cancer and erectile dysfunction.

Rather than reform its conduct, Pom responded to these events by attempting to change the subject and divert attention elsewhere.  Pom began a coordinated media and legal campaign aimed at drawing a distinction between Pom's premium pomegranate juice and so-called "imposter" juices.  New Pom ads featured headlines such as "Help!  I'm surrounded by fake pomegranate juice" and "Back off imposter juices!"  And in 2008, Pom filed lawsuits against the manufacturers of all the major pomegranate-flavored juice blends then on the market—including Welch's, Tropicana, Ocean Spray, and Minute Maid —claiming that it was competition from those "free-riders," as opposed to Pom's own misdeeds, that prevented Pom's sales from meeting its expectations.

## C.    Pom's Litigation Campaign and Its Unclean Hands

As part of that litigation campaign, Pom filed this action in 2008, alleging that the name, label, and advertising for the Juice misled consumers to think that the product was all or mostly pomegranate juice.

Pom alleged that, by highlighting the distinctive pomegranate flavor of the juice, Minute Maid passed off its Juice as providing the same health benefits of Pom's 100% pomegranate juice, thereby free-riding on the market Pom had created by touting the supposed medicinal properties of pomegranate juice.  In its First

1   Amended Complaint, Pom alleged that it had "invested millions of dollars in

2   researching the nutritional qualities and health benefits of pomegranate juice, an

3   investment that continues to this day." Dkt. 53 at ¶ 12.  According to Pom, this

4   "investment of millions of dollars to research and promote the nutritional qualities

5   and health benefits associated with pomegranate juice" was how Pom "created the

6   burgeoning market for genuine pomegranate juice that exists today." *Id.* at ¶ 15.

7   Pom branded Minute Maid as one of many "[u]nscrupulous competitors [that] have

8   set out to cash in on [its] success" and to profit from the fact that, "[d]ue to POM's

9   marketing efforts, . . . many consumers now associate pomegranate juice with

10   certain nutritional qualities and health benefits." *Id.* at ¶ 16.

11       This case was first scheduled for trial in early 2010.  On the eve of the

12   original trial date, however, the Court granted summary judgment to Minute Maid

13   on the centerpiece of Pom's complaint—its Lanham Act claim concerning the

14   Juice's name and label—agreeing with Minute Maid that the fact that the name and

15   label both were authorized by governing FDA labeling regulations precluded Pom's

16   Lanham Act claim.  *See Pom Wonderful LLC v. Coca-Cola Co*. ("*Pom v. Coca*

17   *Cola*"), 727 F. Supp. 2d 849, 871-74 (C.D. Cal. 2010).  The Ninth Circuit affirmed.

18   *See Pom Wonderful LLC v. Coca-Cola Co.*, 679 F.3d 1170 (9th Cir. 2012).  But the

19   U.S. Supreme Court, after granting certiorari on the narrow question of "whether a

20   private party may bring a Lanham Act claim challenging a food label that is

21   regulated by" the federal Food, Drug and Cosmetic Act ("FDCA"), held that Pom's

22   Lanham Act claim was not precluded by applicable FDA regulations.  *Pom*

23   *Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236, 2241 (2014).  The case

24   was remanded to the district court for trial on Pom's Lanham Act claim as to the

25   Juice's name and label.

26       Much has changed in the intervening six years.  To begin, the Juice is no

27   longer being sold.  Minute Maid discontinued the Juice in 2014 due to low

28   consumer demand, and shipments ceased in December of that year.  Pom has

dismissed with prejudice its claims against Minute Maid's advertisements and marketing for the Juice.  Pom also tried and lost its parallel cases against Welch's, Tropicana, and Ocean Spray challenging their pomegranate-flavored juice blends, in each case failing to establish liability, or damages, or both.[1]

Most significantly, Pom's claims as to the health benefits of pomegranate juice—the very foundation for this lawsuit—have been exposed as false.  The veracity of Pom's health claims was the subject of a lengthy trial before an FTC Administrative Law Judge from May to November 2011.  The Commission identified dozens of ads that made unlawful claims about the supposed health benefits of Pom's products.  Pom put forward numerous fact and expert witnesses in an attempt to defend its advertising, but was unsuccessful.  In May 2012, the ALJ ruled that 19 of Pom's ads made unlawful claims that Pom's products treated, prevented, or reduced the risk of heart disease, prostate cancer, or erectile dysfunction, and erroneously represented that these beneficial effects had been clinically proven.  ALJ's Initial Decision, *In re POM Wonderful LLC*, No. 9344 (U.S. Fed. Trade Comm'n May 17, 2012).  The ALJ concluded that Pom's claims were "false," "misleading," and had been material to consumers' decision to purchase Pom's products.  *Id.* pp. 290-92.  The full FTC affirmed the ALJ's determination, holding that Pom was actually liable for making unlawful claims in 36 of its ads.  Opinion of the Commission, *In re POM Wonderful LLC*, No. 9344 (U.S. Fed. Trade Comm'n Jan. 10, 2013).  The FTC enjoined Pom from making

---

[1] The jury in the Welch's case found that although the product's label was deceptive and Welch's intended to deceive consumers, Pom had suffered no injury. Special Verdict Form No. 1: Liability, *Pom Wonderful LLC v. Welch Foods, Inc.* ("*Welch*"), No. 09-cv-00567 AHM (AGRx) (C.D. Cal. Sept. 13, 2010), ECF No. 409-3, Ex. E.  The juries in the Tropicana and Ocean Spray cases found that the products in those cases were not deceptively labeled.  Verdict, *Pom Wonderful LLC v. Tropicana Prods., Inc.* ("*Tropicana*"), No. 09-cv-00566 DSF (CTx) (C.D. Cal. Nov. 12, 2010), ECF No. 243; Special Jury Verdict Form, Pom Wonderful LLC v. Ocean Spray Cranberries, Inc., No. 09-cv-00565 DDP (RZx) (C.D. Cal. Dec. 6, 2011), ECF No. 566.

1    any claims that its products treat, mitigate, cure, or prevent any disease unless such

2    claims are substantiated by randomized, controlled clinical trials.  The order

3    remains effective for 20 years, until January 2033.  Final Order, *In re POM*

4    *Wonderful LLC*, No. 9344 (U.S. Fed. Trade Comm'n Jan. 10, 2013).  Pom appealed

5    the FTC's order to the U.S. Court of Appeals for the D.C. Circuit, which upheld the

6    conclusion that Pom lacked an adequate basis for its claims.  *POM Wonderful, LLC*

7    *v. FTC*, 777 F.3d 478, 484 (D.C. Cir. 2015).

8    **D.    Pom Attempts to Abandon Its Health-Based Allegations**

9        As Pom's health claims came under attack, Pom tried—unsuccessfully—to

10   back away from them in the litigation it had brought.  In September 2010, in a

11   parallel suit against Tropicana, Pom abruptly jettisoned its heavy reliance on its

12   health claims and moved to exclude any reference to them at trial.  The court denied

13   that motion, concluding that Pom's request was contrary to "the pervasive

14   allegations in the complaint and the course of litigation so far," and that "Pom's

15   claims about the connection between pomegranates and health and the validity of

16   those claims are relevant to undermine Pom's claim that it has been harmed."

17   *Tropicana*, No. 09-cv-00566 DSF (CTx) (C.D. Cal. Nov. 1, 2010), ECF No. 208, at

18   6-7.

19       Pom then tried the same tactic here.  In June 2015, it attempted to amend its

20   complaint to delete its allegations that its research and marketing of alleged health

21   benefits created consumer demand for pomegranate juice.  Pom told the Court that

22   this drastic shift in strategy was merely an effort to "simplify its health advertising

23   allegations [and] the presentation of its evidence to meet the Court's allotted trial

24   schedule."  Dkt. 458 at 1.  The Court rejected Pom's gambit, Dkt. 463, and the

25   health claims remain at the core of this action.

26

27

28

## III.   POM'S LANHAM ACT CLAIM

### A.   Summary of Pom's Claim [L.R. 16-4.1(a)]

Although the First Amended Complaint contains sweeping claims that Minute Maid's marketing and advertising of the Juice violated the Lanham Act, 15 U.S.C. § 1125(a)(1), and California's Unfair Competition and False Advertising Laws, Cal. Bus. & Prof. Code §§ 17200 and 17500, none of those claims remain in the case.  In 2010, Pom voluntarily dismissed its Lanham Act attack on Minute Maid's non-label advertising and marketing for the Juice.  Dkt. 375.  And in 2013, Minute Maid was awarded summary judgment on Pom's state-law claims.  Dkt. 418.  Pom filed an appeal of that decision, but later dismissed it voluntarily.  *See* Stipulated Motion to Voluntarily Dismiss Appeal, *Pom Wonderful LLC v. The Coca-Cola Co.*, No. 13-55770 (9th Cir. Sept. 19, 2014), ECF No. 21.  As such, only Pom's Lanham Act challenge to the Juice's name and label remains.

### B.   Elements of Pom's Claim [L.R. 16-4.1(b)]

Pom's Claim 1 is that Minute Maid's name and label for the Juice are false or misleading in violation of the Lanham Act, 15 U.S.C. § 1125.  To establish a false advertising claim under the Lanham Act relating to the Juice's name and label, Pom must prove the following elements:

(1)   The Juice's name or label contains false or misleading statements of fact about the Juice;

(2)   The Juice's name and label actually misled a substantial segment of their audience;

(3)   Such deception was material, *i.e.*, it was likely to influence the purchasing decision of consumers;

(4)   The Juice's name or label was introduced into interstate commerce or in such a way as to have an impact on interstate commerce; and

(5)   Pom has been or is likely to have been injured as a result of the alleged false or misleading statements in the Juice's name or label.

*See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 244 (9th Cir. 1990); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1036 (C.D. Cal. 1998); *In re Century 21-Remax Real Estate Adver. Claims Litig.*, 882 F. Supp. 915, 922 (C.D. Cal. 1994).

## C.   Key Evidence in Opposition to Pom's Claim  [L.R. 16-4.1(c)]

### 1.   Pom Cannot Show that the Juice's Name and Label Are Literally False

In cases where advertisers make literally false statements on the packaging or labeling of their products, a violation may be established without evidence of consumer deception.  *See Mut. Pharm. Co. v. Ivax Pharm. Inc.*, 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006).  But the Juice's label contained no literally false statements.  It is indisputably *true* that the Juice contained pomegranate and blueberry juices and is pomegranate and blueberry flavored.  Pom therefore cannot proceed, let alone recover, on a theory that the mention or depiction of pomegranates or blueberries on the Juice's label was literally false.

### 2.   Pom Cannot Show that the Name and Label of the Juice Are Likely to Mislead a Substantial Number of Consumers

Pom is thus left to argue that the Juice's label was "misleading" to a significant portion of consumers.  Specifically, Pom alleges that, by highlighting the pomegranate-blueberry flavor of the Juice, Minute Maid misled consumers to believe that the Juice consisted predominantly of pomegranate and blueberry juices when, in fact, it was comprised mostly of other juices.  To prevail on this theory, as the Court recognized on summary judgment in 2010, Pom "bears the burden of proving the actual deception by a preponderance of the evidence.  Hence, [it] cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react."  *Pom v. Coca Cola*, 727 F. Supp. 2d at 868-69 (quoting *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228-29 (3d

Cir. 1990)).  As such, "proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients [is] critical." *Id.* at 868 (citation omitted).

> **a.     The FDA Has Specifically Endorsed As Not Misleading Names and Labels Identical to the Juice's**

Pom has not come forward with sufficient or reliable proof that supports its contention that a significant portion of consumers understood the Juice's label to convey that the Juice predominantly consists of pomegranate and blueberry juice. In fact, the Juice's name and label were straightforward and not deceptive.  Text on the label identified the Juice as a "Blend of 5 Juices" that was "Pomegranate Blueberry Flavored."  The vignette truthfully included images of all five fruits whose juice was present in the blend.  Minute Maid never represented that the product was all, or mostly, comprised of pomegranate juice; rather, the ingredient statement on the back panel clearly disclosed the ingredients in descending order by volume, and pomegranate juice was listed third, not first.  Like most consumers, jurors will know and understand the meaning of words such as "flavored" and "blend," which commonly appear on grocery store products.

Indeed, the FDA has already determined that the very elements of the Juice's label challenged by Pom—*i.e.*, its use of the terms "flavored" and "blend," its vignette, and its name—are not misleading.  In particular, in designing a labeling system to eliminate consumer confusion, FDA has determined that:

- Fruit juices that constitute less than 1% of a multi-juice blend may be referenced in a product's name so long as the minority juice is identified as a "flavor."  21 C.F.R. § 102.33(d)(1).

- All of the fruit juices in a flavored multi-juice blend need not be identified on a label (except in the ingredients panel) as long as the juice is called a "blend."  21 C.F.R. § 102.33(c).

10

- • Labels for flavored multi-juice blends may depict any (or all) of the fruits in the blend irrespective of the amount of each type of juice the product contains.  58 Fed. Reg. 2897, 2921 (1996).

Most strikingly, FDA has approved a hypothetical label that is virtually identical to that of the Juice.  Simply substituting the word "pomegranate" for "raspberry" in the discussion below shows that FDA had effectively pre-cleared the Juice's name and fruit vignette:

> For example, for a 100 percent juice product consisting of apple, grape, and [pomegranate] juices, in which the [pomegranate] juice provides the characterizing flavor, a vignette depicting [pomegranates] . . . . would not be misleading if the beverage were named '[pomegranate] flavored fruit juice blend.

58 Fed. Reg. 2897, 2921 (emphasis added).  FDA thus passed judgment on all aspects of the Juice that Pom attacks—*i.e.*, the Juice's name ("Pomegranate Blueberry ***Flavored Blend*** of 5 Juices") and label (depicting an apple, grapes, raspberries, a pomegranate and blueberries)—and has determined that the manner in which Minute Maid labeled its juice is sufficient to inform consumers about what they are buying without misleading.

### b.    The Flawed Jay Survey Is Not Adequate Evidence of Confusion

Earlier in this case, Pom attempted to demonstrate consumer confusion by offering a survey of the Juice's name and label conducted by Dr. E. Deborah Jay of Field Research Corporation.  But the Jay Survey suffered from a number of methodological flaws that render its findings regarding the likelihood of confusion completely unreliable, as Minute Maid's rebuttal expert, Dr. Ran Kivetz, is prepared to explain at trial.  The Jay Survey began with two fairly standard, unbiased open-ended questions that asked respondents to discuss the messages conveyed by the Juice's label in their own words.  The responses to these questions provide no evidence of confusion regarding the Juice's pomegranate or blueberry

juice contents.  To the contrary, the Jay Survey found that "pomegranate" was not a salient message conveyed by the Juice's label.  And the health-related messages conveyed by the Juice's label were virtually identical to the messages conveyed by the Jay Survey's "control" package that redacted the words "pomegranate" and "blueberry" from the Juice's label.   Thus, the only reliable questions in the Jay Survey actually showed that the words "pomegranate" and "blueberry" on the Juice's label are *not* likely to confuse consumers.

However, after the initial open-ended questions, the Jay Survey proceeded to ask a series of suggestive and biased questions regarding respondents' perceptions of the Juice's "main" types of fruit juice.  At trial, Dr. Kivetz will explain that no valid conclusions can be drawn from these inappropriate questions.  Dr. Kivetz will also explain that the flaws in the Jay Survey's questions were compounded by the fact that the Jay Survey lacked a valid and consumer-relevant "control."  The survey therefore failed to adequately account for "confusion" attributable to extraneous factors such respondents' tendency to guess, their pre-existing beliefs, or the inherent suggestiveness of the Jay Survey's questions.

### c.    There Is No Evidence that Minute Maid Acted Intentionally to Mislead Consumers

#### i.    Pom's Evidence Does Not Demonstrate Any Intent to Mislead

Pom attempts to circumvent the consumer deception requirement by arguing that Minute Maid's false advertising is "willful."  Where a defendant has "intentionally misled" consumers by "deliberate conduct of an egregious nature," courts may presume that consumers were in fact deceived and shift the burden to the defendant to demonstrate otherwise.  *See The William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 131 (3d Cir. 1994).  But that exception is not available here.  Minute Maid's label contains no literally false statements.  It is indisputably *true* that the Juice contains pomegranate and

1  blueberry juices and is pomegranate and blueberry flavored.

2       Neither can any deceptive intent be gleaned from the handful of internal

3  Minute Maid documents and other "admissions" on which Pom has focused since

4  the early days of discovery.  For example, Pom points to an e-mail in which Lucy

5  Reid, an employee in Minute Maid's Scientific and Regulatory Affairs Group,

6  opined that the Juice's proposed label posed "a risk from a misleading standpoint as

7  the product has less than 0.5% of pomegranate and blueberry juices."  The email

8  went on to state that Mike Saint John, head of the Minute Maid division, was

9  "aware of this issue [and] willing to assume the risk."  At deposition, however, Mr.

10  Saint John testified that he had never even spoken to Ms. Reid about the Juice and

11  had no idea what she was referring to.  He also noted that, in the prior sentence of

12  the e-mail, Ms. Reid correctly observed that the label was "in compliance with the

13  FDA regs related to naming of juice containing products" and that, in his

14  understanding, a label that complies with FDA regulations poses no risk of

15  deception.  Other witnesses will describe at trial Minute Maid's successful efforts to

16  meticulously comply with FDA's exacting standards concerning the labeling of

17  flavored juice blends.

18       In a similar vein, Pom touts a handful of negative comments Minute Maid

19  received about the Juice via its consumer hotline and testimony by Nancy Tyndal,

20  Coca-Cola's Client Services Manager, that no other product in Minute Maid's

21  history garnered more consumer complaints about its name and label than the Juice.

22  But discovery revealed that Pom was behind some of these complaints, and Ms.

23  Tyndal explained in a sworn declaration filed just weeks after her deposition that

24  she had misunderstood the question put to her.  In fact, the number of inquiries

25  received for the Juice was very small compared to other products and brands.

26       As such, Pom's evidence falls well short of showing "deliberate conduct of

27  egregious nature" on the part of Minute Maid.

28

13

### ii. Minute Maid's Compliance with FDA's Labeling Regulations Confirms the Absence of Deceptive Intent

Pom's assertion that Minute Maid willfully intended to deceive customers with the Juice's name and label is further undermined by Minute Maid's deliberate (and successful) effort to ensure that the label complied with FDA regulations. Indeed, both this Court and the Ninth Circuit have determined that the Juice's name and label indeed comported with the FDCA and applicable regulations. *Pom v. Coca-Cola*, 727 F. Supp. 2d at 873 ("Coca Cola's naming and labeling of the Juice comports with the relevant FFDCA and FDA regulations."); *accord Pom Wonderful LLC v. The Coca-Cola Co.*, 679 F.3d 1170, 1178 (9th Cir. 2012) (holding that the Juice's labeling "abides by the requirements the FDA has established" and "complied with the relevant FDA regulations and thus accords with the judgments the FDA has so far made").

As these decisions recognized, Minute Maid followed FDA regulations that were designed to prevent consumers from being misled. Minute Maid, like other manufacturers in the juice industry, has long relied on the FDA's expert guidance in juice naming and labeling to determine what labeling practices communicate truthful messages to consumers. FDA's "flavored multi-juice blend" regulations were meant to put to rest decades of public debate about the appropriate naming standards for juice products, and were issued through formal notice and comment rulemaking after the agency considered comments from industry, consumers, policymakers and advocacy groups. Upon issuance of the regulations, FDA announced that the agency considered them fully "adequate to prevent misleading labels" on flavored multi-juice beverages. 58 Fed. Reg. 2897, 2920. Thus, Minute Maid strove to do everything required by the FDA—the body charged by Congress "with creating a uniform national scheme of regulation to ensure that food is labeled in a manner that does not mislead consumers," *Reese v. Odwalla, Inc.*, 30 F. Supp. 3d 935, 941 (N.D. Cal. 2014)—to guard against a label that misleads the

public.

Such fidelity to the law is conclusive proof that Minute Maid did not act with an egregious intent to mislead.

### 3. Pom Cannot Show the Materiality of the Purportedly False Juice Name or Label

Pom must also prove that any "deception is material, in that it is likely to influence the purchasing decision." *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003) (quoting *Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 244 (9th Cir. 1990) (per curiam)). Even where a defendant is accused of misrepresenting an "inherent quality or characteristic of the product," *Nat'l Basketball Assoc. v. Motorola, Inc.*, 105 F.3d 841, 856 (2d Cir. 1997), a plaintiff must adduce evidence that reasonable consumers would have a tendency to actually rely on the misleading statement in making their purchasing decisions. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 502 (5th Cir. 2000).

Contrary to Pom's assertions, there is *no* presumption of materiality, even when an advertising statement is found to be literally false. *See Johnson & Johnson Vision Care, Inc. v. 1-800 CONTACTS, Inc.*, 299 F.3d 1242, 1250-51 (11th Cir. 2002) (holding that materiality cannot be presumed); *Camel Hair & Cashmere Mfg. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 & n.10 (1st Cir. 2002) ("[E]ven when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers."). In any event, literal falsity is *not* an issue in this case because, as mentioned previously, the Juice indisputably contains pomegranate and blueberry juices.

Pom has failed to present any viable evidence that purported confusion about the proportions of the ingredients in the Juice influenced consumers' purchasing decisions. Pom cannot rely on the Jay Survey to show materiality; the Jay Survey was designed to assess whether the Juice's name and label were likely to confuse

1    consumers.  It did not assess whether such confusion was likely to influence

2    consumers' purchasing decisions, or whether any consumers actually switched from

3    buying Pom's products to the Juice.  Dr. Jay conceded at her deposition in 2010

4    that her survey provides no evidence of materiality.

5            To plug this gaping hole in its case, in late 2015, Pom proffered a survey

6    from Dr. Yoram Wind that purports to show that purchasers of the Juice considered

7    the amount of pomegranate juice in the product to be material, and that 8.9% of

8    those purchasers would have purchased Pom's products had they known the truth.

9    Like the Jay Survey, however, the results of the Wind Survey are entirely a

10   byproduct of the survey's leading questions and biased design, as Dr. Kivetz will

11   demonstrate at trial.  Most glaring among these defects, Dr. Wind employed the

12   *wrong product name* throughout the survey, asking consumers about the

13   "Pomegranate Blueberry Juice Blend" rather than the "Pomegranate Blueberry

14   Flavored Blend of 5 Juices."  This divorced the survey from marketplace

15   conditions—a significant flaw for which surveys are routinely thrown out.  *E.g.,*

16   *Am. Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 660 & n.4 (2d Cir.

17   1979); *Kournikova v. Gen. Media Commc'ns, Inc.*, 278 F. Supp. 2d 1111, 1125

18   (C.D. Cal. 2003); *Sears, Roebuck & Co. v. Menard, Inc.*, 2003 U.S. Dist. LEXIS

19   951, at *3-6 (N.D. Ill. Jan. 22, 2003).

20           The Wind Survey was also plagued by a litany of other shortcomings.

21   Among others, the Wind Survey used an improper method to identify purchasers of

22   the Juice, resulting in a survey population (or "universe") that is unrepresentative.

23   The Wind Survey's questions regarding the amount of Juice respondents purchased

24   created an impossible memory task and invited respondents to guess about the

25   amount of Juice they purchased, and the frequency with which they purchased it,

26   several years in the past.  Its questions regarding the amount of pomegranate Juice

27   were leading and suggestive.  And its questions regarding the products respondents

28

16

would have purchased instead of the Juice were speculative and highly biased in favor of Pom and Pom's products.

As Minute Maid and Dr. Kivetz will demonstrate, Dr. Wind's survey cannot be relied upon to show materiality, switching, or anything else.

### 4.    Interstate Commerce

The parties have stipulated that this element has been met.

### 5.    Pom Has Not Shown Injury Warranting Relief

#### a.    Pom Has Failed to Demonstrate That It Sustained Any Damages Due To the Juice

Even if the jury were to believe that the Juice's label was misleading, Pom still would not be entitled to recovery because it has failed to establish damages. *See Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) (concluding that even if "consumers were deceived," the plaintiff must still show a "connection with any damage [the plaintiff] might have suffered from defendants' advertising"). To recover its lost profits—its principal theory of damages—Pom "must prove both the fact and the amount of damage." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993). Pom, however, has proven neither.

As an initial matter, the parties' products differed significantly and did not compete with each other. Pom's 100% pomegranate juice is targeted at affluent professionals who are focused on health and preventing disease. Those customers are willing to pay Pom's high price—$4 for just 16 ounces—and know to look for Pom's juice in the produce section of the grocery store, far away from most other juices and beverages. By contrast, Minute Maid's target customers for the Juice were moms seeking a tasty way to deliver nutrients like Omega-3 to their children. The Juice cost about $4 for 59 ounces—about one quarter of what Pom charges. Moreover, the Juice was located in the chilled juices section of the supermarket, near Minute Maid orange juice and lemonade, and far away from the "super premium" juices like Pom's.

1    Pom's products were not even on the radar screen of the vast majority of

2    customers who purchased Minute Maid's Juice.  Indeed, contemporaneous

3    "switching" data compiled by A.C. Nielsen & Co. (the "Nielsen data") show that

4    only 0.5% to 2% of the Juice's sales came from consumers who purchased it

5    instead of Pom.  Pom's own internal documents, as well as market research Pom

6    commissioned in the normal course of business, corroborate the Nielsen data.  For

7    example, in June 2009, ███████████████████████████████

8    ████████████████████████████████████████████████

9    ██████████████████████████ These real-world data bely

10   Pom's claim of massive lost sales because consumers were deceived to switch to

11   the Juice. *BMMG, Inc. v. Am.-Telecast Corp.*, 1993 U.S. Dist. LEXIS 21072, at *7-

12   13 (C.D. Cal. May 6, 1993) ("Since it is the diminution in sales caused by the

13   falsities which is at issue, there is no evidence that the falsities as to which there is

14   sufficient evidence to provide an issue of fact caused any damage."), *aff'd*, 1994

15   U.S. App. LEXIS 34142 (9th Cir. Dec. 1,1994).

16   Despite this wide gulf between Pom's and Minute Maid's markets, Pom has

17   advanced a bloated damages claim, asserting that it lost at least $████████ in

18   sales over the 2008-2014 period due to competition from the Juice.  Pom's claim

19   was once even higher:  in 2009, Pom's damages expert, Joseph Anastasi, opined

20   that competition from the Juice would end up costing Pom as much as $████████

21   through 2015.[2]  Mr. Anastasi arrived at that astronomical figure by assuming that

22   pomegranates confer far-reaching health benefits (as Pom then claimed in its

23   advertisements) and that, once those benefits became more widely known, Pom's

24   sales would skyrocket—were it not for "free-riders" like Minute Maid.

25   In 2015, after the remand, Mr. Anastasi provided a "supplemental" expert

26   report that completely revised his damages calculations, as to both method and

27

28   [2] Pom recently represented to Minute Maid that Mr. Anastasi will not be presenting his 2009 damages calculations at trial**.**

result.  Given the FTC's ruling in 2012 that Pom's health claims were
unsubstantiated and false, Mr. Anastasi jettisoned his earlier calculation that relied
so heavily on public knowledge of those health benefits.  Instead, he substituted
three new "scenarios," all far-fetched:

19



As discussed above, the real-world Nielsen Data show the actual switching between Minute Maid and Pom's products was 0.2%.

Minute Maid's rebuttal expert, Avram Tucker, will detail the many non sequiturs and leaps in logic that undergird Mr. Anastasi's three scenarios.  Mr. Tucker, a certified public accountant and forensic financial analyst, is the Co-Founder and Chief Executive Officer of TM Financial Forensics LLC and has more than 30 years of experience analyzing the financial condition of businesses, assessing financial statements, and analyzing damages and lost profits claims.   He will testify that  Mr. Anastasi's damages theories are based on unreasonable and unsupported assumptions and improperly rely on flawed and unreliable survey data.  In addition, when reliable data regarding consumer behavior are used, even assuming liability, Pom's damages could be no greater than $          .

Pom's alternative theory—that it is entitled to disgorgement of Minute Maid's profits on sales of the Juice—is likewise a non-starter.  Disgorgement under the Lanham Act is reserved for circumstances when the plaintiff's losses are difficult to quantify, but the defendant's profits provide a good approximation of the plaintiff's losses. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011) (recognizing an award of profits is appropriate in two scenarios: (1) "in false *comparative* advertising cases, where it's reasonable to presume that every

1   dollar defendant makes has come directly out of plaintiff's pocket" or (2) "when

2   defendant associates its product with plaintiff's noncompetitive product to

3   appropriate good will or brand value," because "plaintiff is unlikely to have lost any

4   sales or contracts to defendant, and the damages must be measured by defendant's

5   gains from the illicit use").

6          But disgorgement is not appropriate where, as here, there are many

7   competitors in the marketplace, and no reason to believe that all of Minute Maid's

8   profits would have gone to Pom.  *See id.* ("[N]either the comparative advertising

9   nor good will cases are relevant . . . where plaintiffs claim that '[d]efendants

10   advertised a different (and allegedly better) product than they delivered.'") (citation

11   omitted); *Harper House*, 889 F.2d at 209 n.8 ("[E]ven if consumers are likely to

12   suffer injury from a defendant's deception about its own product, when advertising

13   does not directly compare defendant's and plaintiff's products, *when numerous*

14   *competitors participate in a market*, or when the products are aimed at different

15   market segments, injury to a particular competitor may be a small fraction of the

16   defendant's sales, profits, or advertising expenses.  Of course, large, presumptive

17   damage awards are improper in a situation where injury is likely to be slight.")

18   (emphasis added).  Pom has therefore provided the court with "no way to determine

19   with any degree of certainty what award would be compensatory" and not punitive,

20   which is fatal to a claim for disgorgement.  *TrafficSchool.com*, 653 F.3d at 831; see

21   also 15 U.S.C. § 1117(a) (specifying that any damages award under the Lanham

22   Act "shall constitute compensation and not a penalty"); *Lindy Pen Co. v. Bic Pen*

23   *Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993) (in determining whether an award of

24   profits is appropriate, "the court is cautioned that the Plaintiff is not . . . entitled to a

25   windfall") (quotation marks omitted)).

26          In any event, Minute Maid's profits on sales of the Juice were modest.  Mr.

27   Tucker will show at trial the significant costs associated with the Juice and that,

28   once those costs are considered, Minute Maid barely recouped its investment by the

1   time the Juice was discontinued in 2014.  Thus, even if Pom had attempted to

2   calculate Minute Maid's profits on the Juice that specifically flowed from sales

3   diverted from Pom, the profits on those sales would be several orders of magnitude

4   less than the damages Pom has claimed.

5           **b.**    **Pom Cannot Obtain Injunctive Relief**

6         Minute Maid discontinued the Juice in 2014 and will not be reintroducing it,

7   thus mooting Pom's claim for injunctive relief.  *See Henrickson v. eBay, Inc.*, 165

8   F. Supp. 2d 1082, 1095 (C.D. Cal. 2001) (claim for injunctive relief under Lanham

9   Act mooted by defendant's cessation of challenged advertising).  Even if that claim

10  were live, however, Pom would not be entitled to an injunction.  As detailed above,

11  Pom has failed to prove that it has suffered *any* harm from the Juice's label, let

12  alone the irreparable harm required for an injunction to issue.  Finally, Pom's

13  unclean hands, described below, preclude it from seeking relief in equity.  *Adler v.*

14  *Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000) ("The unclean hands

15  doctrine closes the doors of a court of equity to one tainted with inequitableness or

16  bad faith relative to the matter in which he seeks relief, however improper have

17  been the behavior of the defendant.") (quoting *Precision Instr. Mfg. Co. v. Auto.*

18  *Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).

19  **IV.**    <u>**MINUTE MAID'S AFFIRMATIVE DEFENSE OF UNCLEAN HANDS**</u>

20      **A.**    **Summary of Minute Maid's Unclean Hands Affirmative**
21              **Defense [L.R. 16-4.1(d)]**

22        The only affirmative defense Minute Maid intends to pursue at trial is

23  unclean hands (subject to the qualifications in Section X below).  Minute Maid will

24  show that even if Pom could make out a Lanham Act claim concerning the Juice,

25  Pom would be barred from obtaining any relief due to (1) its own misleading

26  advertising regarding the health benefits of pomegranate juice, which it used to

27  build the market it claims was adversely impacted by the Juice; and (2) its failure to

28  disclose the presence of juices other than those appearing in the names of its

products—the very conduct for which it faults Minute Maid.  Pom's dirty hands completely vitiate its claims here.

## B.     Elements of Minute Maid's Unclean Hands Affirmative Defense [L.R. 16-4.1(e)]

Minute Maid's Thirty-Fourth Affirmative Defense is that Pom's claims against Minute Maid are barred due to Pom's unclean hands.  To establish this defense, Minute Maid must prove the following elements:

(1)  Pom engaged in inequitable conduct; and

(2)  Pom's inequitable conduct relates to the subject matter of its claims.

*Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945); *Trafficschool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 833 (9th Cir. 2011); *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000); *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987); *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985); *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1983).

## C.     Key Evidence Supporting Minute Maid's Unclean Hands Defense [L.R. 16-4.1(f)]

### 1.     Pom's False Advertising of Pomegranate Juice's Health Benefits Constitutes Unclean Hands

#### a.     Background

At core, Pom's claim in this case is that, but for Minute Maid's interference, Pom's fraudulent claims about the health benefits of pomegranate juice would have produced even more sales and profits for Pom than they actually did.  It is settled law, however, that a plaintiff cannot seek judicial protection of a market it created through deception.  Such claims are barred by the doctrine of unclean hands.

As noted above, in its complaint in this case, Pom took credit for "creating" the market for pomegranate juice by touting its supposed health benefits.  Indeed, for years, Pom told consumers that its pomegranate juice could cure everything

from cancer to erectile dysfunction.  Pom's co-founder Lynda Resnick testified that Pom's product is not juice; it is "health in a bottle."  In a 2008 television appearance, Mrs. Resnick claimed that Pom's product was "the magic elixir of our age and of all ages. . . .  [I]f you know a man that you care about . . . make him drink 8 ounces of pomegranate juice a day because what it does for prostate cancer is amazing."  And Pom's president described its juice under oath as "not just for refreshment.  It's literally medicine."  Pom built its market by targeting "hypochondriacs" who were most likely to be swayed by its health claims.  Pom blanketed the marketplace with commercials, billboards, and other advertisements trumpeting Pom's key message:  pomegranate juice is medicine.

But Pom's health claims were a sham.  Pom's medical research not only failed to substantiate the claims in its ads—it often contradicted those claims.  For years, Pom touted the results of dubious clinical tests without acknowledging their glaring deficiencies.  Even as the tentative findings of Pom's small pilot studies were debunked by more robust research, Pom went on promoting its preliminary results as though they provided conclusive scientific proof.

For example, from 2004 through 2009, Pom advertised that consuming pomegranate juice resulted in a 30% reduction in arterial thickening, which Pom claimed was a major cause of heart disease.  But the research on which the "30%" claim was based was junk science.  The study was tiny, consisting of a sample group of only ten subjects and a control group of nine.  It was neither randomized nor placebo-controlled, and involved no statistical comparison between the treatment and control groups.  Pom continued touting the "30%" figure in its ads even after 2006, when a much larger, Pom-commissioned study eviscerated any basis Pom could have had for relying on the results of the earlier study—all while attempting to squelch the publication of the definitive research.

Similarly, Pom's ads touted its juice's ability to "save prostates . . . [m]an by man, gland by gland," pointing to "$25 million in vigilant medical research" as

1   support.  Pom even issued press releases claiming that its product could prevent

2   men from "dying of prostate cancer."  As support for these claims, Pom cited a

3   study in which "46 men previously treated for prostate cancer" drank "eight ounces

4   of Pom Wonderful 100% Pomegranate Juice daily for at least two years" and

5   "experienced significantly slower average PSA doubling times."  Pom claimed this

6   was significant because PSA, which stands for prostate-specific antigen, "indicates

7   the presence of prostate cancer" and a longer PSA doubling time "may indicate

8   slower progression" of the disease.  In fact, as Pom's former chief medical officer

9   acknowledged under oath, PSA doubling time is a meaningless endpoint and is not

10  an indicator of progression of prostate cancer.

11      Pom's ads also falsely claimed that its products could treat erectile

12  dysfunction.  Pom told consumers that men who drank its juice daily "were 50%

13  more likely to experience improved erections."  Many of these ads cited a published

14  study that supposedly "reported a 50% greater likelihood of improved erections as

15  compared to placebo."  In fact, the cited study found that pomegranate juice has no

16  statistically significant effect on erectile dysfunction.

17      As discussed above, these falsehoods were all brought to light through the

18  intervention of several independent authorities, including the NAD, ASA, FDA and

19  FTC.  In the years-long FTC proceedings, the Commission determined that Pom

20  engaged in a vast campaign of illegal advertising, in violation of Section 5 of the

21  FTC Act, 15 U.S.C. § 45(a).  The FTC found that Pom had cultivated the belief in

22  consumers that its pomegranate juice would cure or prevent serious diseases—even

23  though Pom never had any *bona fide* support for these claims—and then ignored or

24  obscured the truth and when the flaws in its research were brought to light.

25              **b.      Pom's Conduct Is Inequitable**

26      Pom's dissemination of false health claims readily meets the two-pronged

27  standard for unclean hands—*i.e.*, "inequitable conduct" that "relates to the subject

28  matter of its claims."  *Fuddruckers*, 826 F.2d at 847.  In this Circuit, a Lanham Act

1  plaintiff that has marketed its products with the purpose and effect of deceiving

2  consumers is guilty of unclean hands.  *See, e.g.*, *Japan Telecom, Inc. v. Japan*

3  *Telecom Am., Inc.*, 287 F.3d 866, 870 (9th Cir. 2002) (recognizing Lanham Act

4  plaintiff's acts of deception give rise to unclean hands); *FLIR Sys., Inc. v. Sierra*

5  *Media, Inc.*, 965 F. Supp. 2d 1184, 1197 (D. Or. 2013) (plaintiff's misleading

6  advertising gave it unclean hands in Lanham Act suit); *Emco, Inc. v. Obst*, 2004

7  U.S. Dist. LEXIS 12118, at *13-18 (C.D. Cal. May 7, 2004) (same).

8       Since even acts falling short of illegality can support an unclean hands

9  defense, *see Precision*, 324 U.S. at 815, Pom's deceptive conduct actually adjudged

10  to be in violation of the law clearly meets the "inequitable" standard.  *See Adler*,

11  219 F.3d at 873, 877-78 (holding that participation in scheme to steal from the

12  Nigerian Government and bribe Nigerian officials in violation of California laws

13  and the FCPA established plaintiff's unclean hands); *Metro Motors v. Nissan Motor*

14  *Corp.*, 339 F.3d 746, 750-51 (8th Cir. 2003) ("Well-accepted general principles of

15  equity support [the] contention that a statutory violation gives a party unclean

16  hands.") (collecting cases).  This is particularly so given that Pom preyed on

17  consumers' health concerns by pitching its products as medicine and falsely

18  advertising that pomegranate juice could treat or prevent serious diseases.  *See*

19  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002)

20  ("Of course, the public has a particularly strong interest in an accurate description

21  of health and medical products.").

22          **c.     Pom's Inequitable Conduct Relates to the**
             **Subject Matter of Its Claims**
23
24       Pom's false health advertising is also clearly "related" to the case at hand.

25  For purposes of unclean hands, a plaintiff's inequitable conduct has sufficient

26  "nexus" or relation to the controversy if it "in some measure affect[s] the equitable

27  relations between the parties in respect of something brought before the court for

28  adjudication."  *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245

MEM. OF CONTENTIONS OF LAW AND FACT
CASE NO. 2:08-cv-06237-SJO-MRW

(1933).  Here, Pom seeks to protect the market it created by touting pomegranate juice as a drug with proven health benefits, and its damages claim turns on its use of false health claims to drive demand for its products.  The nexus is self-evident.  *See Manhattan Med. Co. v. Wood*, 108 U.S. 218, 227 (1883) ("If the sales made by the plaintiff and his firm are effected, or sought to be, by misrepresentation and falsehood, they cannot be listened to when they complain that, by the fraudulent rivalry of others, their own fraudulent profits are diminished.  An exclusive privilege for deceiving the public is assuredly not one that a court of equity can be required to aid or sanction."); *Memphis Keeley Inst. v. Leslie E. Keeley Co.*, 155 F. 964, 972 (6th Cir. 1907) (reasoning that the court "should not protect against injury or invasion a business of selling a medicine which has been built up and is being maintained by fraudulent misrepresentations as to its ingredients").

In short, because Pom has built its business on deception regarding the health benefits of its products, the unclean hands doctrine bars its recovery in this case.

### 2. Pom's Use of Filler Juices Constitutes Unclean Hands

A further reason for finding Pom has unclean hands is that Pom itself has engaged in labeling practices similar to Minute Maid's in labeling the Juice—practices that Pom now claims are deceptive.  Pom has marketed products that do not name each ingredient on the label or do not list each ingredient in the order of predominance by volume.

For example, Pom's "100%" Pomegranate Juice previously contained 1-2% elderberry juice concentrate—which Pom used to improve the taste and coloration of the juice—even though it privately acknowledged that disclosing the elderberry only as "natural flavorings" on the bottle's ingredients list invited "questions" and "may expose us to the charge of hypocrisy."  Similarly, despite Pom's boasts in advertisements that its products contained no "cheap filler juices," its juice blends in fact contained many "filler" juices that were not disclosed in the product name or label.  For instance, Pom's own Pomegranate Blueberry product originally

1  contained plum, pineapple, apple, and blackberry juices from concentrate, but was

2  always labeled "Pomegranate Blueberry 100% Juice."  Likewise, its Pomegranate

3  Cherry juice contained pineapple juice, aronia berry juice, plum juice, and apple

4  juice, none of which were apparent from the juice's name.  Of particular note,

5  Pom's Pomegranate Tangerine juice actually contained far less tangerine juice by

6  volume than it did orange juice, ████████████████████████████████

7  ████████████████████████████████████████████

8  ██████

9       Thus, when naming its own juices, Pom employed the very convention it

10  attacks here—*i.e.*, naming its blend based on the juices that provide the flavor, even

11  if other juices comprised a greater portion of the juice by volume.  Pom's own

12  product labeling is no less "deceptive" than the conduct of which it accuses Minute

13  Maid; as the *Welch* court observed of Pom's Pomegranate Tangerine product, "even

14  though orange juice concentrate is more expensive than tangerine juice concentrate,

15  and even though the two juices are 'functional equivalents,' consumers may still be

16  confused and misled by the product's label, which could lure consumers away from

17  products that do contain primarily pomegranate and tangerine juice."  *Pom*

18  *Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1116 (C.D. Cal. 2010).

19  And as the *Tropicana* court held, Pom's failure "to identify the presence of other

20  juices in its named juices" clearly has sufficient relation to its Lanham Act claim to

21  give Pom unclean hands.  *Tropicana*, No. 09-cv-00566 DSF (CTx) (C.D. Cal. Nov.

22  1, 2010), ECF No. 208, at 3-4 ("[T]he Court construes Tropicana's defense Pom as

23  analogous or 'relat[ing] to the subject matter of [Pom's] claim' against Tropicana,

24  namely that Tropicana's naming and labeling of its juice mislead customers.").

25  ## V.   EVIDENTIARY ISSUES [L.R. 16-4.1(h)]

26       Minute Maid has filed the following motions *in limine* addressing anticipated

27  evidentiary issues at trial:

28

28

1.      to exclude portions of the expert testimony of Joseph Anastasi
        (Minute Maid's Motion *in Limine* ("MIL") No. 1);

2.      to exclude the expert testimony of Dr. Yoram Wind (Minute Maid's
        MIL No. 2);

3.      to exclude evidence and testimony regarding the appeal of this matter
        to the U.S. Supreme Court (Minute Maid's MIL No. 3); and

4.      to exclude evidence and testimony regarding consumer complaints
        about the Juice (Minute Maid's MIL No. 4).

Pom has filed four motions *in limine* of its own.

To the extent that other evidentiary issues arise before trial, Minute Maid will enumerate them in the Joint Pretrial Conference Order.

## VI.   <u>KEY LEGAL ISSUES GERMANE TO THE CASE [L.R. 16-4.1(i)]</u>

The following legal issues are discussed elsewhere in this memorandum:

(1) the elements of Pom's Lanham Act claim, as identified in Sections
    III.C.1 to III.C.4, *supra*;

(2) Pom's entitlement to (a) actual damages, (b) an accounting of and
    disgorgement of Minute Maid's profits, and (c) an injunction, as
    identified in Section III.C.5, *supra*;

(3) Minute Maid's unclean hands defense, as identified in Section IV.C,
    *supra*;

(4) the evidentiary issues identified in Section V, *supra*; and

(5) the issues triable by jury and court, as identified in Section VIII, *infra*.

(6)  The only other legal issue of which Minute Maid is aware concerns Pom's claim for attorneys' fees and enhanced damages.  Pom is not entitled to such relief.  The Lanham Act provides that the court "*in exceptional cases* may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) (emphasis added).  In assessing damages, the court may also "enter judgment, according to the

circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." *Id*. Double or treble damages are, like attorneys' fees, an "extraordinary remed[y]." *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986). An act is "exceptional" for purposes of Lanham Act remedies when the conduct at issue is "malicious, fraudulent, deliberate or willful." *Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000); *accord Int'l Olympic Comm. v. San Francisco Arts & Athletics*, 781 F.2d 733, 738 (9th Cir. 1986); *see also McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 364 (9th Cir. 1996) ("[e]xceptional cases include bad faith or other opprobrious conduct.") As discussed above, none of Pom's evidence demonstrates the requisite level of culpability. Rather, it establishes Minute Maid's good faith belief that it was *in compliance with* the applicable FDA regulations. This can hardly be proof of malicious behavior.

## VII.   BIFURCATION OF ISSUES [L.R. 16-4.3]

Minute Maid does not request that any issues be bifurcated for purposes of trial.

## VIII.   ISSUES TO BE RESOLVED BY THE JURY AND THE COURT [L.R. 16-4.4]

### A.   Issues Triable to the Jury

The parties have a right to a jury trial on the legal claims asserted in their respective cases. U.S. CONST. amend. VII; Fed. R. Civ. P. 38(a). Both parties made timely demands for a jury trial. As such, the jury should decide the following issues: (1) whether the Juice's name and label are false and misleading in violation of the Lanham Act; (2) whether Pom has sustained any injury as a result of the allegedly false and misleading statements in the Juice's name and label; and (3) the amount of actual damages Pom has proven.

### B.   Issues Triable to the Court

Despite the parties' jury demands, the Court – not the jury – should decide

the following issues:  (1) whether Pom is entitled to equitable relief, *i.e.*, (a) an

accounting and disgorgement of Minute Maid's profits; (b) attorneys' fees and

enhanced damages; and/or (c) an injunction; and (2) whether Pom has unclean

hands (to be tried before an advisory jury).

### 1.     The Court Should Decide Whether Pom Is Entitled to the Equitable Remedies It Seeks

It is appropriate for the Court, rather than a jury, to rule on the equitable

remedies requested in this case.  Specifically, the Court should decide whether Pom

is entitled to receive the following types of relief that it seeks:

### a.     Disgorgement/Accounting of Profits

An accounting of profits under the Lanham Act is an equitable remedy.  *See,*

*e.g., Reebok Intern., Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir.

1992) ("An accounting of profits under [the Lanham Act] §1117(a) is not

synonymous with an award of monetary damages: '[a]n accounting for profits ... is

an equitable remedy subject to the principles of equity.'") (quoting *Fuller Brush*

*Products Co. v. Fuller Brush Co.*, 299 F.2d 772, 777 (7th Cir. 1962)).

For this reason, it is more appropriate for the Court than a jury to determine

whether an accounting of profits award is appropriate.  *See, e.g., Fifty-Six Hope Rd.*

*Music v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1065 (9th Cir. 2015) (holding in Lanham

Act case that district court did not abuse its discretion in determining defendant's

profits award and explaining that "[t]he Seventh Amendment does not require that a

jury calculate these profits, because juries have not traditionally done so, and a

claim for profit disgorgement is equitable in nature"); *Playboy Enters., Inc. v.*

*Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982) (holding in Lanham

Act case that "any decision concerning the awarding of an accounting of profits

remedy should remain within the discretion of the trial court"); *Oyster Software,*

*Inc. v. Forms Processing, Inc.*, 2001 U.S. Dist. LEXIS 22520, at *10 n.5 (N.D. Cal.

Dec. 6, 2001) (noting in the context of a summary judgment motion on the issue of

1  accounting of defendant's profits under the Lanham Act that "it is the Court, and

2  not the jury, that will make the ultimate determination as to whether or not an

3  accounting is appropriate and the scope of any accounting that may be ordered");

4  *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 344 (D.N.J. 2001)

5  (holding that the argument that a defendant from whom disgorgement is sought

6  under the Lanham Act is entitled to a jury trial on the issue is "legally erroneous"

7  because "[a] plain reading of the Lanham Act remedy section unqualifiedly weighs

8  against [defendants'] interpretation that they are entitled to a jury trial on the

9  disgorgement of profits issue . . . the language of this section makes no mention of

10  a trial by jury").

11  **b.      Attorneys' Fees and Enhanced Damages**

12  The Lanham Act specifies that the decisions whether to increase a damages

13  award and whether to award attorneys' fees are for the court rather than a jury.  *See*

14  15 U.S.C. § 1117(a) ("If *the court* shall find that the amount of the recovery based

15  on profits is either inadequate or excessive *the court* may in its discretion enter

16  judgment for such sum as *the court* shall find to be just, according to the

17  circumstances of the case . . . *The court* in exceptional cases may award reasonable

18  attorney fees to the prevailing party.") (emphases added).

19  **c.      Injunction**

20  Although Minute Maid's discontinuance of the Juice has rendered Pom's

21  injunctive claim moot, Pom persists in asserting an entitlement to injunctive relief.

22  *See, e.g.,* Dkt. 519 at 5 n.4.  To the extent that claim remains viable, the Court alone

23  is capable of granting the requested relief, as there is no right to trial by jury of an

24  equitable claim for an injunction.  *See, e.g., City of Monterey v. Del Monte Dunes at*

25  *Monterey, Ltd.*, 526 U.S. 687, 719 (1999) ("It is settled law that the Seventh

26  Amendment does not apply in" suits seeking injunctive relief).

27

28

MEM. OF CONTENTIONS OF LAW AND FACT
CASE NO. 2:08-cv-06237-SJO-MRW

### 2.    The Issue of Unclean Hands Should Be Submitted to the Jury for Advisory Verdict

Although equitable affirmative defenses, such as unclean hands, are not triable to a jury as a matter of right, this Court should have the jury make advisory findings on Minute Maid's unclean hands defense.  *See* Fed. R. Civ. P. 39(c) (stating that, "[i]n an action not triable of right by a jury, the court, on motion or on its own . . . may try an issue with an advisory jury"); *see also, e.g.*, *Wang Labs., Inc. v. Mitsubishi Elec. Am., Inc.*, 103 F.3d 1571, 1576 (9th Cir. 1997) (noting that jury – "[i]n its advisory capacity" – ruled on the equitable defenses, including unclean hands); *Tropicana*, No. 09-cv-00566 DSF (CTx) (C.D. Cal. Nov. 1, 2010), ECF No. 208, at 4 (noting that court would request advisory opinion from jury on Tropicana's unclean hands defense against Pom); *Diodato v. Turecamo Coastal & Harbor Towing, Inc.*, 100 F.R.D. 756,758 (S.D.N.Y. 1984) (holding that action would be tried before a jury on all issues, but that the verdict would be advisory in regards to nonjury issues); 47 Am. Jur. 2d Jury § 94 (2010) ("As a matter of procedural convenience, where the action involves both jury and nonjury issues, the court may submit questions which are common to all issues to the jury and treat the verdict as an advisory one with respect to the nonjury issues.").

Submitting Minute Maid's unclean hands defense to the jury for an advisory verdict is particularly appropriate in light of the Ninth Circuit's directive that unclean hands cannot "be properly considered independent of the merits of the plaintiff's claim," but rather requires "weigh[ing] the substance of the right asserted by plaintiff against the transgression which, it is contended, served to foreclose that right." *Republic Molding*, 319 F.2d at 350.  As described above, the issue and evidence of unclean hands is inextricably bound up with the issues and facts that will be set forth in Pom's affirmative claim for both liability and damages.

## IX.   ATTORNEYS' FEES [L.R. 16-4.5]

Depending upon the proof at trial, Minute Maid reserves the right to seek an award of its costs, disbursements, and attorneys' fees in this action.

## X.   ABANDONMENT OF ISSUES [L.R. 16-4.6]

Minute Maid does not intend to pursue the following affirmative defenses at trial:  statute of limitations, laches, waiver, First Amendment, and puffing.  In addition, as it previously informed the Court, Minute Maid does not intend to prove at trial that Pom has unclean hands based upon Pom's years-long failure to disclose the fact that its pomegranate juice products are reconstituted from concentrate.

Many of the defenses that Minute Maid listed as "affirmative defenses" in its Answer in fact go to the issue of whether Pom has met its burden of proof on its affirmative claims.  (*E.g.*, failure to state a cause of action; conduct not unlawful; conduct not likely to deceive customers; lack of awareness; lack of reliance; lack of materiality; lack of causation; lack of damage; good faith; lack of intent; justification and excuse; uncertain damages; unjust enrichment; no right to restitution; unconstitutionality of monetary relief; failure to mitigate; setoff; damages caused by others; no right to punitive damages; no right to attorneys' fees; no right to injunctive relief; adequate remedy at law.)  Minute Maid does not presently consider these defenses to be separate "affirmative defenses," but it intends to pursue these defenses at trial.  Minute Maid's arguments in support of these defenses are incorporated in the discussion above.

1 Dated:  February 8, 2016   PATTERSON BELKNAP WEBB & TYLER LLP

2

3          By: */s Steven A. Zalesin*
             Steven A. Zalesin

4

5          1133 Avenue of the Americas
          New York, New York 10036

6

7          Attorneys for Defendant
          THE COCA-COLA COMPANY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEM. OF CONTENTIONS OF LAW AND FACT
CASE NO. 2:08-cv-06237-SJO-MRW